No. 22-35656

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

EL PAPEL, LLC and BERMAN 2, LLC,

Plaintiffs – Appellants,

v.

ROBERT W. FERGUSON, in his official capacity as Attorney General of the State of Washington; BRUCE HARRELL, in his official capacity as the Mayor of the City of Seattle; and THE CITY OF SEATTLE, a municipal corporation,

Defendants – Appellees.

---

On Appeal from the United States District Court
for the Western District of Washington
Honorable Richard A. Jones, District Judge
Case No. 2:20-cv-01323-RAJ-JRC

---

## APPELLANTS' OPENING BRIEF

---

JONATHAN M. HOUGHTON
Pacific Legal Foundation
3100 Clarendon Blvd.,
  Suite 1000
Arlington, VA 22201
Telephone: (916) 503-9041
JHoughton@pacificlegal.org

KATHRYN D. VALOIS
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL
33410
Telephone: (561) 691-5000
KValois@pacificlegal.org

ETHAN W. BLEVINS
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
EBlevins@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

## CORPORATE DISCLOSURE

Plaintiff Appellant El Papel, LLC is a limited liability corporation organized under the laws of the State of Washington. It has no parent corporation and issues no shares. Plaintiff Appellant Berman 2, LLC is a limited liability corporation organized under the laws of the State of Washington. It has no parent corporation and issues no shares.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE ............................................................ i

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION ......................................................................1

JURISDICTIONAL STATEMENT ....................................................5

ISSUE PRESENTED ...................................................................6

STATEMENT OF THE CASE .........................................................6

   A.  Appellants ....................................................................6

   B.  Respondents and the Eviction Bans ................................8

   C.  Procedural History ......................................................11

SUMMARY OF THE ARGUMENT ..................................................13

STANDARD OF REVIEW ...........................................................14

ARGUMENT ...........................................................................15

   I.  The Law of Physical Takings .........................................16

   II.  The Respondents' Eviction Bans Physically Took the Appellants' Private Property ........................................................21

      A.  The Physical Taking Was the Equivalent of an Easement.......................27

   III.  *Yee v. City of Escondido* Does Not Apply ......................30

      A.  The Ninth Circuit Should Follow the Eighth Circuit ..............31

      B.  *Yee* Is a Rent Control Case, Not a Physical Takings Case, and Its Arguments Do Not Apply Here.......................33

         1.  Renting Does Not Waive a Physical Takings Claim..............35

         2.  Temporary Physical Takings Are Still Takings ...................40

         3.  A Partial Physical Taking Is Still a Taking ...........................42

CONCLUSION.........................................................................48

STATEMENT OF RELATED CASES ...............................................48

CERTIFICATE OF SERVICE ........................................................49

CERTIFICATE OF COMPLIANCE FOR BRIEFS ...............................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Agric. Rsch. & Tech. Grp., Inc.*,
916 F.2d 528 (9th Cir. 1990) ..............................................................14

*Alabama Association of Realtors v. HHS*,
141 S. Ct. 2485 (2021)......................................................2–4, 24

*Arkansas Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012)........................................................38, 41

*Armstrong v. United States*,
364 U.S. 40 (1960)........................................................1, 26

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021).........................................................*passim*

*City of Olympia v. Palzer*,
107 Wash. 2d 225 (1986).........................................................28

*F.C.C. v. Fla. Power Corp.*,
480 U.S. 245 (1987)........................................................23, 34–35, 37

*First English Evangelical Lutheran Church of Glendale
v. Los Angeles Cnty.*,
482 U.S. 304 (1987)........................................................*passim*

*FPA Crescent Assocs., LLC v. Jamie's, LLC*,
190 Wash. App. 666 (2015)................................................21

*Heights Apartments, LLC v. Walz*,
30 F.4th 720 (8th Cir. 2022), *denying rehearing and
rehearing en banc*, 39 F.4th 479.............................................3, 31–33

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015).........................................................*passim*

*Int'l Paper Co. v. United States*,
282 U.S. 399 (1931).........................................................16

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979).........................................................19, 21, 29

*Kimball Laundry Co. v. United States*,
338 U.S. 1 (1949).........................................................15

*Knick v. Twp. of Scott, Pennsylvania*,
  139 S. Ct. 2162 (2019) ...................................................................17

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) .......................................................................38

*Lake Arrowhead Cmty. Club, Inc. v. Looney*,
  112 Wash. 2d 288 (1989) ...............................................................28

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005) ...........................................................17, 26, 45

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ................................................................*passim*

*Lucas v. S.C. Coastal Council*,
  505 U.S. 1003 (1992) .....................................................................38

*Lynch v. Household Fin. Corp.*,
  405 U.S. 538 (1972) .......................................................................16

*Nollan v. Cal. Coastal Comm'n*,
  483 U.S. 825 (1987) .......................................................................21

*Oswalt v. Resolute Indus., Inc.*,
  642 F.3d 856 (9th Cir. 2011) .........................................................14

*Penn. Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ..................................................................26, 38

*Pennsylvania Coal Co. v. Mahon*,
  260 U.S. 393 (1922) ..................................................................17, 26

*Phillips v. Washington Legal Found.*,
  524 U.S. 156 (1998) .......................................................................17

*State ex rel. Shorett v. Blue Ridge Club*,
  22 Wash. 2d 487 (1945) .................................................................27

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002) ....................................................................4, 43

*United States v. Causby*,
  328 U.S. 256 (1946) ....................................................20, 29, 44, 46

*United States v. General Motors Corp.*,
  323 U.S. 373 (1945) ................................................................*passim*

*United States v. Petty Motor Co.*,
  327 U.S. 372 (1946) .......................................................................16

iv

*United States v. Pewee Coal Co.*,
   341 U.S. 114 (1951).........................................................................................15

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021).....................................................................................13

*Yee v. Escondido*,
   503 U.S. 519 (1992)..................................................................................*passim*

**Statutes**

28 U.S.C. § 1291 ...................................................................................................5

28 U.S.C. § 1331 ...................................................................................................5

42 U.S.C. § 1983 ...................................................................................................5

Wash. Rev. Code § 59.12.030...............................................................................22

**Rules of Court**

Fed. R. App. P. 4(a)(1)(A) ....................................................................................6

Fed. R. Civ. P. 12(b)(6).......................................................................................32

Fed. R. Civ. P. 56 ................................................................................................14

**Other Authorities**

Merrill, Thomas W., *Property and the Right to Exclude*, 77 Neb. L.
   Rev. 730 (1998) ...............................................................................................18

## INTRODUCTION

This appeal raises a constitutional challenge to eviction moratoriums enacted in response to the COVID-19 pandemic by Washington State and the City of Seattle in early 2020. Tantamount to a forced occupation, these eviction bans commandeered private property for public use and were a physical taking contrary to the Fifth Amendment.

When the pandemic struck, Respondent Robert Ferguson, as Attorney General of the State of Washington, Respondent the City of Seattle, and Jenny Durkan as Mayor of Seattle, each hoped to reduce the spread of COVID-19 by allowing tenants to self-isolate in their current residences regardless of any individual circumstances. The eviction bans that executed this policy gave possession to all occupants of rental properties irrespective of whether they paid rent, complied with the lease, or even had a lease. The bans took the right to possess and exclude away from property owners and were a governmental choice to shift the cost of pandemic housing from the public to private owners. While Respondents may have been entitled to make that choice because they believed that it would have a public benefit, the Fifth Amendment requires the costs to be shared by all. *Armstrong v. United States*, 364 U.S. 40, 49 (1960) (the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

1

Appellants El Papel, LLC and Berman 2, LLC are rental housing providers. Both had tenants that would have been evicted under normal circumstances because of material lease violations. But Respondents' eviction bans rendered that a legal impossibility.

Thus, the Appellants were compelled to shoulder the costs of a public benefit. They could not possess what they owned, nor exclude those who were not entitled to be there. Appellants were also left with the burdens of paying for a mortgage, utilities, and taxes, and maintaining the premises, all for the benefit of those who could violate the lease without fear of eviction.

The Respondents' eviction bans were therefore the physical taking of an easement and contrary to the Fifth Amendment. *Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015) ("the Government's formal demand that the [owners] turn over [their private property] without charge, for the Government's control and use, is of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine") (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), internal quotations omitted).

As the Supreme Court recently instructed in *Alabama Association of Realtors v. HHS*, "preventing [owners] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to

2

exclude." 141 S. Ct. 2485, 2489 (2021) (per curiam) (citing *Loretto*, 458 U.S. at 435).

In deciding to the contrary and dismissing the Appellants' takings claim, the district court erred. It made a singular misstep that had cascading consequences; wrongly conflating distinct Supreme Court doctrines and discarding the physical takings cases that did apply, *e.g.*, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), in favor of a rent control case that didn't. *Yee v. Escondido*, 503 U.S. 519 (1992).

This approach was contrary to the only Circuit Court decision to decide this issue in this context. *Heights Apartments, LLC v. Walz* pertained to a substantially similar eviction ban that was also enacted in response to COVID-19. 30 F.4th 720 (8th Cir. 2022), *denying rehearing and rehearing en banc*, 39 F.4th 479. The Eighth Circuit explicitly held that: "*Cedar Point Nursery* controls here and *Yee*, which the [government] Defendants rely on, is distinguishable." *Id.* at 733. This Court should decide the same.

The district court's misapplication of *Yee* also created further contradictions. For example, it cited *Yee* for the proposition that the Appellants' voluntary decision to rent precluded a physical taking. But the act of signing a lease with a tenant does not waive future constitutional claims against the government. Therefore, the decision is directly contrary to the Supreme Court's determination that "[a]

3

landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Loretto*, 458 U.S. at 439 n.17.

The district court also relied upon the fact that the Respondents' eviction bans were only temporary. But the duration is irrelevant. "A physical appropriation is a taking whether it is permanent or temporary." *Cedar Point Nursery*, 141 S. Ct. at 2074.

Furthermore, in denying a physical takings claim because the eviction bans were a forced occupation in some circumstances (i.e., when the tenant failed to pay rent) but not all circumstances (i.e., eviction was allowed if the tenant caused a significant and immediate safety risk), the court disavowed partial physical takings. But a partial taking of the right to possess and exclude is still a categorical physical taking. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (the government "has a categorical duty to compensate the former owner regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof"). And as applied to the Appellants under the facts and circumstances here, the eviction ban was effective.

The sum of the above parts, the district court's determination was also contrary to the recent determination in *Alabama Association of Realtors*, 141 S. Ct. at 2489, that "preventing [owners] from evicting tenants who breach their leases

4

intrudes on one of the most fundamental elements of property ownership—the right to exclude."

With respect to these cases, the error here does not stem from any contradiction between *Yee* on one side and *Loretto*, *Cedar Point*, etc., on the other. Each case has its own place in the takings doctrine and each applies to the particular facts and circumstances for which it was designed. Rather, the district court erred in applying the teachings of a facial rent control case, *Yee*, to this as-applied physical takings case, a context in which it does not belong.

The district court's decision dismissing Appellants' physical takings claim should be reversed. Respondents' eviction bans caused the physical taking of an easement without just compensation and were contrary to the Fifth Amendment.

## JURISDICTIONAL STATEMENT

1.    Statutory basis of the district court's original subject matter jurisdiction: 28 U.S.C. § 1331 (civil action arising under Constitution or federal law) and 42 U.S.C. § 1983 (federal civil rights).

2.    The district court entered Judgment in favor of all defendants and against plaintiffs and dismissed plaintiffs' causes of action with prejudice. Excerpts of Record ("ER") 004. Statutory basis of appellate jurisdiction: 28 U.S.C. § 1291 (final decisions of district courts).

3.     Date of entry of the Judgment: July 20, 2022. 1-ER-004. Date the district court entered Judgment: July 20, 2022. 1-ER-004. Date of the filing of the Notice of Appeal: August 15, 2022. 6-ER-1413–14. Timeliness of the appeal: Fed. R. App. P. 4(a)(1)(A) (30 days after entry of judgment in civil cases).

## ISSUE PRESENTED

This appeal presents a question of the application of the Fifth Amendment. One question of law is presented for *de novo* review:

1.     Were the eviction moratoriums enacted by Washington State and the City of Seattle in early 2020 in response to the COVID-19 pandemic a physical taking contrary to the Fifth Amendment?

## STATEMENT OF THE CASE

In March 2020, Respondent Ferguson and Respondents the City of Seattle and Mayor Durkan (now Mayor Harrell) (collectively referred to hereinafter as "Respondents") were responsible for laws that vested their respective governments with the right to possess and exclude for Appellants' rental properties. This uncompensated physical taking violated the Fifth Amendment's Takings Clause.

A. Appellants

Appellant El Papel, LLC ("El Papel") owns two rental properties in Seattle. 6-ER-1197–98, 5-ER-1194–95. The larger of the two is located at 1340 15th Avenue South in Seattle (6-ER-1197–98, 5-ER-1194–95) and is a 25-unit building of micro-

apartments. After the enactment of Respondents' eviction bans, two of the tenants in the building defaulted on their rent. 6-ER-1197–98, 5-ER-1194–95. Rent was not paid by either of these tenants for an extended period. 6-ER-1197–98, 5-ER-1194–95.

One tenant, who was employed throughout most of the pandemic, had a monthly rent of $750 and owed $4,235 as of April 7, 2021. 6-ER-1198, 5-ER-1195. The other tenant, with a monthly rent of $925, owed $2,050 as of April 7, 2021. 6-ER-1198, 5-ER-1195. Absent the Respondents' eviction bans, El Papel would have initiated eviction proceedings against the defaulted tenants. 6-ER-1198, 5-ER-1195.

El Papel's second property is a townhouse located at 1343 Sander Road in Seattle. 6-ER-1198. On July 31, 2020, the fixed term lease of the two tenants occupying the townhouse expired. However, the tenants held over and illegally occupied the residence until December 2020. 6-ER-1198. During this time, the former tenants remained in the townhouse without a valid lease and without ever paying rent. 6-ER-1198. Upon their withdrawal from the townhome, the outstanding rent due was $3,786.21. 6-ER-1198.

Appellant Berman 2, LLC ("Berman") owns and manages a residential building with 24 rental units located in Seattle. 5-ER-1191–93. Berman rents these units to low-income tenants, many of whom were previously homeless, at below-

7

market rates. 5-ER-1192. Berman relies on the eviction process to keep these units safe and comfortable for the tenants and to keep rental rates low. 5-ER-1192.

After Respondents' eviction regulations, tenants occupying nine of Berman's rental units defaulted in rent and declined to pay. 5-ER-1192. The total rent owed for these nine defaulted tenants was $16,479 as of April 8, 2021. 5-ER-1192. Berman had attempted to negotiate with its non-paying tenants by phone, text, and in-person, but they ignored him. 5-ER-1192. Berman also indicated that it was willing to accept partial payment or repayment; however, the tenants refused to respond and continued to occupy Berman's rental units in violation of their lease agreements. 5-ER-1192. Berman also observed an increase in drug activity and non-leased occupants living on the property without consent. 5-ER-1192. But for Respondents' eviction bans, Berman would have initiated eviction proceedings against the tenants in default. 5-ER-1192.

## B. Respondents and the Eviction Bans

In February 2020, Washington Governor Jay Inslee proclaimed a state of emergency in response to the COVID-19 pandemic. 4-ER-644–56. Washington initiated several preventative measures, such as prohibiting large or public gatherings and closing schools. 4-ER-647. The State also issued Proclamation 20-19, which prohibited unlawful detainer actions for the non-payment of rent, with an exception for those cases where it was necessary for health and safety reasons. 6-

8

ER-1343–46. Over the course of the pandemic, the eviction ban was extended several times (6-ER-1355, 6-ER-1361) and upon each renewal, there were minor changes to the language. 6-ER-1355, 6-ER-1361.

In its final form, the State's eviction ban read as follows:

> Landlords, property owners, and property managers are prohibited from serving or enforcing, or threatening to serve or enforce, any notice requiring a resident to vacate any dwelling or parcel of land occupied as a dwelling, including but not limited to an eviction notice, notice to pay or vacate, notice of unlawful detainer, notice of termination of rental, or notice to comply or vacate. This prohibition applies to tenancies or other housing arrangements that have expired or will expire during the effective period of this Proclamation.

6-ER-1351.

There were a few exceptions. An owner could take possession as "necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident." 6-ER-1351. A rental property owner could also seek eviction if they gave 60-day notice of their intent to either sell the property or personally occupy it as a primary residence. 6-ER-1351. Otherwise, rental property owners who violated Washington's ban faced criminal penalties. 6-ER-1354.

Washington's eviction ban was rescinded on June 30, 2021. 6-ER-1294. However, anticipating the implementation of a new tenant protection bill, evictions for unpaid rent accruing during certain periods of time continued to be prohibited until implementation of the new legislation. 6-ER-1295.

Respondent Ferguson was responsible for the implementation and enforcement of the State's eviction ban. 6-ER-1308.

With respect to Respondent City of Seattle, in March 2020, Seattle Mayor Jenny Durkan, the predecessor to Respondent Bruce Harrell, issued a proclamation of civil emergency in response to COVID-19. 6-ER-1372–76. Soon thereafter, Seattle issued successive orders preventing rental property owners from initiating any unlawful detainer actions or otherwise evicting tenants unless the eviction was in response to tenant behavior that was an imminent threat to health or safety. 6-ER-1367–79. The Seattle Ordinance stated:

> [A] residential landlord shall not initiate an unlawful detainer action, issue a notice of termination, or otherwise act on any termination notice, including any action or notice related to a rental agreement that has expired or will expire during the effective date of this Emergency Order, unless … [it] is due to actions by the tenant constituting an imminent threat to the health or safety of neighbors, the landlord, or the tenant's or landlord's household members.
>
> ***
>
> It shall be a defense to any eviction action that the eviction of the tenant will occur during the moratorium, unless the eviction action is due to actions by the tenant constituting an imminent threat to the health or safety of neighbors, the landlord, or the tenant's or landlord's household members.

6-ER-1370. After several extensions, the eviction ban terminated on September 30, 2021. 6-ER-1302.

10

The Seattle City Council also passed its own separate eviction ban. 6-ER-1380. The Council's ordinance created an affirmative defense to eviction for the six months following the end of the Mayor's ban and if the reason for eviction was either: (1) the failure to comply with a 14-day notice to pay rent or vacate for rent due during the Mayor's ban or six months after; or (2) the tenant "habitually fails to pay rent resulting in four or more pay-or-vacate notices in a 12-month period." 6-ER-1399.

To rely on the affirmative defense, a tenant needed only to submit a declaration that the tenant was suffering financial hardship. 6-ER-1399. The ban did not require the financial hardship to be related to the pandemic. 6-ER-1399.

C. Procedural History

On September 3, 2020, Appellants filed their Complaint for Declaratory and Injunctive Relief in the Western District of Washington. 6-ER-1325–42. Based upon the above, they alleged, inter alia, that the Respondents' actions were an unconstitutional impairment of contract and an unconstitutional taking of their rental properties.

On September 21, 2020, Appellants sought a Preliminary Injunction (Docket No. 16), which was opposed by Respondents. Docket Nos. 27–28. On December 2, 2020, U.S. Magistrate Judge J. Richard Creatura issued a Report and

11

Recommendation denying Appellants' motion. Docket No. 63. On January 8, 2021, U.S. District Judge Richard A. Jones adopted the Report. Docket No. 78.

On January 12, 2021, Appellants filed their First Amended Complaint for Declaratory and Injunctive Relief (corrected). 6-ER-1305–24. Substantially similar to the initial Complaint, it alleged that the actions of Respondents were an unconstitutional impairment of contract and an unconstitutional taking of Appellants' rental properties.

On April 9, 2021, Appellants filed a Motion for Summary Judgment. Docket No. 93. The Respondents cross-filed on May 7, 2021. Docket No. 104. Each was opposed by the movant's adversary.

On September 15, 2021, Judge Creatura again issued a Report and Recommendation denying Appellants' motion and granting Respondents' cross-motion, recommending that all claims be dismissed with prejudice. 1-ER-0005–36.

On March 9, 2022, Respondent Seattle filed a Supplemental Motion for Summary Judgment on the ground of mootness. Docket No. 162. It was opposed by Appellants.

On July 20, 2022, Judge Jones adopted the Report and Recommendation and granted the Supplemental Motion for Summary Judgment filed by Respondent Seattle. 1-ER-0002–04.

Appellants' Notice of Appeal was timely filed on August 15, 2022. 6-ER-1413–14.

Appellants note that although the Respondents' eviction bans have been rescinded, the Appellants maintain a nominal damages claim with respect to the unconstitutional physical taking of their real property. 6-ER-1322, 1-ER-0032. Accordingly, Appellants have Article III standing with respect to the instant appeal. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (holding that "for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right").

## SUMMARY OF THE ARGUMENT

The Argument first summarizes the Takings Clause of the Fifth Amendment and identifies the facts and circumstances under which a government regulation has gone "too far" and constitutes an unconstitutional taking. To that end, the government's uncompensated taking of the right to possess and exclude is a physical taking. Physical takings are categorically unconstitutional, without regard to the public purpose that enabled the regulation or any individual facts and circumstances. The eviction moratoriums enacted by the Respondents were a physical taking of the Appellants' respective rental properties contrary to the Fifth Amendment:

1.  Appellants are rental property owners that were subject to tenants that had violated the material terms of their leases and/or held-over after the expiration

of their leases. Appellants had the statutory and common law right to evict the defaulted tenants.

2. In order to create public pandemic housing, the Respondents' eviction moratoriums eliminated actions for unlawful detainer and took the Appellants' right to possess and exclude. The Respondents granted possession to tenants regardless of Appellants' consent, the payment of rent, the compliance with the lease, or the existence of a valid lease. The Appellants could not possess what they owned and could not exclude those that had no right to be there.

3. The Respondents' eviction bans were a forced occupation of Appellants' rental property and an uncompensated physical taking contrary to the Fifth Amendment.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's dismissal of the plaintiff's cause of action under Fed. R. Civ. P. 56. *See, e.g.*, *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011) ("We review de novo the district court's grant of summary judgment. We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law."); *In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 533 (9th Cir. 1990) ("This court reviews a district court's rulings on summary judgment motions *de novo*.").

**ARGUMENT**

Physical takings cases are "special." *Loretto*, 458 U.S. at 432. This is because "the right to exclude is [not] an empty formality, subject to modification at the government's pleasure. On the contrary, it is a fundamental element of the property right, that cannot be balanced away." *Cedar Point Nursery*, 141 S. Ct. at 2077–78.

In this case, the Respondents' eviction bans were a physical occupation of Appellants' rental properties in the name of public pandemic housing. Being an occupant became the only criteria for possession and the normal distinctions between lawful tenants, occupants in default, and illegal squatters disappeared.

Consequently, Appellants were forced to house multiple occupants that refused to pay rent or who did not have an existing lease, all of whom would normally be subject to eviction. Appellants could not possess what they owned and could not exclude those with no right to possession. Yet they were still burdened with the financial and physical obligation to maintain their real properties for the benefit of the public. Thus, the effect of Respondents' eviction bans was no different than the government physically invading and occupying the rental property itself.[1]

---

[1] *See, e.g.*, *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (government liable for a taking when it "possessed and operated" the property of a coal mining company for five-and-a-half months in order to prevent a nationwide miners' strike in the middle of World War II); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 3–4, 7, 16 (1949) (government commandeered laundry plant for less than four years, was required to pay rental value for occupied period of time plus depreciation and value

The regulations were a physical taking that were the equivalent of an easement and contrary to the Fifth Amendment.

## I.    The Law of Physical Takings

Property ownership is grounded in certain inherent and well-established rights: the right to possess what you own, the right to use it for your benefit, and the right to dispose of it as you wish. *Gen. Motors Corp.*, 323 U.S. at 378. These property rights have always been given vigilant protection within American jurisprudence because "the protection of private property is indispensable to the promotion of individual freedom" and "empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Cedar Point Nursery*, 141 S. Ct. at 2071; *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 544, 552 (1972) (property rights are "an essential pre-condition to the realization of other basic civil rights and liberties which the [Fourteenth] Amendment was intended to guarantee.… [A] fundamental interdependence exists between the personal right to

---

of lost trade routes); *United States v. Petty Motor Co*., 327 U.S. 372, 374, 380–81 (1946) (government compensated leaseholders for the temporary taking of their leaseholds for period of over two-and-a-half years); *United States v. General Motors Corp*., 323 U.S. 373, 375 (1945) (government required to pay short-term rental value for taking portion of a building that had been leased by an automobile parts company for a period of one year); *Int'l Paper Co. v. United States*, 282 U.S. 399, 407–08 (1931) (government order authorizing a third party to draw the whole of a river's water flow for a period of ten months effected a physical taking of a paper mill's water rights requiring just compensation).

16

liberty and the personal right in property. Neither could have meaning without the other.").

The Takings Clause of the Fifth Amendment thus imposes two conditions upon the government. First, a taking must be for a public use. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). And second, a taking of property for public use must be accompanied by just compensation. *Id.* If it is not, the taking is unconstitutional. *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2168 (2019). Such claims are actionable against state and local governments via the Fourteenth Amendment. *Phillips v. Washington Legal Found.*, 524 U.S. 156, 163–64 (1998).

The severity of the burden upon property rights determines whether the regulation has gone "too far" and crossed from constitutional to unconstitutional action. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("the general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking"); *Lingle*, 544 U.S. at 539 (The "touchstone" of the takings inquiry is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights.").

When the governmental action results in the uncompensated taking of the right to possess and exclude, it is a physical taking. *See Loretto*, 458 U.S. at 432–33.

Physical takings are "perhaps the most serious form of invasion of an owner's property interests." *Id.* at 435. It violates "one of the most treasured rights of property ownership" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Cedar Point Nursery*, 141 S. Ct. at 2072. And the impact is such that "the government does not simply take a single strand from the bundle of property rights: it chops through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435; Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 730 (1998) ("Give someone the right to exclude others from a valued resource, i.e., a resource that is scarce relative to the human demand for it, and you give them property. Deny someone the exclusion right and they do not have property.").

Consequently, physical takings are "per se" or "categorical" takings. *Cedar Point Nursery*, 141 S. Ct. at 2072 ("whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred, and *Penn Central* has no place"); *Horne*, 576 U.S. at 360 (in *Loretto*, "the Court reaffirmed the rule that a physical appropriation of property gave rise to a per se taking, without regard to other factors"); *Loretto*, 458 U.S. at 434–35 ("in short, when the character of the governmental action is a permanent physical occupation of property, our cases

18

uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner"); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) (acknowledged property rights create "expectancies embodied in the concept of 'property'—expectancies that, if sufficiently important, the Government must condemn and pay for before it takes over the management of the landowner's property. In this case, we hold that the right to exclude, so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation.").

Liability is therefore based upon the regulatory act itself regardless of the reason for that act or the underlying facts and circumstances. *Cedar Point Nursery*, 141 S. Ct. at 2074 ("[G]overnment-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation.").

That the taking occurred pursuant to a valid public purpose does not relieve the government of constitutional liability. *Loretto*, 458 U.S. at 434–35 (a physical taking is a categorical deprivation "without regard to whether the action achieves an important public benefit").

It is likewise irrelevant whether the physical taking arose from a regulation or was the product of a direct occupation. *Cedar Point Nursery*, 141 S. Ct. at 2072

19

("Government action that physically appropriates property is no less a physical taking because it arises from a regulation.").

A physical taking can be either permanent or temporary. *See id.* at 2074 ("[A] physical appropriation is a taking whether it is permanent or temporary. … The duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation." (citations omitted)); *see First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 318 (1987) ("temporary takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation"). It may be only an intermittent occupation. *Cedar Point Nursery*, 141 S. Ct. at 2075 ("we have recognized that physical invasions constitute takings even if they are intermittent as opposed to continuous").

Partial physical takings are also actionable. *See Cedar Point Nursery*, 141 S. Ct. at 2069 (a physical taking granting possession only to union organizers and only for certain time periods); *Loretto*, 458 U.S. at 421–22 (a physical taking of a portion of the exterior by cable companies); *United States v. Causby*, 328 U.S. 256, 258 (1946) (a physical taking of a portion of the owner's airspace with respect to military aircraft).

Lastly, the government does not need to invade property itself. A physical taking also occurs when the government authorizes the public or third parties to

invade private property. As *Loretto* explained, a physical taking is "without regard to whether the State, or instead a party authorized by the State, is the occupant." 458 U.S. at 432 n.9; *Cedar Point Nursery*, 141 S. Ct. at 2072 (the essential question is "whether the government has physically taken property for itself or someone else— by whatever means—or has instead restricted a property owner's ability to use his own property"); *Kaiser Aetna*, 444 U.S. at 179–80 (pertaining to the physical taking of a navigational servitude on behalf of the public); *see also Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 833 (1987) (observing that a taking by physical occupation would exist if the government authorized individuals to traverse private land).

## II.   The Respondents' Eviction Bans Physically Took the Appellants' Private Property

Prior to the eviction bans, the Appellants had the common law and statutory right to possess and exclude.

Under Washington common law, a rental property owner has the fundamental right to take possession of his or her property and to exclude defaulted tenants. *See, e.g.*, *FPA Crescent Assocs., LLC v. Jamie's, LLC*, 190 Wash. App. 666, 675 (2015) ("The unlawful detainer statute is in derogation of common law. The action of unlawful detainer is the legal substitute for the common-law right of personal re-entry for breach. The statutory action relieves a landlord of having to file an expensive and lengthy common law action of ejectment."). Washington's unlawful

detainer statute codified and streamlined the common law right. Wash. Rev. Code § 59.12.030.

Appellants El Papel and Berman 2 were both subject to occupants that could have been evicted pursuant to Washington's law of unlawful detainer. El Papel had several tenants that refused to pay rent and tenants that refused to vacate despite not having an existing lease. 6-ER-1197–98, 5-ER-1194–95. Berman 2 was also forced to carry the cost of numerous tenants that refused to pay rent. 5-ER-1191–93. Both El Papel and Berman 2 would have filed unlawful detainer actions but for the Respondents' eviction bans. 6-ER-1197–98, 5-ER-1194–95, 5-ER-1191–93.

But the Respondents' eviction bans then abrogated actions for unlawful detainer and took title to and control of the Appellants' right to possess and exclude. 6-ER-1347, 6-ER-1367. From that point on, it was the Respondents that decided who could possess Appellants' rental properties, who could be excluded from them, under what circumstances, and for how long. The property owner's consent, the lease (or even the existence of a lease), the individual facts and circumstances, and the law of detainer were all rendered immaterial.

Thus, Appellants were excluded from their own property and forced to house occupants who would have otherwise been subject to eviction. The Respondents' eviction bans were a forced physical occupation that took Appellants' fundamental right to possess and exclude and transformed the defaulted tenants into "interlopers

with a government license." *See F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 253 (1987); *id.* at 252 ("This element of required acquiescence is at the heart of the concept of occupation."). The defaulted tenants could have continued in hostile possession against Appellants' will interminably, subject only to the Respondents' unilateral terms and conditions. *Gen. Motors Corp.*, 323 U.S. at 378 ("When the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing, which we denominate ownership.").

The resulting impact upon Appellants was not far removed from the physical taking in *Loretto*, where the Court found that the rights to possess, use, and dispose of property were effectively destroyed. *Loretto*, 458 U.S. at 435–36.

First, in *Loretto* "the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space." *Id.* at 435. The Respondents' eviction bans achieved a similar result.

Second, as *Loretto* discussed:

the permanent physical occupation of property forever denies the owner any power to control the use of the property; he not only cannot exclude others but can make no nonpossessory use of the property. Although deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking, it is clearly relevant.

*Id.* at 436.

In this case, Appellants could not freely or profitably use their property because they were beholden to occupants that could not be forced to leave and whose possession was not conditioned upon the payment of rent. *See also Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 ("the moratorium has put the applicants, along with millions of rental property owners across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery").

Lastly, with respect to the right to dispose of the property, *Loretto* said "even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property." *Loretto*, 458 U.S. at 436. For Appellants, no reasonable purchaser would have wanted to buy a rental property when there was no legal avenue to exclude occupants that violated the lease. *See Horne*, 576 U.S. at 364 (finding a taking when the owners "lose any right to control [the] disposition [of their property]").

The fact that the Appellants would eventually get their fundamental property rights back does not change the result. A physical taking is categorical whether the government's physical interference appropriated a fee simple or for a term of months or years. *General Motors*, 323 U.S. at 378. Although the owner in the latter instance may still hold some valuable rights in the land, those rights are irreparably harmed

24

because the owner's rights are more limited and diminished than they were before the intrusion. *Id.* The Takings Clause requires just compensation in both circumstances. *Id.* Thus, as the Supreme Court decided in *Horne*:

> when there has been a physical appropriation, we do not ask whether it deprives the owner of all economically valuable use of the item taken. The fact that the [owners] retain a contingent interest of indeterminate value does not mean there has been no physical taking, particularly since the value of the interest depends on the discretion of the taker, and may be worthless[.]

576 U.S. at 352; *Loretto*, 458 U.S. at 436 ("such an occupation is qualitatively more severe than a regulation of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion").

The same is true here. The Appellants had no control over the timing, extent, or nature of the forced occupation of their rental properties. When the Appellants would get back their fundamental property rights—whether they would get back all of those rights or just some of them—and the value of what Appellants got back when the eviction bans were finally rescinded, were all indeterminate and at the discretion of the government.

Therefore, while it has been frequently stated that "the government does not have unlimited power to redefine property rights," that is exactly what happened here. *Loretto*, 458 U.S. at 439 (citing *Webb's Fabulous Pharmacies, Inc. v.*

*Beckwith*, 449 U.S. 155, 164 (1980) ("a State, by *ipse dixit*, may not transform private property into public property without compensation")).

The public purpose of stemming the tide of COVID-19 doesn't transform this categorical physical taking into a lesser intrusion. *See Lingle*, 544 U.S. at 536–37 ("As its text makes plain, the Takings Clause does not prohibit the taking of private property, but instead places a condition on the exercise of that power. In other words, it is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." (cleaned up)). The constitutional issue is not whether Respondents had the police power authority to protect public health but rather who must bear the cost of those actions. *Penn. Coal Co.*, 260 U.S. at 416 ("We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."). Thus, by effecting a physical occupation of the Appellants' rental properties, the Respondents' ban is a per se taking. Protecting property owners from shouldering the burden of public benefits is exactly what the Fifth Amendment was designed to protect against. *Armstrong*, 364 U.S. at 49 (the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

In this case, the eviction bans favored occupants over owners and the Appellants, as disfavored rental property owners, were left to bear the public burden of the pandemic response. Therefore, the Respondents' eviction bans were an unconstitutional physical taking contrary to the Fifth Amendment.

A. The Physical Taking Was the Equivalent of an Easement

The eviction bans were the equivalent of the physical taking of an easement under Washington property law, defined as "a right to enter and use property for some specified purpose." *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wash. 2d 442, 458 (2010); *State ex rel. Shorett v. Blue Ridge Club*, 22 Wash. 2d 487, 494 (1945) ("an easement []is a privilege to use another's land in a certain manner which must originate by grant or its equivalent").

Here, the Respondents took control of the right to enter and use the Appellants' rental properties for the purpose of providing public pandemic housing and allowing the occupants to isolate and shelter in place during the pandemic. More severe than the categorical physical taking in *Cedar Point*, which only created a limited easement to "take access," 141 S. Ct. at 2074, the Respondents' easements granted full and complete possession to a third party irrespective of the facts and circumstances and forcibly excluded the owners of the real property itself.

The Respondents' eviction ban could also be viewed as a negative easement, to the extent that it precluded Appellants from taking possession and excluding those

27

occupants that had violated the material terms of their leases. *City of Olympia v. Palzer*, 107 Wash. 2d 225, 230 (1986) ("A negative easement has been defined as one the effect of which is to preclude the owner of the land subject to the easement from doing that which, if no easement existed, he would be entitled to do, or one which curtails the owner of the servient tenement in the exercise of some of his rights in respect of his estate in favor of the owner of the dominant tenement or tenements.").

In some respects, Respondents' ban could be viewed as an affirmative easement. It forced Appellants to maintain their rental properties for the benefit of a third party, while that third party was under no obligation to do anything in order to maintain possession. *See Lake Arrowhead Cmty. Club, Inc. v. Looney*, 112 Wash. 2d 288, 294 (1989) ("Along these same lines, the covenant in question qualifies as an *affirmative* easement, at least for purposes of RCW 84.64.460, because it creates additional obligations in respect of the estate of the owner of the servient tenement in favor of the owner of the dominant tenement or tenements.").

Regardless of the type of easement, Respondents commandeered a servitude in Appellants' properties in the name of the public good. *See Cedar Point Nursery*, 141 S. Ct. at 2073 ("Given the central importance to property ownership of the right to exclude, it comes as little surprise that the Court has long treated government-authorized physical invasions as takings requiring just compensation. The Court has

28

often described the property interest taken as a servitude or an easement."); *Kaiser Aetna*, 444 U.S. at 180 (finding that a navigational servitude was a physical taking); *Causby*, 328 U.S. at 267 (frequent, low-level flights were a physical taking and "a servitude has been imposed upon the land").

But the exact classification of state property right is less important than the result. As *Cedar Point* explained, the government "cannot absolve itself of takings liability by appropriating the [owner's] right to exclude in a form that is a slight mismatch from state easement law. Under the Constitution, property rights cannot be so easily manipulated." *Cedar Point Nursery*, 141 S. Ct at 2076. Thus, "we never paused to consider whether the physical invasions at issue vested the intruders with formal easements according to the nuances of state property law (nor do we see how they could have). Instead, we followed our traditional rule: Because the government appropriated a right to invade, compensation was due. That same test governs here." *Id*.; *see also Horne*, 576 U.S. at 362 ("the Government's actual taking of possession and control of the reserve raisins gives rise to a taking as clearly as if the Government held full title and ownership, as it essentially does"); *Gen. Motors Corp.*, 323 U.S. at 378 ("When the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing, which we denominate ownership.").

29

Indeed, the Washington Supreme Court that the conveyance of the right to use and occupy property was the conveyance of a property interest regardless of the label. *Affiliated FM Ins. Co.*, 170 Wash. 2d at 458–59 ("In this case, we do not need to label SMS's property interest as a lease, a license, a profit, or an easement. It is plain that the City granted to SMS 'the concession right and privilege to maintain and exclusively operate the Monorail System including the facilities, personal property and equipment, together with the *right to use and occupy* the areas, described in this section.' These are property interests in using and possessing the Seattle Monorail.").

In light of the above, Respondents' eviction bans vested in the Respondents an easement with respect to Appellants' rental properties and were an uncompensated, unconstitutional physical taking contrary to the Fifth Amendment.

## III. *Yee v. City of Escondido* Does Not Apply

Relying upon *Yee v. City of Escondido*, the lower court dismissed Appellants' Fifth Amendment claim based upon the proposition that the voluntary act of leasing waived a future physical takings claim. 1-ER 0032–34. It also held that the Supreme Court's physical takings doctrine under *Cedar Point Nursery* did not apply. 1-ER-0034.

These determinations were in error. To hold that the forced occupation of Appellants' properties—by defaulted tenants that the Appellants wanted to evict—

30

was somehow a "voluntary" possession granted by the Appellants "is to use words in a manner that deprives them of all their ordinary meaning." *See Cedar Point Nursery*, 141 S. Ct. at 2075.

To this end, the lower court's decision was contrary to multiple cases, including the Eighth Circuit's *Heights Apartments, LLC*, and several Supreme Court physical takings cases including *Loretto*, *Horne*, and others. But the heart of the matter is that the *Yee* matter is a facial rent control case, not an as applied physical takings case and it was error for the lower court to shoehorn its discussions into a context for which they do not apply. One needs to look no further than the Supreme Court's pronouncement in *Alabama Association of Realtors* that "preventing [owners] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." 141 S. Ct. at 2489. The Court did not indicate that *Yee* applied, nor even mention it, which is a pointed omission that reveals much about *Yee*'s relevance.

Therefore, the district court's decision should be reversed.

A.    The Ninth Circuit Should Follow the Eighth Circuit

The sole Federal Circuit Court to address a physical takings claim resulting from an eviction moratorium was the Eighth Circuit's *Heights Apartments, LLC*. 30 F.4th 720. Like here, the State of Minnesota enacted an eviction ban prohibiting all residential evictions except for those cases where the tenants seriously endangered

the safety of other residents or significantly damaged the property, or if the owner's family needed to move into the unit. *Id.* at 724–25. A takings claim followed.

The government moved to dismiss the action under Fed. R. Civ. P. 12(b)(6). But the Eighth Circuit declined to do so, holding that the owners had sufficiently pled an unconstitutional physical taking. *Id.* at 733. More importantly, the Eighth Circuit also held that *Yee* did not apply to physical takings claims. As the court determined:

> Heights alleges the [Executive Orders] effectuated physical takings because they forced landlords to accept the physical occupation of their property regardless of whether tenants provided compensation. The [Government Respondents] contend that no physical taking has occurred because landlords were not deprived of their right to evict a tenant. Rather, they argue, the [Executive Orders] imposed only a restriction on when a landowner could evict a tenant, making it similar to *Yee v. City of Escondido*, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (finding a rent control ordinance was not a physical taking). Since the parties briefed this issue, the Supreme Court decided *Cedar Point Nursery*, which is instructive in this case.

> \*\*\*

> *Cedar Point Nursery* controls here and *Yee*, which the [Government] Defendants rely on, is distinguishable. The rent controls in *Yee* limited the amount of rent that could be charged and neither deprived landlords of their right to evict nor compelled landlords to continue leasing the property past the leases' termination. The landlords in *Yee* sought to exclude future or incoming tenants rather than existing tenants. Here, the [Executive Orders] forbade the nonrenewal and termination of ongoing leases, even after they had been materially violated, unless the tenants seriously endangered the safety of others or damaged property significantly. According to Heights' complaint, the [Executive Orders] "turned every lease in Minnesota into an indefinite lease, terminable only at the option of the tenant." Heights has sufficiently alleged that

32

the [Government Respondents] deprived Heights of its right to exclude existing tenants without compensation. The well-pleaded allegations are sufficient to give rise to a plausible

*Id.*

It is irrelevant that the *Heights* decision derived from a motion to dismiss. Either *Yee* applies to physical takings cases, or it doesn't; and the answer to that question does not change based upon the procedural posture. The Eighth Circuit's determination was correct and this Court should follow it.

B. *Yee* Is a Rent Control Case, Not a Physical Takings Case, and Its Arguments Do Not Apply Here

At issue in *Yee* was a local rent control ordinance that limited the rates that could be charged for the land beneath the tenants' mobile homes.[2] 503 U.S. 519. The Yees owned a mobile home park and filed suit alleging that the rent cap was a regulatory taking. The property owners in *Yee* did not object to a particular tenant's occupancy or allege that a tenant failed to pay the required rent, or that a tenant violated any of the material terms of the lease. Nor did the owners seek to evict anyone. The real dispute was about money and value and how the forced rent reduction damaged the property owners' bottom line.

---

[2] Despite their name, mobile homes are not particularly mobile. The cost of moving them is often substantial and mobile home tenants frequently add site specific improvements, such as a driveway, a porch, and landscaping. *Yee*, 503 U.S. at 523. This ties the mobile home tenants to the property in a way that the tenants in this case are not.

33

But undoing rent control is an uphill battle. Earlier cases significantly restrained an owner's ability to claim that such was an unconstitutional taking. *See, e.g.*, *Fla. Power Corp.*, 480 U.S. at 253; *Loretto*, 458 U.S. at 440. Consequently, the Yees did not contend that rent control devalued their land. Rather, they argued (as a facial claim, not an as applied claim, *Yee*, 503 U.S. at 534), that the regulation effected a physical taking of "a discrete interest in land—the right to occupy land indefinitely at a submarket rent." *Id.* at 527.

"At a submarket rent" was the key modifier. Yee was not objecting to physical possession, but rather possession at a specific and undesirable price point. If the price point increased, the owner's objections would have disappeared.

The Court held that the physical taking doctrine was not the correct theory to facially challenge a rent control regulation. *Id.* at 528. It also found that this transfer of wealth (such that the rent control regulation made the tenant's interest more valuable and the owner's interest less valuable) was not unconstitutional. *Id.* at 529.

"Ordinary rent control often transfers wealth from landlords to tenants by reducing the landlords' income and the tenants' monthly payments, although it does not cause a one-time transfer of value as occurs with mobile homes…. The mobile homeowner's ability to sell the mobile home at a premium may make this wealth transfer more *visible* than in the ordinary case, but the existence of the transfer in itself does not convert regulation into physical invasion." *Id.* at 529–30.

The *Yee* Court may have looked at things differently had the rent control statute precluded eviction. The Court noted: "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* at 528. "Had the city required such an occupation, of course, petitioners would have a right to compensation, and the city might then lack the power to condition petitioners' ability to run mobile home parks on their waiver of this right." *Id.* at 531–32; *see also Fla. Power Corp.*, 480 U.S. at 252 n.6 ("We do not decide today what the application of [*Loretto*] would be if the FCC in a future case required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements.").

But this was not the case in *Yee*. The owners were free to evict the tenant on numerous grounds. 503 U.S. at 524 (permissible reasons to evict included "the nonpayment of rent, the mobile homeowner's violation of law or park rules, and the park owner's desire to change the use of his land"); *id.* at 527–28 ("At least on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so.").

Accordingly, *Yee* is a facial rent control case that is inapplicable to Respondents' as-applied physical taking of Appellants' right to possess and exclude.

1. Renting Does Not Waive a Physical Takings Claim

The district court's determination was largely based upon the fact that Appellants had voluntarily rented to their tenants. According to the court's interpretation of *Yee*, that meant that the eviction bans here did not forcibly require the owners to submit to a physical occupation. 1-ER-0033. This conclusion was in error.

A tenant's occupancy is temporary and conditional, not permanent and absolute. If it weren't, it would not be a lease. Therefore, the act of allowing a tenant to take possession at lease signing does not waive future claims that a physical taking has occurred, nor insulate Respondents from the consequences of taking the owner's fundamental property rights.

To hold otherwise is to disregard the legal rights of the present for the legal rights of the past. In the past, at lease signing, Appellants had the right to possess and exclude. The Appellants could decide to rent and if a particular tenant violated the terms, the owner had the power and control to take possession and exclude the tenant.

But in the present, the Appellants' right to possess and exclude were appropriated by virtue of the Respondents' eviction bans. *See Horne*, 576 U.S. at 361–62 (the determinant for physical takings is control over the bundle of rights, not whether the government takes actual physical possession). The property owner's consent to the tenant's possession became an irrelevancy, replaced by Respondents'

unilateral determination as to who can possess a rental unit, when, and for how long. Case in point, both Appellants were forced to house multiple occupants that no longer had the right or the Appellants' consent to be there, but who were kept in possession solely because of the Respondents' eviction bans. 6-ER-1347, 6-ER-1367.

That is not "voluntary" renting but forced occupation. *Fla. Power Corp.*, 480 U.S. at 252 ("this element of required acquiescence is at the heart of the concept of occupation").

For these reasons, the lower court's reliance on voluntariness was directly contrary to the Supreme Court's determination in *Loretto*. 458 U.S. 419. In that case, the condemnor argued that the property owner voluntarily chose to use her building as a rental. Having made that choice, the physical attachment of the cable box was alleged to be a regulation of use, not a physical taking. *Id.* at 438–39.

The Court disagreed. A physical taking is a physical taking and the owner's choice to use her property in her chosen way did not waive the takings claim. *Id.* at 438–39. As the Court held, "[a] landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Id.* at 439 n.17.

The same legal principle applies here. That the Appellants voluntarily chose to utilize their property as rental units and, likewise, entered into lease agreements,

did not waive the right to just compensation for the Respondents' subsequent physical taking. *See also Horne*, 576 U.S. at 365 ("The Government contends that the reserve requirement is not a taking because raisin growers voluntarily choose to participate in the raisin market. According to the Government, if raisin growers don't like it, they can 'plant different crops,' or 'sell their raisin-variety grapes as table grapes or for use in juice or wine.' 'Let them sell wine' is probably not much more comforting to the raisin growers than similar retorts have been to others throughout history. In any event, the Government is wrong as a matter of law.… [P]roperty rights cannot be so easily manipulated.").

Notwithstanding the above, *Yee* is not at odds with *Loretto*, *Horne*, or the other physical takings cases. In the realm of regulatory takings, there are several different types, each with their own rules and legal standards. *Cf. Cedar Point Nursery*, 141 S. Ct. 2063 (2021) (physical takings); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) (complete loss of economic use); *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) (less than complete loss of economic use); *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012) (flooding); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) (exactions).

*Loretto* and *Cedar Point* are physical takings cases and directly apply to the circumstances here. Conversely, *Yee* is about rent control and is not pertinent to the taking of the right to possess and exclude. To that end, it is worth examining the

38

context in which the issue of "voluntariness" arose within *Yee*. It was referenced twice and both times, the focus of the Court's discussion was upon the rental price point, not physical possession.

As discussed above, the Yees alleged that the rent control regulations allowed mobile home tenants to occupy the land at a below market rent. *Yee*, 503 U.S. at 526. But when the property owner retains the right to exclude the tenant and take possession in the event of default, a price limitation is not a physical taking. Thus, the first time that the Court referenced "voluntariness" it said as follows:

> [Yee's] argument, while perhaps within the scope of our regulatory taking cases, cannot be squared easily with our cases on physical takings. The government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land.… But the Escondido rent control ordinance, even when considered in conjunction with the California Mobile Home Residency Law, authorizes no such thing. Petitioners voluntarily rented their land to mobile home owners. At least on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so.

*Id.* at 527–28.

The second reference to "voluntariness" was similar. Yee further complained that rent control precluded him from using price discrimination as a tool to choose one particular tenant over another, *i.e.*, favorable prospective tenants would be quoted favorable rents, while unfavorable prospective tenants would be quoted markedly higher rents. In sum and substance, Yee alleged that the inability to choose tenants via price gouging was a physical taking. *Id.* at 530–31 & n.*.

39

But, again, the Yees were not looking to evict, or retake possession, or exclude a defaulted tenant. The Yees were going to rent to someone, it was just a matter of who that someone would be. Such was the context of the Court's second discussion of "voluntariness." The Court said that the inability to employ price discrimination to choose specific tenants "does not convert regulation into the unwanted physical occupation of land. Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals." *Id.* at 531.

Therefore, the discussions of "voluntariness" in *Yee* do not apply to the context of this case, where the Appellant property owners were affirmatively stripped of the right to possess and exclude and were forced to submit to compelled occupation by multiple defaulted tenants, irrespective of Appellants' consent to continue renting, the expiration of the lease, or the tenant's compliance with the lease.

## 2. Temporary Physical Takings Are Still Takings

The lower court further misapplied *Yee* by placing emphasis on the fact that the Appellants only temporarily lost their right to possess and exclude. 1-ER-0033. However, that distinction is legally irrelevant.

In *Cedar Point*, the Supreme Court held that a temporary physical taking is on equal footing with a permanent one. The duration of the regulation impacts

damages, not constitutionality. *Cedar Point Nursery*, 141 S. Ct. at 2074 ("To begin with, we have held that a physical appropriation is a taking whether it is permanent or temporary. Our cases establish that compensation is mandated when a leasehold is taken and the government occupies property for its own purposes, even though that use is temporary. The duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation.") (cleaned up).

Likewise, in *Arkansas Game & Fish Commission v. United States*, the Court held "that takings temporary in duration can be compensable." 568 U.S. at 32–33 (citing *Pewee Coal Co.*, 341 U.S. 114; *Kimball Laundry Co.*, 338 U.S. 1; and *General Motors Corp.*, 323 U.S. 373). "[W]e have rejected the argument that government action must be permanent to qualify as a taking. Once the government's actions have worked a taking of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *Id.* at 33.

In *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, the Supreme Court also found that an interim, temporary local ordinance was a compensable taking. 482 U.S. at 318–19 ("These cases reflect the fact that 'temporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation.") (citing cases).

41

Accordingly, the district court erred in relying upon the temporariness of the Respondents' eviction bans.

3. A Partial Physical Taking Is Still a Taking

There was no dispute that the Respondents' eviction bans granted possession to occupants that would have otherwise been evicted from the Appellants' properties due to the failure to pay rent or the expiration of the lease. 1-ER-0034. Nonetheless, the lower court found that "this is not a persuasive reason to depart from *Yee*" as Appellants could evict for certain other purposes, such as a "significant and immediate risk to the health, safety, or property," or if the owner intended to sell the property or occupy it themselves. 1-ER-0034, 6-ER-1347, 6-ER-1367. In essence, the court recognized the physical taking but concluded that because it was only partial, it did not rise to a constitutional violation. This was in error.

First, as applied, this was a physical taking. Both Appellants were forced to house occupants that did not pay rent and/or held over after the lease expired and who would have otherwise been subject to eviction. 6-ER-1197–98, 5-ER-1194–95, 5-ER-1191–93. As applied to them, the Respondents' eviction bans were a compelled physical invasion.

Second, Supreme Court jurisprudence holds otherwise. The forced occupation of the Appellants' rental properties under some factual circumstances but not all of them does not erase the physical taking for those circumstances where the

Respondents' eviction ban applies. It simply means that it was a partial physical taking as opposed to a full physical taking. Thus, as the Court has held, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322.

The recent case of *Cedar Point Nursery* was a partial physical taking. The regulation at issue granted access to private property only for union organizers and only for the purpose of soliciting union support. *Cedar Point Nursery*, 141 S. Ct. at 2069. Union organizers could take access upon written notice and within four 30-day periods in a calendar year. *Id.* There were also limits on how many organizers could be present and each daily visit was to be for no more than one hour before work, one hour during lunch break, and one hour after work. *Id.*

Other than this limited and specific access easement, applicable only to union organizers, the property owner maintained the full right to possess and exclude. Nonetheless, the Court held that this regulation was still a categorical physical taking. "The access regulation appropriates a right to invade the growers' property and therefore constitutes a *per se* physical taking. The regulation grants union organizers a right to physically enter and occupy the growers' land for three hours per day, 120 days per year. Rather than restraining the growers' use of their own

43

property, the regulation appropriates for the enjoyment of third parties the owners' right to exclude." *Id.* at 2072.

Similarly, in *Loretto* the physical taking was a small cable box on the exterior of the building. *Loretto*, 458 U.S. at 421–22. For all other physical spaces inside and outside, for all other purposes, and for all other third parties, the owner maintained the right to possess and exclude. As we know, the Court held it to be a physical taking. *Id.* at 427.

In *Causby*, military aircraft physically invaded privately owned airspace. 328 U.S. at 258. The occupation was obviously intermittent and only occurred with respect to 4% of the take-offs and 7% of the landings at the adjacent military airport. *Id.* at 259. But like the other cases, the property owner retained the right to possess and exclude with respect to anyone and everyone, other than military aircraft for the specific purpose of take-offs and landings. Nonetheless, it was held to be a taking. *Id.* at 265.

The distinction taught by these cases is the difference between the physical occupation and the extent of that occupation.

All uncompensated physical takings—whether full or partial, temporary or permanent, continuous or intermittent, substantial or nominal—are categorically unconstitutional and contrary to the Fifth Amendment. *Cedar Point Nursery*, 141 S. Ct. at 2072–75; *Loretto*, 458 U.S. at 434–35 (physical occupations are "a taking to

the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner").

The extent of that physical taking does not pertain to whether a constitutional violation has occurred, but the compensation that is due to the affected property owner. *Loretto*, 458 U.S. at 437–38 ("[W]hether a permanent physical occupation has occurred presents relatively few problems of proof. The placement of a fixed structure on land or real property is an obvious fact that will rarely be subject to dispute. Once the fact of occupation is shown, of course, a court should consider the *extent* of the occupation as one relevant factor in determining the compensation due. For that reason, moreover, there is less need to consider the extent of the occupation in determining whether there is a taking in the first instance."); *Cedar Point Nursery*, 141 S. Ct. at 2074 ("The duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation."); *Lingle*, 544 U.S. at 539 ("Physical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests.").

In declining to hold that a partial taking was actionable, the lower court failed to recognize the taken property interest for what it was—an easement. By definition, easements are partial rights to property that are specific to the purpose of the

easement and leave the balance of the property rights to the servient estate. As the

Washington Supreme Court has held:

> "Property" is made up of an infinite collection of "interests" that may be held, separated, divided, transferred, restricted—combined and recombined like jack-straws. 17 William B. Stoebuck & John W. Weaver, Washington Practice: Real Estate: Property Law § 1.1, at 3 (2d ed.2004). Accordingly, more than one person can "own" or "hold" an interest in property. The law protects a wide range of property interests from harm.

*Affiliated FM Ins. Co.*, 170 Wash. 2d at 458.

That the Respondents took a portion of the Appellants' right to possess and

exclude, but not the entirety of those fundamental rights, merely defines the scope

of the easement taken; it does not mean that no easement was taken at all, as the

lower court erroneously held. *See Causby*, 328 U.S. at 265 n.10 (after reciting that

"an owner is entitled to the absolute and undisturbed possession of every part of his

premises," the Court compared physical invasions of private property by a wire, a

beam, and a bridge noting that "there would have been a difference in degree, but

not in principle"); *Cedar Point Nursery*, 141 S. Ct. at 2074 ("The dissent likewise

concludes that the regulation cannot amount to a *per se* taking because it allow

access short of 365 days a year. That position is insupportable as a matter of

precedent and common sense. There is no reason the law should analyze an

abrogation of the right to exclude in one manner if it extends for 365 days, but in an

entirely different manner if it lasts for 364.").

Similar to *Cedar Point* where "the fact that a right to take access is exercised only from time to time does not make it any less a physical taking," 141 S. Ct. at 2075, that the Appellants may exercise the right to exclude under certain, limited circumstances does not obviate all of the other ways in which the right to possess and exclude was forcibly taken away from them.

With regard to the fact that the Washington eviction bans allowed Appellants to take possession by leaving the rental business and occupying the premises themselves, the result is the same. 6-ER-1351. This was squarely addressed by *Loretto*, stating, "we fail to see, however, why a physical occupation of one type of property but not another type is any less a physical occupation … so long as the property remains residential and [the condemnor] wishes to retain the installation, the landlord must permit it." 458 U.S. at 439.

While "[i]t is true that the landlord could avoid the requirements of [the regulation] by ceasing to rent the building to tenants, [] a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Id.* at 439 n.17; *see Horne*, 576 U.S. at 365 ("The Government contends that the reserve requirement is not a taking because raisin growers voluntarily choose to participate in the raisin market. According to the Government, if raisin growers don't like it, they can 'plant different crops,' or 'sell their raisin-variety grapes as table grapes or for use in juice or wine'… the

Government is wrong as a matter of law…. As [*Loretto*] concluded, property rights cannot be so easily manipulated.").

In light of the above, the lower court erred in declining to find a partial physical taking.

## CONCLUSION

The Respondents' eviction bans were an uncompensated physical taking of Appellants' real property contrary to the Fifth Amendment. This Court should reverse and remand for further proceedings.

DATE: November 16, 2022.

Respectfully submitted,

Pacific Legal Foundation

 *s/ Jonathan M. Houghton*
JONATHAN M. HOUGHTON
KATHRYN D. VALOIS
ETHAN W. BLEVINS
*Attorneys for Plaintiffs – Appellants*

## STATEMENT OF RELATED CASES

Counsel for Appellants state there are no related cases within the meaning of Circuit Rule 28-2.6.

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Jonathan M. Houghton*
JONATHAN M. HOUGHTON

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Cir. Case Number: 22-35656

I am the attorney or self-represented party.

**This brief contains  11,499  words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

[X] complies with the word limit of Cir. R. 32-1.

[  ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[  ] it is a joint brief submitted by separately represented parties;

[  ] a party or parties are filing a single brief in response to multiple briefs; or

[  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATE:  November 16, 2022.          *s/  Jonathan M. Houghton*
                                   JONATHAN M. HOUGHTON
                                   *Attorney for Plaintiffs – Appellants*