No. 22-35656

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EL PAPEL, LLC, ET AL.,

*Plaintiffs-Appellants,*

vs.

CITY OF SEATTLE, ET AL.,

*Defendants-Appellees*

On Appeal from the United States District Court
For the Western District of Washington
(United States District Court No. 2:20-cv-01323-RAJ-JRC)

## CITY OF SEATTLE'S ANSWERING BRIEF

ANN DAVISON
Seattle City Attorney

Roger D. Wynne,
Jeffery S. Weber,
Assistant City Attorneys
Attorneys for Defendant-Appellee City of Seattle

Seattle City Attorney's Office
701 Fifth Ave., Suite 2050
Seattle, WA 98104-7095
(206) 233-2177

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION AND SUMMARY ............................................................1

II. JURISDICTION ...........................................................................................3

III. ISSUE PRESENTED FOR REVIEW ...............................................................3

IV. STATEMENT OF THE CASE ........................................................................4

    A. The pandemic's economic impacts increased the risk of eviction, which would have exacerbated the pandemic's health risks. ........................4

    B. Governments instituted rental assistance programs to help alleviate the pandemic's economic disruptions and housing instability. ....................6

    C. The Mayor proclaimed a civil emergency (since terminated) and the Mayor and Council enacted a temporary eviction moratorium (since expired), six-month defense (since expired), and repayment plan requirement (expiring this spring). ..............................................8

    D. No City measure entitled a tenant to free rent; the City paused evictions while allowing landlords to pursue payment of back rent. ..........11

    E. Most of Plaintiffs' tenants timely paid rent, and most of those in arrears were only slightly behind. ...............................................12

    F. The district court granted the City's and State's cross-motions for summary judgment. .................................................................13

    G. Plaintiffs filed this appeal, dropping all claims other than a nominal damages claim premised on their as-applied, per se physical invasion takings challenge to the moratoria and six-month defense. ........................15

V.  STANDARD OF REVIEW ................................................................15

VI. ARGUMENT .................................................................................15

    A.  Plaintiffs' per se physical invasion takings claim fails under
        controlling and persuasive case law. ............................................16

        1.  *Loretto*, *F.C.C.*, and *Yee* instruct that regulating the landlord-
             tenant relationship effects no per se physical invasion taking if
             the regulation neither requires the landlord to acquiesce to the
             presence of a third-party stranger nor forces the landlord to serve
             as such in perpetuity. ............................................................16

        2.  This Court and other federal courts follow that authority to reject
             physical invasion takings claims in the landlord-tenant context..........19

        3.  Every federal district court to have considered a per se physical
             invasion takings claim against a pandemic-related eviction
             moratorium—and a Washington appellate court resolving a
             challenge to the City's six-month defense—followed *Yee* to
             reject it. .............................................................................21

        4.  Under *Yee*, Plaintiffs' claim fails because the moratorium neither
             required them to acquiesce to the presence of a third-party
             stranger nor forced them to serve as landlords in perpetuity. ..............23

    B.  Plaintiffs' many arguments lack merit. .......................................24

        1.  Plaintiffs cast their situation in ways immaterial to their claim
             and unsupported by evidence. ...............................................24

        2.  Plaintiffs misread the relevant authority and offer novel theories
             at odds with that authority and the record. ..............................27

            (a)  Plaintiffs fail to analogize their situation to *Loretto*. ......................27

            (b)  Plaintiffs misread *F.C.C.*'s "required acquiescence" element........27

            (c)  Plaintiffs cannot distinguish *Yee*. ....................................28

(d) Plaintiffs' attempts to cast the moratorium as governmental occupation, the taking of an easement, or the exclusion of landlords cannot be squared with the record or *Yee*. ......................31

3.  Plaintiffs embrace distinguishable or incorrect case law. ....................33

    (a) *Cedar Point*, which addressed a law requiring an invasion by a third-party stranger, is distinguishable. ........................................33

    (b) An outlier, the Eighth Circuit in *Heights Apts.* incorrectly applied *Cedar Point* rather than *Yee* to an eviction moratorium challenge.........................................................................34

    (c) *Alabama Realtors* addressed no takings claim and left *Yee* undisturbed. ..................................................................................36

    (d) Plaintiffs' analogy to *Horne* is inapt. ..............................................38

    (e) *Armstrong* adds nothing to Plaintiffs' per se physical invasion takings claim. ..................................................................39

4.  Plaintiffs invoke irrelevant takings truisms and mischaracterize Washington eviction law. .......................................................................41

    (a) Irrelevant takings truisms gain Plaintiffs nothing. ..........................41

    (b) Washington law conveys no "fundamental right" to evict a tenant. ................................................................................................42

5.  Plaintiffs' core argument leads down a slippery slope where any law allowing a tenant to violate a material lease term—no matter how contrary to public policy that term may be—would effect a per se physical invasion taking............................................................43

VII.    CONCLUSION ...............................................................................................45

VIII.   STATEMENT OF RELATED CASES .......................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*335-7 LLC v. City of New York*,
  524 F. Supp. 3d 316 (S.D.N.Y. 2021) ...................................................39

*Alabama Ass'n of Realtors, v. Department of Health & Human Services*, Order on App. to Vacate Stay,
  141 S. Ct. 2485 (2021) (per curiam) ................................ 36, 37, 38, 39

*Armstrong v. United States*,
  364 U.S. 40 (1960) ....................................................................... 39, 40

*Auracle Homes, LLC v. Lamont*,
  478 F. Supp. 3d. 199 (D. Conn. 2020) ................................................22

*Ballinger v. City of Oakland*,
  24 F.4th 1287 (9th Cir. 2022) .......................................... 19, 20, 27, 38

*Baptiste v. Kennealy*,
  490 F. Supp. 3d 353 (D. Mass. 2020) .......................................... 22, 28

*Building and Realty Institute of Westchester and Putnam Counties, Inc. v. State of New York*,
  No. 19-CV-11285 (KMK), No. 20-CV-634 (KMK), 2021 WL 4198332 (S.D.N.Y. Sept. 14, 2021), *appeal docketed sub nom.*, *G-Max Mgmt., Inc. v. State of New York*, No. 21-2448 (2nd Cir. Sept. 28, 2021) ............................................................................................21

*Building Owners and Managers Ass'n v. F.C.C.*,
  254 F.3d 89 (D.C. Cir. 2001) .............................................................20

*CDK Global LLC v. Brnovich*,
  16 F.4th 1266 (9th Cir. 2021) .............................................................20

iv

*Cedar Point Nursery v. Hassid*,
  141 S. Ct. 2063 (2021) ............................................................. 33, 34, 35

*Csutoras v. Paradise High Sch.*,
  12 F.4th 960 (9th Cir. 2021) ................................................................15

*Dolan v. City of Tigard*,
  512 U.S. 374 (1994) .........................................................................39

*El Papel, LLC v. Durkan*, Report & Rec.,
  No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323 (W.D. Wash.
  Sept. 15, 2021), *order adopting Report & Rec.*, 2022 WL 2828685
  (July 20, 2022), *appeal docketed sub nom.*, *El Papel, LLC v. City of
  Seattle*, No. 22-35656 (9th Cir. Aug. 17, 2022) ...................................22

*Elmsford Apt. Associates, LLC v. Cuomo*,
  469 F. Supp. 3d. 148 (S.D.N.Y. 2020), *appeal dismissed sub nom.*,
  *36 Apt. Associates, LLC v. Cuomo*, 2021 WL 3009153 (2nd Cir.
  July 16, 2021) (summary order) ............................................................22

*F.C.C. v. Florida Power Corp.*,
  480 U.S. 245 (1987) ........................................................ 17, 18, 27, 28

*Farhoud v. Brown*,
  No. 3:20-cv-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022) ................... 22, 34

*Federal Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty.
  Renewal*,
  83 F.3d 45 (2d Cir. 1996) ...................................................................20

*Flower World, Inc. v. Sacks*,
  43 F.4th 1224 (2022) .........................................................................29

*FPA Crescent Assocs., LLC v. Jamie's, LLC*,
  360 P.3d 934 (Wash. Ct. App. 2015) ....................................................42

*Gallo v. District of Columbia*,
  ___ F. Supp. 3d ___, 2022 WL 2208934
  (D.D.C. June 21, 2022) ................................................... 22, 27, 34, 36

v

*GHP Mgmt. Corp. v. City of Los Angeles*,
   No. CV 21-06311 DDP (JEMx), 2022 WL 17069822 (Nov. 17,
   2022), *appeal docketed*, No. 23-55013 (9th Cir. Jan. 6, 2023) .................... passim

*Gonzales v. Inslee*,
   504 P.3d 890 (Wash. Ct. App. 2022), *review granted*, No. 100992-5
   (Wash. Oct. 14, 2022) ............................................................................23

*Heights Apts., LLC v. Walz*,
   510 F. Supp. 3d 789 (D. Minn. 2020), *rev'd*, 30 F.4th 720 (8th Cir.
   2022) ......................................................................................................22

*Heights Apts., LLC v. Walz*,
   30 F.4th 720 (8th Cir. 2022) .................................................... 22, 34, 35

*Heights Apts., LLC v. Walz*, Order Denying Petition for Rehearing En
   Banc,
   2022 WL 2167494 (8th Cir. June 16, 2022) ........................................35

*Horne v. Department of Agric.*,
   576 U.S. 350 (2015) ..............................................................................38

*In re Recall of Inslee*,
   508 P.3d 635 (Wash. 2022) ...................................................................41

*Jevons v. Inslee*,
   561 F. Supp. 3d 1082 (E.D. Wash. 2021), *appeal docketed*, No. 22-
   35050 (9th Cir. Jan. 18, 2022) ................................................ 22, 34, 46

*Lingle v. Chevron USA, Inc.*,
   544 U.S. 528 (2005) ................................................................ 16, 39, 40

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982) ......................................................................... 17, 27

*Pakdel v. City and County of San Francisco*,
   No. 17-cv-03638-RS, 2022 WL 14813709
   (N.D. Cal. Oct. 25, 2022) .................................................. 20, 28, 33, 34

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001) ...........................................................................39

*Rental Housing Ass'n v. City of Seattle*,
    512 P.3d 545 (Wash. Ct. App. 2022) ..................................... 23, 34, 42

*Slidewaters LLC v. Washington State Dep't of Labor and Industries*,
    4 F.4th 747 (2021) ............................................................................41

*Social Technologies LLC v. Apple Inc.*,
    4 F.4th 811 (9th Cir. 2021)................................................................15

*Southern Cal. Rental Housing Ass'n v. County of San Diego Bd. of
    Supervisors*,
    No. 3:21cv912-L-DEB, 2021 WL 3171919 (S.D. Cal. July 26,
    2021)................................................................................................ 22, 34

*Stuart Mills Props., LLC v. City of Burbank*,
    No. 2:22-cv-04246-RGK-AGR, 2022 WL 4493573 (C.D. Cal. Sept.
    19, 2022)........................................................................................... 21, 34

*Suzuki Motor Corp. v. Consumers Union, Inc.*,
    330 F.3d 1110 (9th Cir. 2003)............................................................15

*Tuck's Restaurant and Bar v. Newsom*,
    No. 2:20-cv-02256-KJM-CKD, 2022 WL 5063861 (E.D. Cal. Oct.
    4, 2022)...............................................................................................34

*Whole Woman's Health v. Jackson*, Order on App. for Injunctive
    Relief,
    141 S. Ct. 2494 (2021) ......................................................................36

*Williams v. Alameda County*,
    ___ F. Supp. 3d ___, 2022 WL 17169833 (C.D. Cal. Nov. 22, 2022) ........ passim

*Yee v. City of Escondido*,
    503 U.S. 519 (1992) ...................................................................... passim

## LEGISLATION AND RULES

Fed. R. Civ. P. 56(c)..................................................................15

SEATTLE MUN. CODE § 22.205.080.........................................25

SEATTLE MUN. CODE § 22.205.110.........................................26

WASH. REV. CODE § 59.12.030(3) ...........................................43

WASH. REV. CODE § 59.18.650 ...............................................43

WASH. REV. CODE §59.18.180 .................................................43

WASH. REV. CODE §59.18.410(3) ............................................43

## OTHER AUTHORITIES

Stephen I. Vladeck, *The Solicitor General and the Shadow Docket*,
  133 HARV. L. REV. 123 (2019) ...........................................36

William Baude, *Foreword: The Supreme Court's Shadow Docket*,
  9 N.Y.U.J.L. & LIBERTY 1 (2015) ......................................36

## I.  INTRODUCTION AND SUMMARY

Like many states and local jurisdictions seeking to stem a tide of evictions—and their adverse health and economic impacts—in the wake of the COVID-19 pandemic, Defendant-Appellee City of Seattle enacted a temporary eviction moratorium, a version of which the City extended for an additional six months ("six-month defense"), ending last August. The City also allowed tenants to repay back rent in installments. None of these measures offered a tenant free rent—if a tenant refused to repay rent in installments or otherwise, the landlord could seek a court order for back rent or even eviction, as long as any resulting eviction order took effect after termination of the moratorium and six-month defense. To mitigate the impact of such laws on landlords, local governments—including the City—offered rental assistance to help cover unpaid rent.

Plaintiffs-Appellants Berman 2, LLC, and El Papel, LLC, ("Plaintiffs") are Seattle landlords. When this action's record was established—thirteen months into the City's moratorium—over 70% of their tenants were current on their rent, and most of those in arrears were only slightly behind. One tenant held over beyond the end of their lease, ultimately vacating their unit, but their landlord was made whole for rent owed during the holdover period.

Having lost a range of claims on cross-motions for summary judgment, Plaintiffs now press only an as-applied physical invasion takings challenge to the

City's moratorium and six-month defense (and a similar Washington State moratorium).

That claim fails under controlling and persuasive case law. A trio of U.S. Supreme Court opinions instructs that regulating the landlord-tenant relationship effects no per se physical invasion taking if the regulation neither requires the landlord to acquiesce to the presence of a third-party stranger nor forces the landlord to serve as such in perpetuity. This Court and others follow that authority to reject physical invasion takings claims in the landlord-tenant context. And every federal district court—at least a dozen so far—to have considered a per se physical invasion takings claim against a pandemic-related eviction moratorium followed that controlling and persuasive authority to reject the claim. Also following that case law, the Washington Court of Appeals recently rejected a similar claim brought against the City's six-month defense. As in those cases, Plaintiffs' claim fails because the City neither required them to acquiesce to a stranger's invasion nor forced them to remain landlords in perpetuity.

None of Plaintiffs' many arguments succeeds. They cast their situation in ways immaterial to their claim and unsupported by evidence. They misread the relevant authority and offer novel theories at odds with that authority and the record. They embrace distinguishable or incorrect case law. And they invoke irrelevant takings truisms and mischaracterize Washington eviction law. Their core

2

argument leads this Court down a slippery slope where any law allowing a tenant to violate a material lease term—no matter how contrary to public policy that term may be—would effect a per se physical invasion taking.

The City respectfully asks this Court to affirm summary judgment for the City.

## II.     JURISDICTION

The City agrees with Plaintiffs' jurisdictional statement.

## III.     ISSUE PRESENTED FOR REVIEW

The U.S. Supreme Court and this Court recognize that a landlord-tenant regulation effects no per se physical invasion taking if it does not require a landlord to acquiesce to invasion by a third-party stranger or force the landlord to continue serving as such in perpetuity. Plaintiffs challenge temporary measures that delayed their ability to pursue one statutory remedy for nonpayment of rent— eviction—while maintaining their tenants' obligation to pay rent. Does Plaintiffs' per se physical invasion takings claim fail?

## IV.    STATEMENT OF THE CASE

**A.    The pandemic's economic impacts increased the risk of eviction, which would have exacerbated the pandemic's health risks.**

In spring 2021, the world continued to deal with a public health crisis unprecedented in modern times.[1] As of May 5, 2021, over 575,000 Americans had died from COVID. Centers for Disease Control and Prevention ("CDC"), *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#trends_totaldeaths_select_00 (last visited Jan. 10, 2023).

To stem the spread of the pandemic, federal, state, and local governments took such extraordinary measures as closing schools for in-person learning, banning large gatherings, and limiting retail operations, in-office professional services, indoor fitness establishments, and at-home social gatherings. *See, e.g.*, 6-ER-1403 (City ordinance recognizing early state restrictions).

The pandemic devastated the economy. Washington lost half a million jobs in March and April of 2020, with the unemployment rate reaching 16.3% in April—the highest in decades. *See* CitySER-147 (Wash. State Econ. and Revenue Forecast Council, ECON. & REVENUE UPDATE (Sept. 16, 2020)).

---

[1] Although Plaintiffs challenge laws that the City enacted in spring 2020, the parties briefed cross-motions for summary judgment in spring 2021. Because the record focused on the pandemic's impacts as of those motions, the City will continue that focus on appeal.

Unemployment increased the risk of evictions. A 2018 Federal Reserve Report found that 40% of Americans could not produce $400 if an emergency occurred, and a survey of Seattle residents who faced eviction found most cited loss of employment or income as the reason they fell behind on rent. *See* CitySER-161–162 (Seattle Women's Comm'n & King Cty. Bar Ass'n Housing Justice Project, LOSING HOME: THE HUMAN COST OF EVICTION IN SEATTLE (2018)).

Evictions lead to homelessness. One survey found most evicted respondents became homeless, with 37.5% completely unsheltered, 25% living in a shelter or transitional housing, and 25% staying with family or friends. CitySER-159 (*id.*).

Evictions would have exacerbated the pandemic's dangers for evictees and others. The virus that causes COVID-19 spreads easily between people in close contact. *See* CitySER-180 (CDC, Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,293 (Sept. 4, 2020) ("CDC Order")). Evictees had to move, many into shared housing or other congregate settings, fostering COVID-19's spread. CitySER-182 (*id.*). Extensive outbreaks were identified in homeless shelters. CitySER-183 (*id.*). Evictees who became unsheltered faced additional problems with exposure and inadequate access to hygiene, furthering the virus's spread. *Id.* The CDC recognized eviction moratoria as an effective public health measure to prevent the spread of COVID-19 because they allowed those who become ill to self-isolate, supported stay-at-home

and social distancing directives, and kept individuals away from congregate settings. CitySER-182 (*id*.).

**B.     Governments instituted rental assistance programs to help alleviate the pandemic's economic disruptions and housing instability.**

Even before the pandemic, research showed that low-income households are most likely to be evicted where stagnant wages and inadequate welfare cannot keep up with increases in rent. *See* CitySER-70–71 (Timothy Thomas, *et al.*, THE STATE OF EVICTIONS: RESULTS FROM THE UNIV. OF WASH. EVICTIONS PROJECT (updated Feb. 17, 2019)). To have afforded an average-priced home in King County (home to Seattle) in 2019, for which monthly rents had reached $2,200, a tenant needed to make about $90,000 annually. CitySER-70 (*id.*). In 2017, 46% of Washington households were rent burdened (defined as contributing over 30% of household income to rent), with about half of those households contributing over 50% of their income to rent. CitySER-71 (*id.*).

The pandemic increased economic and housing disruptions. Many tenants remained at risk of eviction over a year into the pandemic. According to estimates, as of March 29, 2021, about ten percent of Washington households were behind on rent, 44,270 King County households were behind on rent, and the rent debt per household in King County was $4,903. CitySER-77 (U.S. Census Bureau Household Pulse Survey); CitySER-82–83 (National Equity Atlas Rent Debt Graphics).

6

Local governments implemented a variety of rental assistance programs to help tenants make rental payments. The City, in partnership with other entities, raised millions and expanded the Home Base Rental Assistance Program in April 2020. CitySER-15–16 (Alvarado Decl.); CitySER-143 (United Way of King County, HOME BASE RENTAL ASSISTANCE PROGRAM UPDATE (July 29, 2020)). The King County Eviction Prevention & Rental Assistance Program ("EPRAP") funded approximately $47 million in August 2020 through programs designed to distribute rental assistance quickly, efficiently, and equitably. *See generally* CitySER-17 (Ellerbrook Decl.). By the end of 2020, EPRAP provided rental assistance to just over 9,000 landlords while receiving 25,000 landlord and tenant interest forms, with the average landlord receiving just over $4,100 in rental assistance. CitySER-18 (*id.*).

Officials expected subsequent versions of City and County rental assistance programs to appropriate additional federal stimulus funds by mid-May 2021, including $22.7 million through the City and approximately $145 million through the County. *Id.*; CitySER-15 (Alvarado Decl.). Based on administering prior funding, those officials estimated that landlords would receive funding several weeks after landlords or tenants applied for rental assistance. CitySER-15–16 (Alvarado Decl.); CitySER-27 (data review). Programs involving community-based organizations distributing targeted rental assistance to certain populations

could have taken additional time to disburse funds. CitySER-16 (Alvarado Decl.); CitySER-18 (Ellerbrook Decl.).

**C.    The Mayor proclaimed a civil emergency (since terminated) and the Mayor and Council enacted a temporary eviction moratorium (since expired), six-month defense (since expired), and repayment plan requirement (expiring this spring).**

In response to the pandemic, the CDC and state and local governments adopted temporary measures to protect tenants from eviction. *See* CitySER-180–185 (CDC Order); Ballotpedia, *Changes to rent, mortgage, eviction, and foreclosure policies in response to the coronavirus (COVID-19) pandemic, 2020* (last updated Nov. 24, 2020), https://ballotpedia.org/Changes_to_rent,_mortgage,_eviction,_and_foreclosure_policies_in_response_to_the_coronavirus_(COVID-19)_pandemic,_2020 (last visited Jan. 10, 2023). Four measures the City adopted are relevant to this dispute. Three are no longer in effect; the other expires this spring.

**The emergency proclamation (now terminated).** The Mayor issued a Proclamation of Civil Emergency on March 3, 2020. CitySER-220–223.[2] The City Council amended the Proclamation two days later, making the amended version the operative one until terminated by the Mayor or Council. CitySER-187–199

---

[2] Plaintiffs misidentify a later order as the Proclamation. Appellants' Opening Br., Dkt. # 7 at p. 16 ("Opening") (citing 6-ER-1372–76).

(Res. 31937). On October 31, 2022, after Plaintiffs filed this appeal, the Mayor terminated the Proclamation. MAYORAL PROCLAMATION TERMINATING CIVIL EMERGENCY (Oct. 31, 2022), *available at* http://clerk.ci.seattle.wa.us/search/clerk-files/322483 (last visited Jan. 10, 2023).

**The eviction moratorium (now expired)**. On March 14, 2020, the Mayor issued an emergency order temporarily establishing a residential eviction moratorium, CitySER-201–204**,** which the Council amended two days later. CitySER-206–218 (Res. 31938).[3] The moratorium established a defense to an eviction that would occur during the moratorium "unless the eviction action is due to actions by the tenant constituting an imminent threat to the health or safety of neighbors, the landlord, or the tenant's or landlord's household members." CitySER-216 (*id*.). The Mayor extended the moratorium several times. *E.g.*, CitySER-12. It expired on February 28, 2022. *See id.*; CitySER-6 (City notification to the district court).[4]

**The six-month defense (in effect March–August 2022).** Recognizing "that economic impacts from the COVID-19 emergency [were] likely to last much

---

[3] Plaintiffs fail to cite the full resolution and mistakenly cast the moratorium as an amalgam of orders and an ordinance. Opening at 16 (citing 6-ER-1367–79).

[4] Plaintiffs mistakenly report that the moratorium expired September 30, 2021. Opening at 16.

longer than the civil emergency itself," the Council adopted additional eviction protections on May 4, 2020. 6-ER-1381–1401 (Ord. 126075).[5] The Council created a defense to an eviction that would occur within six months after the termination of the eviction moratorium if: (1) the landlord sought eviction because the tenant violated a 14-day notice to pay rent or vacate for rent due during, or within six months after, the eviction moratorium or habitually failed to pay rent resulting in four or more pay-or-vacate notices in a 12-month period; and (2) the tenant declared they suffered a financial hardship and could not pay rent. 6-ER-1399.[6] Because the eviction moratorium expired February 28, 2022, the six-month defense expired August 31, 2022.

**The repayment plan requirement (expiring this spring).** Understanding that the pandemic would have long-lasting housing and economic impacts, the Council adopted a repayment plan requirement on May 11, 2020. 6-ER-1403–1412 (Ord. 126081). The ordinance allows a tenant who fails to pay rent when due

---

[5] The six-month defense was eventually codified as SEATTLE MUN. CODE § 22.205.090. *See* CitySER-13 (City notification to the trial court, providing a link).

[6] Two years later, on May 24, 2022, the Council amended the six-month defense to allow a landlord to rebut the tenant's declaration of financial hardship. Ord. 126593 § 1, *available at* https://seattle.legistar.com/View.ashx?M=F&ID=11003796&GUID=AE1649D5-9A06-4BBA-A68E-ADEFAD7BF214 (last visited Jan. 10, 2023).

during, or within six months after the termination of, the Proclamation of Civil Emergency to elect to pay the overdue rent in installments. 6-ER-1409–1410.[7] Failure of the landlord to accept payment under the installment schedule constitutes a defense to an eviction action. 6-ER-1410. Because the Mayor terminated the Emergency Proclamation on October 31, 2022, the repayment plan requirement will cover rent accruing only through April 30, 2023.

**D.    No City measure entitled a tenant to free rent; the City paused evictions while allowing landlords to pursue payment of back rent.**

Neither the moratorium, six-month defense, nor repayment plan requirement offered a tenant free rent. A tenant remained responsible for rent. The repayment plan ordinance provides them an opportunity to pay back rent over time—and that time affords them an opportunity to tap rental assistance programs. The moratorium and six-month defense temporarily paused one landlord remedy—eviction—while allowing a landlord to pursue rent owed. If a tenant failed to repay back rent in installments or otherwise, nothing in those measures precluded a

_____

[7] The Council amended the repayment plan requirement ordinance in April 2022 to better align it with similar state law. Ord. 126571, *available at* https://seattle.legistar.com/View.ashx?M=F&ID=10959233&GUID=611F53A3-ED68-4009-A4BA-673E5FEFEEBD (last visited Jan. 10, 2023). Instead of speaking of paying rent in installments over three to six months, the amended ordinance follows state law to require only that the landlord offer a "reasonable repayment plan" and allow the tenant 14 days to accept it. *Id.* § 1. The details of this amendment are immaterial to this dispute.

landlord from seeking a court order for back rent or even eviction, as long as any resulting eviction order took effect after termination of the moratorium and six-month defense.

**E.     Most of Plaintiffs' tenants timely paid rent, and most of those in arrears were only slightly behind.**

As of April 2021, most of Plaintiffs' tenants—over 70%—were current on their rent, and most of those in arrears were only slightly behind. Berman 2, LLC, owned a residential building with 22 units. CitySER-36 (Berman 2 interrogatory responses). As of April 16, 2021—thirteen months into the City's moratorium—tenants in only six of those units were behind in rent and had not vacated. CitySER-38–42 (*id.*).[8] For five of those six units, the rent owed was no more than $710 each—tenants in three received rental subsidies from a nonprofit agency that continued to pay on time, while the other two owed only one month or less of rent. *Id.*

El Papel, LLC, owned two rental properties: a 25-unit building and a two-unit building. CitySER-55 (El Papel interrogatory responses). As of April 19, 2021, El Papel had only eight tenants—all in the larger building—who were

---

[8] Plaintiffs misread the record when reporting that tenants in nine of Berman 2's rental units were behind in rent. *See* Opening at 14. Berman 2's interrogatory responses list only six units where tenants were behind in rent and had not vacated. CitySER-38–42. And the declaration of Berman 2's governor, which Plaintiffs cite, reported only three units where tenants "aren't paying rent." 5-ER-1192.

behind in rent and had not vacated. CitySER-57 (*id.*). Five of those eight were less than one month behind. CitySER-58–61 (*id.*). The other three were further behind, with only one being over six months behind. CitySER-59–60 (*id.*). El Papel alleges that the tenants in one unit in the smaller building held over five months past the end of their lease while failing to pay rent. Appellants' Opening Br., Dkt. # 7 at p. 13 ("Opening"). But Plaintiffs omit that El Papel ultimately received $17,360 in governmental rental assistance that satisfied all amounts owed through the time those tenants vacated. CitySER-63 (El Papel interrogatory responses).

Because the record closed in April 2021, it does not resolve how long Plaintiffs' tardy tenants remained in arrears, whether Plaintiffs ultimately accepted rental assistance for amounts owed, or if Plaintiffs sought a court order for any unpaid amount.

## F. The district court granted the City's and State's cross-motions for summary judgment.

Plaintiffs sued on September 3, 2020, pressing facial and as-applied challenges against the City's eviction moratorium, six-month defense, and repayment plan requirement, and a similar State moratorium. 6-ER-1325–1342 (Complaint); CitySER-86–104 (Corrected First Amended Complaint).[9] Plaintiffs

---

[9] Plaintiffs cite to the original Amended Complaint, not the corrected version. *See* Opening at 18 (citing 6-ER-1305). Other than substituting Attorney General Robert

claimed that the City's repayment plan requirement violated the Contract Clause, and that the other laws violated that clause and the Takings Clause. *Id*. Plaintiffs sought injunctive and declaratory relief and nominal damages. *Id.*

The district court denied Plaintiffs' motion for preliminary injunction. CitySER-111–141 (Report and Rec.); CitySER-106–110 (Order).[10]

The district court granted the City's and State's cross-motions for summary judgment and denied Plaintiffs' cross-motion. 1-ER-005–035 (Report and Rec.); 1-ER-002–003 (Order). The court dismissed as moot Plaintiffs' claims for declaratory and injunctive relief against the City moratorium because it had expired. 1-ER-002–003 (Order). The court rejected Plaintiffs' remaining claims, ruling that Plaintiffs' Contract Clause and takings claims lacked merit. 1-ER-017–034 (Report and Rec.); 1-ER-002 (Order). The court dismissed Plaintiffs' action with prejudice. 1-ER-003 (Order).

---

Ferguson for Governor Jay Inslee as the named defendant for Washington, the Amended Complaint does not differ substantively from the Complaint.

[10] The sole individual Plaintiff, Karvell Li, withdrew after the preliminary injunction ruling, leaving only the other two, corporate Plaintiffs: El Papel and Berman 2. CitySER-84–85 (Stipulation of Voluntary Dismissal).

**G.  Plaintiffs filed this appeal, dropping all claims other than a nominal damages claim premised on their as-applied, per se physical invasion takings challenge to the moratoria and six-month defense.**

In this appeal, Plaintiffs seek only nominal damages, pressing only an as-applied, per se physical invasion takings challenge to the City and State moratoria and the City's six-month defense. They have abandoned their claims for declaratory and injunctive relief, facial challenges, Contract Clause challenge, and challenge to the City's repayment plan requirement.

## V.  STANDARD OF REVIEW

This Court reviews de novo a district court's decision on cross-motions for summary judgment. *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 965 (9th Cir. 2021). Applying Fed. R. Civ. P. 56(c), this Court asks whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Social Technologies LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021); *Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003).

## VI.  ARGUMENT

This appeal presents no genuine issue of material fact. The City is entitled to judgment as a matter of law on Plaintiffs' per se physical invasion takings challenge to the City's eviction moratorium and six-month defense, which for conciseness this brief will refer to collectively as the "moratorium" unless the

context indicates otherwise. *Cf.* Opening (referring to the City's and State's measures collectively as the "eviction bans").

**A.    Plaintiffs' per se physical invasion takings claim fails under controlling and persuasive case law.**

**1.    *Loretto*, *F.C.C.*, and *Yee* instruct that regulating the landlord-tenant relationship effects no per se physical invasion taking if the regulation neither requires the landlord to acquiesce to the presence of a third-party stranger nor forces the landlord to serve as such in perpetuity.**

Government implicates the Takings Clause by directly appropriating or invading private property or effectively ousting the owner from their domain through regulation. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537–39 (2005). Plaintiffs claim a per se regulatory taking from a law they contend causes them to suffer a physical invasion. That claim fails because a trio of U.S. Supreme Court opinions instructs that regulating the landlord-tenant relationship effects no per se physical invasion taking if the regulation neither requires the landlord to acquiesce to the presence of a third-party stranger nor forces the landlord to serve as such in perpetuity.

First, when announcing the per se physical invasion takings test, *Loretto* rejected concerns that the test would undercut landlord-tenant regulations: "This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."

16

*Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 440 (1982).
Through a "very narrow" holding, *Loretto* ruled that a law forcing a property
owner to suffer a physical invasion from a stranger outside the landlord-tenant
relationship—there in the form of a cable company installing its cable on the
property—constituted a per se physical invasion taking. *Id*. at 441. *Accord id*.
at 436 ("an owner suffers a special kind of injury when a *stranger* directly invades
and occupies the owner's property"), 449 (distinguishing the cable company's
rights from the tenants'). "So long as . . . regulations do not require the landlord to
suffer the physical occupation of a portion of his building by a third party," they
effect no per se physical invasion taking. *Id*. at 440.

Second, *F.C.C.* reaffirmed that a landlord-tenant regulation that requires no
landlord to acquiesce to a third-party stranger's invasion passes muster under the
per se physical invasion takings test. *F.C.C. v. Florida Power Corp.,* 480 U.S. 245,
250–53 (1987). In *F.C.C.*, utility pole owners challenged a federal agency ruling
that reduced the annual rent the owners could charge cable companies to attach a
cable to a pole, from as high as $7.15 to $1.79. *Id*. at 247–49. Echoing *Loretto*,
*F.C.C.* observed that "statutes regulating the economic relations of landlords and
tenants are not per se takings." *Id*. at 252. Building on *Loretto*'s warning that the
per se test applies only to regulations requiring a landlord to acquiesce to a
stranger's invasion, *F.C.C.* observed that "[t]his element of required acquiescence

17

is at the heart of the concept of occupation." *Id*. A landlord who leases to a tenant voluntarily acquiesces to that tenant's occupation and cannot claim a physical invasion when the government adjusts the landlord-tenant relationship:

> Appellees contend, in essence, that it is a taking under *Loretto* for a tenant invited to lease at a rent of $7.15 to remain at the regulated rent of $1.79. But it is the invitation, not the rent, that makes the difference. The line which separates these cases from *Loretto* is the unambiguous distinction between a commercial lessee and an interloper with a government license.

*Id*. at 252–53.

Finally, heeding *Loretto* and *F.C.C.*, *Yee* held that a residential landlord-tenant regulation that prevents a landlord from excluding individuals who pay on terms the landlord disfavors effects no per se physical invasion taking because it neither requires the landlord to acquiesce to the presence of a third-party stranger nor forces the landlord to continue serving as such in perpetuity. *Yee v. City of Escondido*, 503 U.S. 519 (1992). *Yee* rejected a per se physical invasion claim from mobile home park landlords who complained that an ordinance—combined with a state law—limited their ability to evict a tenant who did not pay the higher rents a landlord would otherwise demand. *Id*. at 526–27. That claim failed because the landlord invited the tenant onto the property—the tenant did not enter as a third-party stranger with a government license:

> Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government. While the "right to exclude"

is doubtless, as petitioners assert, "one of the most essential sticks in the bundle of rights that are commonly characterized as property," we do not find that right to have been taken . . . .

.  .  .

Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals.

*Id.* at 528, 531 (citations omitted). *Yee* noted two exceptions: a landlord-tenant regulation might effect a per se physical invasion taking if it requires someone to become an involuntary landlord (a form of acquiescing to a stranger's invasion) or forces a landlord to continue serving as such in perpetuity. *Id*. at 528.

### 2. This Court and other federal courts follow that authority to reject physical invasion takings claims in the landlord-tenant context.

This Court follows that Supreme Court authority. *See Williams v. Alameda County*, ___ F. Supp. 3d ___, 2022 WL 17169833, at *9 (C.D. Cal. Nov. 22, 2022) ("The Ninth Circuit has held consistently that laws governing the landlord-tenant relationship are not subject to a categorical per se takings analysis."). Most recently, *Ballinger* rejected a per se physical invasion takings challenge to an ordinance that requires a landlord seeking to reoccupy their home upon a lease's expiration to pay the tenant a relocation fee. *Ballinger v. City of Oakland*, 24 F.4th 1287, 1291 (9th Cir. 2022). Relying on *Yee* and *F.C.C.*, *Ballinger* reasoned that a law that forces a landlord to accept tenants the landlord dislikes, or transfers wealth from landlords to tenants, effects no per se physical invasion taking. *Id*. at 1292–

19

94. Because the challenged law did not force a property owner to become a landlord, the element of required acquiescence was absent. *Id*. at 1293 n.3. *Accord CDK Global LLC v. Brnovich*, 16 F.4th 1266, 1281–82 (9th Cir. 2021).

Other courts likewise follow the reasoning in *Loretto*, *F.C.C.*, and *Yee* to reject per se physical invasion takings claims in the landlord-tenant context. *E.g.*, *Building Owners and Managers Ass'n v. F.C.C.*, 254 F.3d 89, 98–99 (D.C. Cir. 2001) (noting "the extensive case law upholding the government's authority to regulate various aspects of the landlord-tenant relationship" without effecting a per se physical invasion taking); *Federal Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47–48 (2d Cir. 1996) ("where a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking"); *Pakdel v. City and County of San Francisco*, No. 17-cv-03638-RS, 2022 WL 14813709, at *5 (N.D. Cal. Oct. 25, 2022) ("The common thread that runs through these landlord-tenant cases is the notion that a *per se* physical taking has not occurred because the element of 'required acquiescence' is absent."); *Building and Realty Institute of Westchester and Putnam Counties, Inc. v. State of New York*, No. 19-CV-11285 (KMK), No. 20-CV-634 (KMK), 2021 WL 4198332, at *19 (S.D.N.Y. Sept. 14, 2021) ("the case law is clear: property owners who offer their properties for rent do not suffer from a taking based on laws that regulate the

rental of that property"), *appeal docketed sub nom.*, *G-Max Mgmt., Inc. v. State of New York*, No. 21-2448 (2nd Cir. Sept. 28, 2021).

Plaintiffs acknowledge none of that authority.

**3.      Every federal district court to have considered a per se physical invasion takings claim against a pandemic-related eviction moratorium—and a Washington appellate court resolving a challenge to the City's six-month defense—followed *Yee* to reject it.**

Federal district courts—at least a dozen so far—have uniformly applied *Yee* to reject per se physical invasion takings challenges to pandemic-related eviction moratoria, which neither require landlords to acquiesce to the presence of a third-party stranger nor force them to serve as landlords in perpetuity:

1.    *Williams*, 2022 WL 17169833, at *8, 11 ("In the context of regulations affecting the landlord-tenant relationship, the main Supreme Court case is *Yee*");

2.    *GHP Mgmt. Corp. v. City of Los Angeles*, No. CV 21-06311 DDP (JEMx), 2022 WL 17069822, at *2–4 (Nov. 17, 2022), *appeal docketed*, No. 23-55013 (9th Cir. Jan. 6, 2023);

3.    *Stuart Mills Props., LLC v. City of Burbank*, No. 2:22-cv-04246-RGK-AGR, 2022 WL 4493573, at *3 (C.D. Cal. Sept. 19, 2022) ("Plaintiff's situation is more akin to the facts in *Yee*");

4.    *El Papel, LLC v. Durkan*, Report & Rec., No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323, at *16 (W.D. Wash. Sept. 15, 2021),[11] *order adopting Report & Rec.*, 2022 WL 2828685 (July 20, 2022), *appeal*

---

[11] The relevant page is reproduced at 1-ER-032.

*docketed sub nom.*, *El Papel, LLC v. City of Seattle*, No. 22-35656 (9th Cir. Aug. 17, 2022);

5. *Gallo v. District of Columbia*, ___ F. Supp. 3d ___, 2022 WL 2208934, at *8–9 (D.D.C. June 21, 2022) (*Yee* "controls");

6. *Farhoud v. Brown*, No. 3:20-cv-2226-JR, 2022 WL 326092, at *10 (D. Or. Feb. 3, 2022);

7. *Jevons v. Inslee*, 561 F. Supp. 3d 1082, 1106 (E.D. Wash. 2021), *appeal docketed*, No. 22-35050 (9th Cir. Jan. 18, 2022);

8. *Southern Cal. Rental Housing Ass'n v. County of San Diego Bd. of Supervisors*, No. 3:21cv912-L-DEB, 2021 WL 3171919, at *8 (S.D. Cal. July 26, 2021);

9. *Heights Apts., LLC v. Walz*, 510 F. Supp. 3d 789, 812 (D. Minn. 2020), *rev'd*, 30 F.4th 720 (8th Cir. 2022);

10. *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 387–88 (D. Mass. 2020);

11. *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d. 199, 220–21 (D. Conn. 2020); and

12. *Elmsford Apt. Associates, LLC v. Cuomo,* 469 F. Supp. 3d. 148, 162–64 (S.D.N.Y. 2020), *appeal dismissed sub nom*., *36 Apt. Associates, LLC v. Cuomo*, 2021 WL 3009153 (2nd Cir. July 16, 2021) (summary order).

Plaintiffs acknowledge practically none of that persuasive authority.[12]

Plaintiffs also ignore a persuasive Washington Court of Appeals decision—

applying federal law to a per se physical invasion takings claim under the

Washington Constitution—which followed *Yee* to reject a challenge to the City's

---

[12] Plaintiffs invoke *Heights Apts., LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022), which reversed a district court ruling. Opening at 37–39. The City responds to that below.

six-month defense, the same law Plaintiffs challenge here. *Rental Housing Ass'n v. City of Seattle*, 512 P.3d 545, 557–60 (Wash. Ct. App. 2022). *Accord Gonzales v. Inslee*, 504 P.3d 890, 903–05 (Wash. Ct. App. 2022), *review granted*, No. 100992-5 (Wash. Oct. 14, 2022) (applying *Yee* to reject a claim against the State moratorium challenged here).

> **4.** **Under *Yee*, Plaintiffs' claim fails because the moratorium neither required them to acquiesce to the presence of a third-party stranger nor forced them to serve as landlords in perpetuity.**

As the district court correctly ruled, "*Yee* supplies the rule that is dispositive of the physical taking arguments in this matter." 1-ER-032 (Report and Rec.). *See generally* 1-ER-032–036 (*id.*). Like the *Yee* landlords, Plaintiffs invited tenants onto their property—the moratorium did not require Plaintiffs' acquiescence to a stranger's invasion. Like the *Yee* landlords' claimed right to exclude tenants who refuse to pay higher rent, Plaintiffs assert a right to immediately exclude tenants who fall behind on rent, even though the tenants remain obligated to pay their debt. The *Yee* landlords claimed that, because of the local rent control and state just-cause eviction limitations, they were locked into renting to lower-paying tenants in perpetuity. *Yee*, 503 U.S. at 526–27. Plaintiffs' claim is weaker because the moratorium was temporary and did not lower rent—tenants remained responsible for back rent and governments offered funds to help cover any shortfall.

23

What was true in *Yee* is true here. "Put bluntly, no government has required any physical invasion of [Plaintiffs'] property. [Their] tenants were invited by [them], not forced upon them by the government." *Id*. at 528. "Because they voluntarily open their property to occupation by others, [Plaintiffs] cannot assert a *per se* right to compensation based on their inability to exclude particular individuals." *Id.* at 531.

**B.    Plaintiffs' many arguments lack merit.**

Instead of acknowledging the Supreme Court's clear lesson and the legion of persuasive decisions following it, Plaintiffs point this Court in a variety of other directions. Their arguments lack merit.

**1.    Plaintiffs cast their situation in ways immaterial to their claim and unsupported by evidence.**

As the district court recognized, Plaintiffs raised no genuine issue of material fact regarding their per se physical invasion takings claim. *See* 1-ER-006– 007 (Report and Rec.). Although immaterial to that claim, Plaintiffs attempt to characterize their situation sympathetically in four ways that lack evidentiary support.

First, the record contains nothing about the profitability of Plaintiffs' rental businesses. *Cf*. Opening at 30 (Plaintiffs could not "profitably use their property"). Most of Plaintiffs' tenants—over 70%—were current on their rent, and most of those in arrears were only slightly behind. *See* CitySER-36–42 (Berman 2

interrogatory responses); CitySER-55–61 (El Papel interrogatory responses). The record does not reveal Plaintiffs' costs, income, or profit, nor does it reflect whether Plaintiffs were eventually made whole through governmental assistance—just like El Papel was made whole for all amounts owed by its one holdover tenant through the time they vacated. *See* CitySER-63 (El Papel interrogatory responses).

Second, Plaintiffs can present no evidence for their assertion that, but for the City and State moratoria, tenants "would have otherwise been evicted from [Plaintiffs'] properties due to the failure to pay rent or the expiration of the lease." Opening at 48. Although Plaintiffs said they would "start" eviction proceedings, 6-ER-1198 (Travers Decl.); 5-ER-1192 (Berman Decl.), those proceedings might not have resulted in an eviction for multiple reasons. For example, a tenant might have erased their debt—and the basis for eviction—if their landlord accepted governmental assistance to meet the shortfall, the tenant adhered to a repayment plan, or the tenant's economic situation improved. The one tenant who held over eventually vacated the unit—perhaps as quickly as if El Papel had pursued a court-ordered eviction. And tenants might have been able to invoke other defenses despite owing rent or holding over. *See, e.g.*, SEATTLE MUN. CODE § 22.205.080

(banning certain evictions during winter months); *id*. § 22.205.110 (banning certain evictions during the school year).[13]

Third, nothing suggests that Plaintiffs wished to cease being landlords and permanently occupy the units themselves. *Cf*. Opening at 8 (Plaintiffs "could not possess what they owned").

Finally, the record contains no evidence of Plaintiffs' desire or ability to sell their property. *Cf*. Opening at 30 ("no reasonable purchaser would have wanted to buy a rental property when there was no legal avenue to exclude occupants who violated the lease"). Nothing suggests that they considered selling or explored the prospect, and they presented no evidence comparing sales of residential properties before and after the moratorium took effect. Potential buyers might have understood that the temporary measure did not absolve tenants of their obligation to pay back rent, realized the availability of governmental assistance, and made reasonable offers to purchase Plaintiffs' property.

---

[13] The Seattle Municipal Code is available online at https://library.municode.com/wa/seattle/codes/municipal_code (last visited Jan. 10, 2023).

### 2. Plaintiffs misread the relevant authority and offer novel theories at odds with that authority and the record.

#### (a) Plaintiffs fail to analogize their situation to *Loretto*.

Ignoring that *Loretto*'s "very narrow" holding is limited to invasion by a third-party stranger and that *Loretto* disclaimed application to landlord-tenant regulations, *see Loretto*, 458 U.S. at 440–41, Plaintiffs assert that, like the *Loretto* landlords, they too "can make no nonpossessory use" of their property. Opening at 29–30 (quoting *Loretto*, 458 U.S. at 435–36).

Plaintiffs are mistaken. Unlike in *Loretto*, where landlords could charge no rent for the strangers' invading cables, Plaintiffs continued to make the nonpossessory use of their units by the receipt and accrual of rent, which they could pursue through a repayment plan, court order, or governmental funding. *Accord Gallo*, 2022 WL 2208934, at *10 (rejecting a similar assertion).

#### (b) Plaintiffs misread *F.C.C.*'s "required acquiescence" element.

Invoking *F.C.C.*, Plaintiffs mistakenly assert that the moratorium amounts to "required acquiescence" to occupation by tenants who do not timely pay rent. Opening at 28–29, 43 (citing *F.C.C.*, 480 U.S. at 252). This Court and others— including ones rejecting claims against eviction moratoria—have explained that, where landlords invited tenants onto their property, they were not required to acquiesce to an invasion by third-party strangers. *E.g.*, *Ballinger*, 24 F.4th at 1293

27

n.3 (landlords were not subject to "required acquiescence" when "they invited their tenants to lease their property"); *GHP Mgmt.*, 2022 WL 17069822, at *4 ("the Moratorium does not swoop in out of the blue to force Plaintiffs to submit to a novel use of their property"); *Pakdel*, 2022 WL 14813709, at *5 ("unlike instances in which the government has required a property owner to submit to occupation by the government or a third party, a landlord has *voluntarily* invited a tenant to occupy their land"); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020) (noting the absence of "required acquiescence" because "plaintiffs voluntarily chose to rent to their tenants" before the eviction moratorium).

A tenant does not morph into an invader whenever a regulation enables the tenant to remain despite a lease violation. As *F.C.C.* explained, "it is the invitation . . . that makes the difference." *F.C.C.*, 480 U.S. at 253. Because the moratorium did not force Plaintiffs to invite third-party strangers onto their property, the element of "required acquiescence" is absent.

### (c)    Plaintiffs cannot distinguish *Yee*.

Plaintiffs try but fail to evade *Yee*. Again, the *Yee* landlords challenged a local mobile home park rent control law that prevented them from charging market rents. *Yee*, 503 U.S. 524–27. That meant that, because of a state law limiting the grounds for eviction, the landlords could not evict their lower-paying tenants for higher-paying ones. *Id*. at 526–27. This, the landlords contended, meant the rent

28

control law effected a per se physical invasion taking by forcing landlords to acquiesce to the presence of people they would prefer to exclude, transferring to those people the right of physical occupation. *Id*. at 527.

Plaintiffs gain nothing from noting that *Yee* involved a facial claim, whereas they—having dropped their facial claim—press only an as-applied claim on appeal.[14] *E.g.*, Opening at 37. *Yee* made no note of the as-applied–facial distinction when rejecting the landlords' per se physical invasion takings claim. *See Yee*, 503 U.S. at 526–32.[15] The landlords' facial claim presented all the facts the Court needed to reject it. The same was true of Plaintiffs' twin facial and as-applied claims below, and remains true of their as-applied-only claim here.

That the local ordinance in *Yee* imposed rent control is immaterial. *Cf*. Opening at 39–41. Attempting to distinguish *Yee* because of differences in the

_____

[14] By jettisoning their facial claim, perhaps to enhance this distinction from *Yee*, Plaintiffs undercut their challenge to the six-month defense—their as-applied challenge to that defense may be unripe because the record was established in the spring of 2021, before that defense took effect, and contains no evidence of Plaintiffs' tenants using that defense. *See Flower World, Inc. v. Sacks*, 43 F.4th 1224, 1229 (2022) (the ripeness inquiry turns on whether a claim is too speculative to support jurisdiction). Because Plaintiffs' challenge to the moratorium raises the same takings question, this Court need not resolve whether Plaintiffs' as-applied challenge to the six-month defense is ripe.

[15] The distinction between as-applied and facial claims arose in *Yee* only where the Court held that the landlords' facial "regulatory takings" claim—separate from their per se physical invasion takings claim—was ripe even though they had not yet applied for a rent increase under the local ordinance. *Yee*, 503 U.S. at 533–34.

challenged ordinances, Plaintiffs argue: "If the price point increased, the [*Yee* landlords'] objections would have disappeared." *Id*. at 40. But an analogous argument is true here: had the City required tenants to pay on time rather than later, Plaintiffs' objections would have disappeared. Either way—whether the alleged "invasion" comes from tenants who pay less than more, or later than sooner—the legal principle is the same. Neither can support a per se physical invasion takings claim because the government did not force landlords to acquiesce to a third-party stranger's invasion.

Plaintiffs are technically correct that the *Yee* landlords "did not object to a particular tenant's occupancy" or allege "that a tenant failed to pay the required rent." Opening at 39. But that is irrelevant. The *Yee* landlords did not need to identify a particular tenant—they wanted to evict every tenant who would not accede to higher rent, if only the local rent control ordinance would allow them to charge market rent. The Court understood that the landlords sought the authority to evict particular individuals who refused to pay higher rent—*Yee* rejected the landlords' claim because, under controlling case law, they could not base it "on their inability to exclude particular individuals." *Yee*, 503 U.S. at 531.

Mischaracterizing *Yee*, Plaintiffs insist that it has nothing to do with an alleged taking of the rights to possess and exclude. Opening at 40, 41, 44. *Yee* resolved a per se physical invasion takings claim premised on taking the rights to

30

occupy and exclude. "Petitioners contend that what has been transferred from park owner to mobile home owner is no less than *a right of physical occupation* of the park owner's land." *Yee*, 503 U.S. at 527 (emphasis added). "While the '*right to exclude*' is doubtless, as petitioners assert, 'one of the most essential sticks in the bundle of rights that are commonly characterized as property,' we do not find that right to have been taken from petitioners . . . ." *Id.* at 528 (emphasis added).

*Yee* remains on point. Landlords there pressed a per se physical invasion takings challenge to a law that permanently denied landlords the ability to evict tenants who paid less than the landlords wanted. Plaintiffs here mount the same challenge to a law that temporarily denied them the ability to evict tenants who did not pay their rent on the timeline Plaintiffs wanted.

> **(d)   Plaintiffs' attempts to cast the moratorium as governmental occupation, the taking of an easement, or the exclusion of landlords cannot be squared with the record or *Yee*.**

Turning away from *Yee*, Plaintiffs attempt to characterize the moratorium as something other than a regulation of the landlord-tenant relationship that forced no landlord to acquiesce to a third-party stranger's invasion or serve as a landlord in perpetuity. Those attempts fail.

First, Plaintiffs proclaim that this is "no different than the government physically invading and occupying the rental property itself." Opening at 21. Plaintiffs cite decisions dealing with the government taking over a business or

assuming a tenant's leasehold interest. *Id*. at 21 n.1. Nothing of the sort happened here.

Second, Plaintiffs claim that the City took a positive or negative easement or servitude. *Id*. at 33–36. None of the case law Plaintiffs cite addressed a landlord-tenant regulation. If any easement were present here (and none is), it was one Plaintiffs already granted their tenants—the right to physically enter, occupy, and use their units. The City did not take that easement—the tenants remained the only ones who could enjoy it.

Finally, Plaintiffs were not "excluded from their own property" by the moratorium any more than they were excluded from their property beforehand. *Cf*. Opening at 28. When Plaintiffs invited their tenants into their units, Plaintiffs ceded possession and largely excluded themselves. The moratorium did not alter the contours of that exclusion.

Again, *Yee* addressed a landlord-tenant regulation that, like the City's moratorium, limited landlords' preexisting right to evict tenants who refused to pay on terms the landlords preferred. *Yee* did not analogize the regulation to a physical occupation by the government, cast the regulation as the taking of an easement, or view the regulation as excluding landlords from their property. *Yee* controls.

### 3. Plaintiffs embrace distinguishable or incorrect case law.

### (a) *Cedar Point*, which addressed a law requiring an invasion by a third-party stranger, is distinguishable.

As the district court correctly recognized, *Cedar Point* is distinguishable.

*Compare* Opening at 39–41, 44–45 (relying on *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021)) with 1-ER-034 (Report and Rec.). Far from overruling *Yee*, *Cedar Point* cited it favorably for takings principles. *Cedar Point*, 141 S. Ct. at 2072. Consistent with *Yee*, *F.C.C.*, and *Loretto*, *Cedar Point* struck down a law forcing certain landowners (agricultural employers) to suffer an invasion by third-party strangers (union organizers). *Id.* at 2069.[16]

*Cedar Point* distinguished laws—like the City's moratorium—that regulate how landowners must treat those they have invited onto their land: "Limitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public." *Id.* at 2077. As *Loretto*, *F.C.C.*, and *Yee* instruct, the same principle applies to rental property: limitations on how a landlord must treat a

---

[16] The only new issue in *Cedar Point* was whether the law created any less of a physical easement for per se physical invasion takings purposes when the right to invade did not span every hour of every day of the year. *Id.* at 2074. *Cedar Point* ruled that an intermittent physical easement effects a per se taking. *Id.* at 2074–76.

tenant on the premises differ from regulations—like the one in *Cedar Point*—granting a third-party stranger the right to invade property.

Federal district courts and the Washington Court of Appeals uniformly distinguish *Cedar Point* when raised in a challenge to an eviction moratorium or other landlord-tenant regulation. *E.g.*, *Williams*, 2022 WL 17169833, at *9; *GHP Mgmt.*, 2022 WL 17069822, at *3–4; *Pakdel*, 2022 WL 14813709, at *6; *Tuck's Restaurant and Bar v. Newsom*, No. 2:20-cv-02256-KJM-CKD, 2022 WL 5063861, at*9–10 (E.D. Cal. Oct. 4, 2022); *Stuart Mills Props.,* 2022 WL 4493573, at *2–3; *Gallo*, 2022 WL 2208934, at *8; *Farhoud*, 2022 WL 326092, at *10; *Building and Realty Institute*, 2021 WL 4198332, at *22 n.26; *Jevons*, 561 F. Supp. 3d at 1106–07; *Southern Cal. Rental Housing Ass'n*, 2021 WL 3171919, at *8; *Rental Housing Ass'n*, 512 P.3d at 557–58. This Court should too.

### (b) An outlier, the Eighth Circuit in *Heights Apts*. incorrectly applied *Cedar Point* rather than *Yee* to an eviction moratorium challenge.

The Eighth Circuit's *Heights Apts.* decision, which swims against the tide of controlling and persuasive authority, is an incorrect outlier. *Cf.* Opening at 37–39 (relying on *Heights Apts., LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022)). *Heights Apts.* followed *Cedar Point* instead of *Yee* to hold that landlords had pleaded a "plausible" per se physical invasion takings claim against Minnesota's eviction

moratorium, at least sufficient to reverse a motion to dismiss and remand to the district court. *Heights Apts.*, 30 F.4th at 733.

The Eighth Circuit panel distinguished *Yee* based on the incorrect premise that the *Yee* landlords "sought to exclude future or incoming tenants rather than existing tenants." *Id*. To the contrary, the *Yee* landlords also sought to exclude existing tenants, claiming that the challenged law had the effect of "granting to the tenants of mobilehomes [sic] *presently in The Park*, as well as the successors in interest of such tenants, the right to physically permanently occupy and use" the landlords' property. *Yee*, 503 U.S. at 525 (emphasis added; quoting the complaint). *Accord Heights Apts., LLC v. Walz*, Order Denying Petition for Rehearing En Banc, 2022 WL 2167494, at *1 (8th Cir. June 16, 2022) (Colloton, J., dissenting) (noting the same faulty premise). Perhaps the Eighth Circuit panel erred on that crucial point because it ruled without the benefit of briefing on *Cedar Point*— briefing in *Heights Apts.* concluded in May 2021, a month before the Supreme Court issued *Cedar Point*. *See* Petition for Rehearing or Rehearing *En Banc* at 5, *Heights Apts., LLC v. Walz* (8th Cir. No. 21-1278) (*Cedar Point* "came after the parties had briefed the merits of this appeal"); *accord* Docket, *Heights Apts.* (8th Cir. No. 21-1278).

No matter the error's source, courts outside the Eighth Circuit have found *Heights Apt.*'s treatment of the per se physical invasion takings claim unpersuasive

35

and declined to follow it. *E.g.*, *Williams*, 2022 WL 17169833, at *8; *Gallo*, 2022 WL 2208934, at *9. This Court should too.

### (c) *Alabama Realtors* addressed no takings claim and left *Yee* undisturbed.

Plaintiffs latch onto a sentence from *Alabama Realtors*, an unsigned Supreme Court "shadow docket"[17] order issued in response to an emergency motion for injunctive relief. Opening at 8–11, 37 (quoting *Alabama Ass'n of Realtors, v. Department of Health & Human Services*, Order on App. to Vacate Stay, 141 S. Ct. 2485 (2021) (per curiam)).

Plaintiffs gain nothing from that sentence. *Alabama Realtors* challenged an administrative eviction moratorium enacted by the CDC. *Alabama Realtors*, 141 S. Ct. at 2487–88. The trial court ruled that the CDC lacked authority to enact the moratorium, but the court stayed its order pending appeal—a stay the Court of Appeals retained. *Id*. The sole issue before the Supreme Court was whether to

---

[17]A law professor coined "shadow docket" to refer to the orders and summary decisions that do not result from the Court's formal merits docket. William Baude, *Foreword: The Supreme Court's Shadow Docket*, 9 N.Y.U.J.L. & LIBERTY 1 (2015). *See also Whole Woman's Health v. Jackson*, Order on App. for Injunctive Relief, 141 S. Ct. 2494, 2500 (2021) (Kagan, J., dissenting) (noting "just how far the Court's 'shadow-docket' decisions may depart from the usual principles of appellate process"); Stephen I. Vladeck, *The Solicitor General and the Shadow Docket*, 133 HARV. L. REV. 123 (2019) (critiquing the shadow docket's use).

grant the plaintiffs' emergency motion to vacate the stay pending the CDC's appeal. *Id.*

The Court granted the motion after considering the likelihood of success on the merits and balancing the equities. *Id.* at 2488–90. On the likelihood-of-success prong, the Court considered no takings claim—it found only that, although Congress could adopt a moratorium, the CDC lacked authority to do it administratively: "If a federally imposed eviction moratorium is to continue, Congress must specifically authorize it." *Id.* at 2490. Turning to the equities, the Court concluded its list of harms landlords would suffer with the sentence Plaintiffs invoke: "And preventing them from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership— the right to exclude." *Id.* at 2489 (citing *Loretto*).

That sentence fails to advance Plaintiffs' argument because *Alabama Realtors* addressed no takings claim and failed to mention, let alone overrule, *Yee*. Rather than erect a constitutional hurdle to eviction moratoria, the Court invited Congress to authorize one. The sentence merely acknowledged an "intrusion" on the right to exclude—which *Yee* also acknowledged while nevertheless rejecting a per se physical invasion takings claim. *Yee*, 503 U.S. at 528 ("the right to exclude is doubtless . . . one of the most essential sticks in the bundle of rights that are

commonly characterized as property") (internal quotation marks omitted). *Accord GHP Mgmt.*, 2022 WL 17069822, at *2 (distinguishing *Alabama Realtors*).

      **(d)**    **Plaintiffs' analogy to *Horne* is inapt.**

Plaintiffs incorrectly analogize their case to *Horne*, which struck a requirement that raisin growers set aside a portion of their crop so the government could sell it. *E.g.*, Opening at 7, 24, 31 (citing *Horne v. Department of Agric.*, 576 U.S. 350 (2015)). *Horne* found that the requirement amounted to a physical appropriation of the grapes, and that it was no less of an appropriation simply because the growers could exit the market by growing other crops. *Horne*, 576 U.S. at 364–67. Plaintiffs assert that the moratorium appropriates their rights, a violation not cured by their voluntary decision to enter the residential leasing market. Opening at 30–31, 43–44.

This Court has already rejected an analogy between *Horne*'s physical appropriation of raisins and landlord-tenant regulations, reasoning that when a person voluntarily surrenders a property interest—like when a landlord rents their property—the government has not deprived that person of that interest. *Ballinger*, 24 F.4th at 1293–94.

Other courts recognize the obvious: a direct physical appropriation of crops bears no resemblance to regulating the economic relationship between a landlord and tenant. *E.g.*, *Williams*, 2022 WL 17169833, at *11 ("a landlord's decision to

rent property is different than selling a commodity"); *335-7 LLC v. City of New York*, 524 F. Supp. 3d 316, 329 (S.D.N.Y. 2021) ("unlike the law in *Horne*, [a rent control law] does not transfer possession or disposal rights from landlords").

### (e) *Armstrong* adds nothing to Plaintiffs' per se physical invasion takings claim.

Over sixty years ago, *Armstrong* claimed—in a parting rhetorical flourish unsupported by citation to history or law—that the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Building on that line, Plaintiffs argue that the moratorium effected a taking because it left them alone "to bear the public burden of the pandemic response." Opening at 27. *Accord id.* at 7, 32. That argument is misplaced.

Although the Supreme Court often repeats *Armstrong*'s unsupported assertion about the Takings Clause's objective, *e.g.*, *Palazzolo v. Rhode Island*, 533 U.S. 606, 617–18 (2001); *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 835 n.4 (1987), *Lingle* rejected *Armstrong*'s "in all fairness and justice" language as a takings test:

> [The property owner] appeals to the general principle that the Takings Clause is meant "'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice,

> should be borne by the public as a whole."' But that appeal is clearly misplaced  . . . [because a] test that tells us nothing about the actual burden imposed on property rights, or how that burden is allocated, cannot tell us when justice might require that the burden be spread among taxpayers through the payment of compensation.

*Lingle*, 544 U.S. at 542–43 (citations omitted). Instead of a test that identifies what burdens should properly be borne by the public, *Lingle* explained that the primary touchstone of takings law discerns "regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id*. at 539. Instead of probing the justification for or distribution of the burden, the focus must be "directly upon the severity of the burden that government imposes upon private property rights." *Id*. It does not matter what the government gets from the taking or whether the government should have secured it from others.

Even if *Armstrong*'s line were the test for a physical invasion takings claim, Plaintiffs have not met it. Plaintiffs should not overstate the magnitude of the burden they carried, given that over 70% of their tenants were current on rent, most of those in arrears were only slightly behind, and governmental funding was available to mitigate unpaid rent. And given the pandemic's widespread economic impact and the breadth of business regulations imposed to address the pandemic, Plaintiffs' claim about bearing the response's burden alone is untenable. *See*, *e.g.*, *Slidewaters LLC v. Washington State Dep't of Labor and Industries*, 4 F.4th 747,

753 (2021) (discussing enforcement of state regulations); *In re Recall of Inslee*, 508 P.3d 635, 638 (Wash. 2022) (discussing various state regulations).

### 4. Plaintiffs invoke irrelevant takings truisms and mischaracterize Washington eviction law.

#### (a) Irrelevant takings truisms gain Plaintiffs nothing.

Plaintiffs invoke four takings truisms, all irrelevant to this appeal. First, they focus on how a taking may be temporary. Opening at 46–48. But here there is no taking, temporary or permanent.

Second, Plaintiffs discuss how a physical invasion taking can occur even where the government invades only part of one's property. *Id*. at 48–54. But here there is no invasion within the meaning of *Loretto*, *F.C.C.*, or *Yee*.

Third, Plaintiffs note that the government's reason for a physical invasion taking does not absolve the constitutional violation. *Id*. at 25–26. But again, here there is no physical invasion, just a regulation of the landlord-tenant relationship— a regulation intended to mitigate the pandemic's harms.

Finally, Plaintiffs observe that "the act of allowing a tenant to take possession at lease signing does not waive future claims that a physical taking has occurred . . . ." *Id*. at 42. But no one here suggests that Plaintiffs waived valid takings claims. If the government forced Plaintiffs to, say, acquiesce to a cellular communications provider installing an antenna on their roof, Plaintiffs could assert a valid per se physical invasion takings claim despite having leased spaces below

41

the roof to tenants. But under *Yee*, Plaintiffs have no valid per se physical invasion takings claim when the government adjusts the relationship between Plaintiffs and their tenants.

      **(b)**      **Washington law conveys no "fundamental right" to evict a tenant.**

Plaintiffs falsely claim a "fundamental right" under state common law to evict: "Under Washington common law, a rental property owner has the fundamental right to take possession of his or her property and to exclude defaulted tenants." Opening at 27 (citing *FPA Crescent Assocs., LLC v. Jamie's, LLC*, 360 P.3d 934 (Wash. Ct. App. 2015)). But the authority Plaintiffs cite undercuts that claim—without characterizing the common law right of ejectment as "fundamental" (or even uttering "fundamental"), *FPA Crescent Assocs.* held that landlords must follow state eviction statutes, which supplanted common law remedies. *FPA Crescent Assocs.*, 360 P.3d at 938–40.

Plaintiffs enjoy no unfettered, fundamental right to evict in Washington's highly regulated rental housing market—only a statutory right subject to change. The Washington Court of Appeals ruled that the City's six-month defense implicates no "fundamental right" under Washington's privileges and immunities clause because "rights left to the discretion of the legislature," such as the right to evict, "are not generally considered fundamental." *Rental Housing Ass'n*, 512 P.3d at 565–66. For example, Washington limits the lawful bases for eviction, imposes

42

notice and other requirements forestalling eviction actions, and authorizes a judge to delay an eviction for up to ninety days. *See, e.g.*, WASH. REV. CODE § 59.12.030(3) (notice); *id.* § 59.18.180 (notice) ; *id.* § 59.18.410(3)  (potential delay); *id.* § 59.18.650 (limiting the grounds for eviction).

> **5. Plaintiffs' core argument leads down a slippery slope where any law allowing a tenant to violate a material lease term—no matter how contrary to public policy that term may be—would effect a per se physical invasion taking.**

Plaintiffs' central argument is premised on a tenant violating a material lease term—such a violation, Plaintiffs reason, entitles a landlord to evict, so a regulation limiting that eviction right amounts to a per se physical invasion taking. *E.g.*, Opening at 19–20, 33–34, 39, 42. The material terms Plaintiffs invoke in their as-applied challenge are the obligations to timely pay rent and vacate after the expiration of a fixed-term lease. *E.g.*, *id*. at 48. But their argument cannot be limited to those terms; its logic leads down a slippery slope.

Imagine a landlord and tenant enter into a lease that limits tenants to those over 55, but a local ordinance then outlaws discrimination based on age, prompting the tenant to reveal that he is only 50 years old. If Plaintiffs are correct that barring eviction despite a tenant violating a material lease term effects a per se physical invasion taking, how could that ordinance—or any antidiscrimination housing law that nixes a landlord's preference memorialized in a lease—pass constitutional muster? Plaintiffs' logic, which they express in broad terms, would apply equally

to a law that, for the first time, banned eviction based on race, religion, or sexual orientation despite lease terms to the contrary:

> In the past, at lease signing, [Plaintiffs] had the right to possess and exclude. [They] could decide to rent and if a particular tenant violated the terms, the owner had the power and control to take possession and exclude the tenant.
>
> But in the present, [Plaintiffs'] right to possess and exclude were appropriated by virtue of the Respondents' eviction bans. The property owner's consent to the tenant's possession became an irrelevancy, replaced by Respondents' unilateral determination as to who can possess a rental unit, when, and for how long.

Opening at 42–43 (citation omitted).

Rent control ordinances also fail under Plaintiffs' logic. They recognize case law holding that rent control effects no per se physical invasion taking. Opening at 40. But they offer no principled basis for why such laws fall outside their argument—just that case law says so. If a landlord and tenant enter into a lease that provides for the rent to increase four percent annually, but an ordinance then limits all increases to two percent, the tenant will violate a material lease term by paying the lower amount. Why is that ordinance constitutionally permissible despite preventing the eviction of that tenant in material breach, but the City's moratorium—which allows a tenant to pay later than on time—is not?

Plaintiffs ask this Court to embrace a mode of constitutional analysis while ignoring its implications. This Court should decline that invitation.

44

## VII. CONCLUSION

Controlling Supreme Court and Ninth Circuit case law—backed by the overwhelming weight of persuasive authority—forecloses Plaintiffs' per se physical invasion takings claim. The City's moratorium required no landlord to acquiesce to the presence of a third-party stranger. It absolved no tenant from their duty to pay the rent they owed. It forced no landlord to continue serving as such in perpetuity. It merely regulated the landlord-tenant relationship by temporarily suspending a landlord's' access to one remedy—eviction—as part of the City's response to an unprecedented public health crisis.

Because Plaintiffs' claim lacks merit, the City respectfully asks this Court to affirm summary judgment for the City.

## VIII.  STATEMENT OF RELATED CASES

*Jevons v. Inslee*, No. 22-35050, is related to this case within the meaning of Cir. Rule 28-2.6 because *Jevons* challenges the State's eviction moratorium, which Plaintiffs challenge here, in part by raising a physical invasion takings claim like the one Plaintiffs raise here.

*GHP Mgmt. Corp. v. City of Los Angeles*, No. 23-55013, is likely related to this case within the meaning of Cir. Rule 28-2.6. In the district court, plaintiff landlords in *GHP* brought a per se physical invasion takings claim and a different takings claim against a local pandemic-related eviction moratorium. If those landlords maintain their per se physical invasion takings claim on appeal, it will be similar to the one Plaintiffs pursue here.

Respectfully submitted January 17, 2023.

ANN DAVISON
Seattle City Attorney

By:     s/ Roger D. Wynne
        s/ Jeffrey S. Weber

Roger D. Wynne, WSBA # 23399
Jeffrey S. Weber, WSBA #24496
Assistant City Attorneys
Attorneys for Appellee-Defendant City of Seattle

46

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number** 22-35656_____

I am the attorney or self-represented party.

**This brief contains 10,306 words,** including _0_ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** \_\_\_\_s/ Roger D. Wynne_____ **Date** \_\_Jan. 17, 2023_____

47