No. 22-35656

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EL PAPEL, LLC ET AL.,

*Plaintiffs-Appellants*,

v.

CITY OF SEATTLE, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Western District of Washington (Case No. 2:20-cv-01323-RAJ-JRC)

**BRIEF OF APPLESEED FOUNDATION, ALLIANCE FOR JUSTICE, INTERNATIONAL MUNICIPAL LAWYERS' ASSOCIATION, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL HOUSING LAW PROJECT, AND WESTERN CENTER ON LAW AND POVERTY AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

Rachel L. Fried
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
rfried@democracyforward.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Appleseed Foundation is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of Appleseed.

Alliance for Justice is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of AFJ.

International Municipal Lawyers' Association is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of IMLA.

Lawyers' Committee for Civil Rights Under Law is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of the Lawyers' Committee.

National Housing Law Project is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of NHLP.

Western Center on Law and Poverty is a non-profit entity and has no parent corporation. No publicly owned corporation owns 10% or more of the stocks of the Western Center.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ii

INTEREST OF AMICI CURIAE ............................................................. 1

INTRODUCTION ...................................................................................... 2

ARGUMENT ............................................................................................. 2

I. The eviction moratoria did not effect a per se, physical taking. ...... 2

    A. Regulations of the landlord-tenant relationship, including the eviction moratoria at issue in this case, are properly challenged as regulatory takings governed by the *Penn Central* analysis. ................. 4

    B. The case law on which Appellants rely does not change the takings claim analysis. .......................................................................... 18

    C. *Cedar Point* reaffirmed, without expanding, longstanding physical takings doctrine. .................................................................... 23

CONCLUSION ....................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*301, 712, 2103 & 3151 LLC v. City of Minneapolis*,
27 F.4th 1377 (8th Cir. 2022) ................................................................25

*335-7 LLC v. City of New York*,
524 F. Supp. 3d 316 (S.D.N.Y. 2021)............................................12, 15

*Ala. Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021) ...........................................................................21

*Auracle Homes, LLC v. Lamont*,
478 F. Supp. 3d 199 (D. Conn. 2020)....................................................11

*Ballinger v. City of Oakland*,
24 F.4th 1287 (9th Cir. 2022) ..................................................................9

*Baptiste v. Kennealy*,
490 F. Supp. 3d 353 (D. Mass. 2020)....................................................11

*Better Hous. for Long Beach v. Newsom*,
452 F. Supp. 3d 921 (C.D. Cal. 2020) .....................................................9

*Bldg. & Realty Inst. v. New York*, No, 19-CV-11285 (KMK),
2021 WL 4198332 (S.D.N.Y Sept. 14, 2021) .......................................26

*Blevins v. United States*,
158 Fed. Cl. 295 (Fed. Cl. Feb. 18, 2022)........................................25, 27

*Block v. Hirsh*,
256 U.S. 135 (1921) ...............................................................................13

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021)..................................................................*passim*

*Cmty. Hous. Improvement Program v. City of New York*,
492 F. Supp. 3d 33 (E.D.N.Y. 2020) .......................................................9

*Connolly v. Pension Benefit Guar. Corp.*,
475 U.S. 211 (1986) ...............................................................................13

ii

*DiVittorio v. Cnty. of Santa Clara,*
　　No. 21-CV-03501-BLF, 2022 WL 409699 (N.D. Cal. Feb.
　　10, 2022) ................................................................................ 26

*El Papel LLC v. Durkin,*
　　No. 2:20-CV-01323-RAJ-JRC, 2021 WL 4272323 (W.D.
　　Wash. Sept. 15, 2021) ............................................................. 6

*Elmsford Apartment Assocs., LLC v. Cuomo,*
　　469 F. Supp. 3d 148 (S.D.N.Y. 2020) ............................... 11, 17

*Farhoud v. Brown,*
　　No. 3:20-CV-2226-JR, 2022 WL 326092 (D. Or. Feb. 3,
　　2022) ................................................................................... 11, 26

*FCC v. Fla. Power Corp.,*
　　480 U.S. 245 (1987) ............................................................... 7, 8

*Fisher v. City of Berkeley,*
　　37 Cal. 3d 644 (Cal. 1984) ...................................................... 12

*Gallo v. D.C.,*
　　No. 1:21-CV-03298 (TNM), 2022 WL 2208934 (D.D.C.
　　June 21, 2022) ..................................................................... 11, 20

*GHP Mgmt. Corp. v. City of Los Angeles,*
　　No. CV 21-06311 DDP, 2022 WL 17069822 (C.D. Cal. Nov.
　　17, 2022) ............................................................................. 11, 21

*Golf Vill. N., LLC v. City of Powell, Ohio,*
　　14 F.4th 611 (6th Cir. 2021) ................................................... 27

*Gonzales v. Inslee,*
　　504 P.3d 890 (Wash. Ct. App. 2022) ................................. 10, 27

*Hardy v. United States,*
　　156 Fed. Cl. 340 (2021) ...................................................... 25, 27

*Heights Apartments, LLC v. Walz,*
　　30 F.4th 720 (8th Cir. 2022) ................................................... 20

iii

*Hinkle Fam. Fun Ctr., LLC v. Grisham*,
 586 F. Supp. 3d 1118 (D.N.M. Feb. 17, 2022) ..................................... 27

*Jevons v. Inslee*,
 561 F. Supp. 3d 1082, 1105-06 (E.D. Wash. Sept. 21, 2021) ........ 10, 26

*KI Fla. Properties, Inc. v. Walton Cty.*,
 No. 3:20CV5358-RH-HTC, 2021 WL 5456668 (N.D. Fla.
 Oct. 15, 2021) .................................................................................. 27

*Lingle v. Chevron U.S.A. Inc.*,
 544 U.S. 528 (2005) ....................................................................... 4, 5, 6

*Loretto v. Teleprompter Manhattan CATV Corp.*,
 458 U.S. 419 (1982) .................................................................. *passim*

*Lucas v. S.C. Coastal Council*,
 505 U.S. 1003 (1992) ............................................................................ 4

*Munn v. Illinois*,
 94 U.S. 113 (1876) .............................................................................. 17

*Munzel v. Hillsborough Cnty.*,
 No. 8:21-CV-2185-WFJ-AAS, 2022 WL 671578 (M.D. Fla.
 Mar. 7, 2022) .................................................................................... 25

*Pa. Coal Co. v. Mahon*,
 260 U.S. 393 (1922) .............................................................................. 4

*Pakdel v. City & Cnty. of San Francisco*,
 No. 17-CV-03638-RS, 2022 WL 14813709 (N.D. Cal. Oct.
 25, 2022) ............................................................................................ 12

*Pavlock v. Holcomb*,
 35 F.4th 581 (7th Cir. 2022) ............................................................... 27

*Penn Central Transportation Co. v. City of New York*,
 438 U.S. 104 (1978) .............................................................................. 5

*Rancho de Calistoga v. City of Calistoga*,
 800 F.3d 1083 (9th Cir. 2015) ......................................................... 9, 17

iv

*Rent Stabilization Ass'n of New York City, Inc. v. Higgins*,
83 N.Y.2d 156 (N.Y. 1993) ............................................... 9, 15

*S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*,
550 F. Supp. 3d 853 (S.D. Cal. 2021) ........................... 11, 26

*Skatemore, Inc. v. Whitmer*,
No. 1:21-CV-66, 2021 WL 3930808 (W.D. Mich. Sept. 2,
2021) ............................................................................ 27

*Stuart Mills Props., LLC v. City of Burbank*,
No. 2:22-CV-04246-RGK-AGR, 2022 WL 4493573 (C.D.
Cal. Sept. 19, 2022) ..................................................... 11

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) ................................................. 5, 6, 17

*Troy Ltd. v. Renna*, 727 F.2d 287, 302 (3d Cir. 1984) ............ 9

*Valancourt Books, LLC v. Perlmutter*,
554 F. Supp. 3d 26 (D.D.C. July 23, 2021) ...................... 27

*Williams v. Alameda Cnty.*,
No. 3:22-CV-01274-LB, 2022 WL 17169833 (N.D. Cal.
Nov. 22, 2022) ........................................................... 11, 20

*Yee v. City of Escondido*,
503 U.S. 519 (1992) ................................................. *passim*

## Other Authorities

192 Canadian Med. Ass'n J. E716 (June 29, 2020),
https://bit.ly/3zsHvM9 ...................................................... 14

Centers for Disease Control and Prevention, *COVID Data
Tracker: Trends in Number of COVID-19 Cases and
Deaths in the US Reported to CDC, by State/Territory*,
http://bit.ly/3Wm4ZLB (last visited Jan. 11, 2023) ........... 13

Karl Manheim, *Tenant Eviction Protection and the Takings
Clause*, 1989 Wis. L. Rev. 925, 996–97 (1989) .......... 8, 12, 14, 15

Anjalika Nande et al., *The effect of eviction moratoria on the transmission of SARS-CoV-2*, Nature Communications (Apr. 15, 2021), https://www.nature.com/articles/s41467-021-22521-5 ............................................................................ 14

Melissa Perri et al., *COVID-19 and people experiencing homelessness: challenges and mitigation strategies*, 192 Canadian Med. Ass'n J. E716 (June 29, 2020), https://bit.ly/3zsHvM9 .......................................................... 14

## INTEREST OF AMICI CURIAE[1]

Amici include organizations dedicated to promoting just access to safe and affordable housing and protecting tenants from eviction. Amici have significant experience researching and advocating for housing rights. Amici also include an association representing the collective viewpoint of local government entities on legal matters, including local governments' authority to regulate the landlord-tenant relationship. Amici are familiar with the Supreme Court's decision in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), and with the numerous attempts, including by landlords, to use that decision to expand the physical takings doctrine beyond the bounds of that case and contrary to longstanding Takings Clause case law. Amici have a strong interest in supporting state and local governments' efforts to protect vulnerable tenants from eviction during emergencies like the COVID-19 pandemic.

---

[1] Amici certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than Amici, their members, and their counsel contributed money intended to fund this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties to this appeal have consented to the filing of this amicus brief.

## INTRODUCTION

Amici agree with the District Court and with Appellees that Washington's and Seattle's eviction moratoria in effect during the COVID-19 pandemic did not constitute a physical taking of private property under the Fifth Amendment. Amici submit this brief to demonstrate that Takings Clause challenges to regulations of the landlord-tenant relationship—like the eviction moratoria at issue here—are governed by the standard set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). *Penn Central* has provided the appropriate standard since long before the decision in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), and it remains the appropriate standard following *Cedar Point*. Appellants' argument that the eviction moratoria effected a *physical* taking of their property following *Cedar Point* is simply wrong, and the District Court correctly dismissed that claim.

## ARGUMENT

### I. The eviction moratoria did not effect a per se, physical taking.

This case concerns the regulation of contracts between landlords and the tenants they voluntarily invite onto their properties. Washington's and Seattle's eviction moratoria temporarily prohibited landlords from

evicting their tenants—subject to specified exceptions—during a time of emergency.[2] For decades, courts have consistently rejected landlords' arguments that regulations of the landlord-tenant relationship effect a physical, "per se" taking of property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982)**. *Cedar Point*, 141 S. Ct. 2063, which held that governments generally may not require property owners to suffer the intrusion onto their property of uninvited third parties without just compensation, does not upset—but instead reaffirms—the established case law subjecting regulations of the landlord-tenant relationship to a regulatory takings analysis under *Penn Central*.

---

[2] The State's eviction moratorium was in effect from March 18, 2020, through June 30, 2021. *See* ER-645, 653. Seattle's eviction moratorium was in effect from March 14, 2020 through February 28, 2022. *See* CitySER-201–04, 11–12. The two eviction moratoria have slight differences, as set forth in the Defendant-Appellees' respective briefs. *See* Br. of Def.-Appellee Robert W. Ferguson at 5–8; Br. of City of Seattle at 9–11. These differences are largely immaterial to the issues on appeal, and neither moratorium effected a physical taking of property. This brief discusses the eviction moratoria jointly, noting their differences where applicable.

**A. Regulations of the landlord-tenant relationship, including the eviction moratoria at issue in this case, are properly challenged as regulatory takings governed by the *Penn Central* analysis.**

Compensable takings come in two main varieties: physical takings and regulatory takings. "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992); *see also Cedar Point*, 141 S. Ct. at 2072 (physical taking occurs when "the government has physically taken property for itself or someone else"). By contrast, the government effects a so-called regulatory taking when it "restrict[s] a property owner's ability to use his own property," *Cedar Point*, 141 S. Ct. at 2072, and that use restriction "goes too far," *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

Both physical takings and use restrictions "that completely deprive an owner of '*all* economically beneficial us[e]' of her property" require just compensation regardless of how beneficial the public use of the property may be. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). The doctrines governing physical takings and "total regulatory takings" under *Lucas*, *id.*, are designed to justly compensate property owners for the destruction

4

of *all three* of their rights as owners to (1) possess, (2) use, and (3) dispose of their property. *Loretto*, 458 U.S. at 435. But "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 327 (2002) (quotation omitted).

Regulations that do not fall into the "relatively narrow categories" of physical takings and *Lucas* takings, *Lingle*, 544 U.S. at 538—the vast majority of regulations that affect private property—are governed by the "flexible test" set forth in *Penn Central*. *Cedar Point*, 141 S. Ct. at 2071–72. Under *Penn Central*, courts consider (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124. The *Penn Central* factors "aim[] to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. *Penn Central* supplies the "default rule" for takings challenges. *Tahoe-Sierra*, 535 U.S. at 332. "This longstanding distinction between acquisitions of property for public use, on the one

hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Id.* at 323.

As the Report and Recommendation correctly concluded, the eviction moratoria at issue, like other regulations of the landlord-tenant relationship, did not require "a physical invasion of plaintiffs' property." *El Papel LLC v. Durkan*, No. 2:20-CV-01323-RAJ-JRC, 2021 WL 4272323, at *16 (W.D. Wash. Sept. 15, 2021), *report and recommendation adopted in pertinent part, as modified sub nom. El Papel LLC v. Durkan*, No. 20-CV-01323-RAJ, 2022 WL 2828685 (W.D. Wash. July 20, 2022). Rather, regulations affecting the landlord-tenant relationship that are challenged as violations of the Takings Clause are subject to *Penn Central*'s fact-specific inquiry. Indeed, the United States Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto*, 458 U.S. at 440; *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("[S]tatutes regulating the

economic relations of landlords and tenants are not *per se* [physical] takings.").

The reason for this is simple: Tenants are people whom property owners invite onto their properties. That is the basic premise of the landlord-tenant relationship. As the Supreme Court explained in *Yee*, landlords "voluntarily rent[] their land." 503 U.S. at 527. Because tenants are invitees of the landlord, they cannot be characterized as third-party intruders, as the union organizers were in *Cedar Point*, 141 S. Ct. at 2072, 2076, or the cable boxes in *Loretto*, 458 U.S. at 440.[3] In *Yee*, property owners argued that a rent control ordinance, in conjunction with a state law restricting their ability to evict mobile home park tenants, effected a physical taking by enabling mobile home park tenants to be "effectively . . . perpetual tenant[s]." 503 U.S. at 527. The Supreme Court unanimously rejected this argument. Because the tenants "were invited by petitioners, not forced upon them by the government," as a matter of fact "no government ha[d] required any physical invasion of petitioners'

---

[3] The fact that tenants are invited onto the property is key, but nothing in this brief should suggest that all regulations involving access to property of people other than invitees cause a physical taking. *See also infra* note 9.

property." *Id.* at 528; *see also* Karl Manheim, *Tenant Eviction Protection and the Takings Clause*, 1989 Wis. L. Rev. 925, 996–97 (1989) ("Existing tenants . . . are not strangers. By renting to them initially, the landlord voluntarily yielded certain rights, notably those associated with possession . . . . [A] tenant's presence does not constitute 'occupation' of property because it is, or was, by invitation."). Contrary to Appellants' assertions, Br. of Appellants at 36, 46, restrictions on landlords' ability to evict their invited tenants thus do not amount to an appropriation of the right to exclude, let alone the entire bundle of property rights necessary to effect a per se, physical taking.

This crucial distinction between regulation of the relationship between landlords and invited tenants, on the one hand, and regulation that permits "an interloper with a government license" to intrude upon property, on the other hand, determines whether the physical takings or regulatory takings doctrine applies. *Fla. Power*, 480 U.S. at 253. As this Court recently reaffirmed, "[w]hen a person voluntarily surrenders liberty or property, like when the [property owners] chose to rent their property causing them to [be subject to rental housing regulation], the State has not *deprived* the person of a constitutionally protected

interest." *Ballinger v. City of Oakland*, 24 F.4th 1287, 1293 (9th Cir. 2022), *cert. denied*, 142 S. Ct. 2777 (2022) (quotation omitted); *see also Better Hous. for Long Beach v. Newsom*, 452 F. Supp. 3d 921, 934 (C.D. Cal. 2020) ("[B]ecause they regulate the use of property, rent control provisions and restrictions on terminating tenancies are examined under *Penn Central*'s regulatory takings test." (citing *Yee*, 503 U.S. at 522–23, 528–30)). Accordingly, this Circuit and courts across the country consistently reject property owners' arguments that tenant-protective regulations can constitute physical takings.[4]

---

[4] *See, e.g.*, *Ballinger*, 24 F.4th at 1293 (regulations such as rent control ordinances or relocation fees "'merely regulate[] [property owners'] *use* of their land by regulating the relationship between landlord and tenant,'" and are not physical takings (quoting *Yee*, 503 U.S. at 528)); *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1086–87 (9th Cir. 2015) (rejecting property owners' "novel legal theory" that rent control ordinance be governed by anything other than "established regulatory-takings jurisprudence"); *Troy Ltd. v. Renna*, 727 F.2d 287, 302 (3d Cir. 1984) ("Statutory tenancy laws protecting holdover tenants are not takings, but merely regulations of the use to which private property may be put. Such regulations of the use of private property frequently involve costs to the owner. They are nevertheless not deemed to be takings."); *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 44 (E.D.N.Y. 2020), *appeal docketed*, No. 20-3366 (2d Cir. argued Feb. 16, 2022) (rejecting landlords' argument that regulations regarding rent control and tenant consent for condominium conversion should be analyzed as physical takings); *Rent Stabilization Ass'n of New York City, Inc. v. Higgins*, 83 N.Y.2d 156, 172 (N.Y. 1993) ("That a rent-regulated tenancy might itself be of indefinite duration—as has long been the case

Based on these established principles, two courts have, like the District Court in this case, already rejected landlords' arguments that the State's eviction moratorium constitutes a physical taking. In *Jevons v. Inslee*, the Eastern District of Washington held that the State's eviction moratorium "does not constitute a *per se* taking because the moratorium did not require Plaintiffs to submit to physical occupation or invasion of their land and did not appropriate Plaintiffs' right to exclude." 561 F. Supp. 3d 1082, 1105-06 (E.D. Wash. Sept. 21, 2021), *appeal docketed*, No. 22-35050 (9th Cir. Jan. 18, 2022). The Court of Appeals of Washington likewise stated that a physical takings challenge to the State's eviction moratorium was "similar to *Yee* and . . . dissimilar to *Cedar Point Nursery*" and held that "the eviction moratorium did not constitute a physical per se taking." *Gonzales v. Inslee*, 504 P.3d 890, 904–05 (Wash. Ct. App. 2022), *appeal docketed*, No. 100992-5 (Wash. June 3, 2022).

Numerous courts have sustained other state and local governments' eviction moratoria during the ongoing COVID-19 pandemic. For example, the Central District of California recently held that Los Angeles's eviction

---

under rent control and rent stabilization—does not, without more, render it a permanent physical occupation of property.").

moratorium was not a physical taking because it "d[id] not swoop in out of the blue to force Plaintiffs to submit to a novel use of their property," nor did it "compel[] a landowner to 'refrain in perpetuity from terminating a tenancy.'" *GHP Mgmt. Corp. v. City of Los Angeles*, No. CV 21-06311 DDP (JEMX), 2022 WL 17069822, at *3 (C.D. Cal. Nov. 17, 2022), *appeal docketed*, No. 23-55013 (9th Cir. Jan. 6, 2023) (quoting *Yee*, 503 U.S. at 528).[5]

These cases apply directly here. Landlords freely agreed to place their unit onto the rental market and invited a tenant to take possession of it. Like other regulations of the relationship between landlords and their invited tenants, the eviction moratoria did not effect a physical intrusion onto property. Courts have rejected physical takings challenges to

---

[5] *Accord Williams v. Alameda Cnty.*, No. 3:22-CV-01274-LB, 2022 WL 17169833, at *12 (N.D. Cal. Nov. 22, 2022); *Stuart Mills Props., LLC v. City of Burbank*, No. 2:22-CV-04246-RGK-AGR, 2022 WL 4493573, at *3 (C.D. Cal. Sept. 19, 2022); *Gallo v. D.C.*, No. 1:21-CV-03298 (TNM), 2022 WL 2208934, at *10 (D.D.C. June 21, 2022); *Farhoud v. Brown*, No. 3:20-CV-2226-JR, 2022 WL 326092, at *10 (D. Or. Feb. 3, 2022); *S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 866 (S.D. Cal. 2021); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220 (D. Conn. 2020); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 163 (S.D.N.Y. 2020), *appeal dismissed sub nom. 36 Apartment Assocs., LLC v. Cuomo*, 860 F. App'x 215 (2d Cir. 2021).

regulations that prohibit eviction of tenants for much longer periods of time than the duration of the eviction moratoria at issue. *See, e.g.*, *Pakdel v. City & Cnty. of San Francisco*, No. 17-CV-03638-RS, 2022 WL 14813709, at \*6 (N.D. Cal. Oct. 25, 2022) (condominium conversion requirement that landlords offer tenants lifetime lease was not a physical taking); *335-7 LLC v. City of New York*, 524 F. Supp. 3d 316, 323 (S.D.N.Y. 2021), *appeal docketed*, No. 21-0823 (2d Cir. argued Mar. 30, 2022) (rent control regulation "requir[ing] landlords to renew leases for rent-stabilized tenants and some successors" and restricting landlords' ability to evict tenants was not a physical taking).

The established case law applying a multi-factor test for takings challenges to regulations of the rental housing market, rather than the per se test under the physical takings doctrine, reflects the significant public policy interests underlying such regulations. State and local governments have a profound interest in ensuring housing stability, which is crucial to the health and welfare not only of individual tenants, but also local economies and whole communities. *See Fisher v. City of Berkeley*, 37 Cal. 3d 644, 652 (Cal. 1984), *aff'd sub nom. Fisher v. City of Berkeley, Cal.*, 475 U.S. 260 (1986); Manheim, at 943–44. Regulations of

the landlord-tenant relationship intend to avoid these disruptions, and they are such a core and historically recognized power of local governments that they typically cannot be viewed as takings without the individualized analysis required by *Penn Central*. *See Loretto*, 458 U.S. at 440; *see also Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986). Indeed, temporary restrictions on owners' right to evict tenants have been upheld as non-takings for over a century. *See, e.g.*, *Block v. Hirsh*, 256 U.S. 135, 157–58 (1921) (Washington, D.C. war-time regulation controlling rents and prohibiting eviction except in cases of owner occupancy did not violate the Takings Clause).

States' and cities' interest in ensuring housing stability is at its peak during times of emergency—especially where, as here, an increase in the number of unhoused people would likely increase the rate of transmission of a deadly disease. The COVID-19 pandemic wreaked havoc in Washington and across the country. As of August 31, 2022—the date Seattle's six-month defense to eviction expired—over 1,785,000 people had contracted COVID-19, and nearly 14,000 people had died from COVID-19 in Washington. *See* Centers for Disease Control and Prevention, *COVID Data Tracker: Trends in Number of COVID-19 Cases*

13

*and Deaths in the US Reported to CDC, by State/Territory*, http://bit.ly/3Wm4ZLB (last visited Jan. 11, 2023). Unhoused people are at increased risk of contracting SARS-CoV-2 and of developing severe COVID-19 symptoms relative to housed people. *See* Melissa Perri et al., *COVID-19 and people experiencing homelessness: challenges and mitigation strategies*, 192 Canadian Med. Ass'n J. E716 (June 29, 2020), https://bit.ly/3zsHvM9. Restrictions on eviction, among other regulations such as rent control, have long been a crucial tool for state and local governments to protect vulnerable tenants from displacement. Manheim, at 954–55; *see also* Anjalika Nande et al., *The effect of eviction moratoria on the transmission of SARS-CoV-2*, Nature Communications (Apr. 15, 2021), https://www.nature.com/articles/s41467-021-22521-5 (concluding eviction moratoria are an important component of COVID-19 control).

Washington and Seattle are not unique in desiring to prevent displacement of tenants during the COVID-19 pandemic or other types of emergencies. *See supra* note 5 (string cite of cases upholding state and local eviction moratoria during the COVID-19 pandemic). To be sure, the eviction moratoria, like most other regulations of the landlord-tenant relationship, had the effect of "transfer[ring] wealth from landlords to

tenants." *Yee*, 503 U.S. at 529. However, "the existence of the transfer in itself does not convert regulation into physical invasion." *Id.* at 529–30. Were courts to equate regulations that protect tenants from displacement with "forced occupation" constituting a per se, physical taking of property, as Appellants urge (at 37), state and local governments' ability to effectively protect tenants from displacement—especially in times of emergency—would be severely and impracticably curtailed. Indeed, under Appellants' theory even regulations requiring a period of notice before evicting a tenant would qualify as physical takings requiring compensation.

To be sure, there are limited situations in which a rental housing regulation may go beyond regulating voluntarily entered landlord-tenant relationships and effect a physical taking. Consistent with the principles set forth in *Yee* and related precedent, the case law reflects that a regulation affecting the landlord-tenant relationship might constitute a physical taking where it deprives the owner of their reversionary interest.[6] It is for this reason important to clarify that, despite

---

[6] *See Yee*, 503 U.S. at 528 (distinguishing between regulation restricting a property owner's ability to evict tenants and compelling owner "to refrain in perpetuity from terminating a tenancy"); *cf. 335-7 LLC*, 524 F.

Appellants' assertions, the District Court did not hold that Appellants "waived a future physical takings claim." Br. of Appellants at 30; *see also id.* at 38. Yet the eviction moratoria did not deprive Appellants of their reversionary interest. The eviction moratoria preserved landlords' ability to evict tenants where necessary to protect the health or safety of others, and the State's eviction moratorium also made an exception where the landlord intended to "personally occupy" or "sell the property." *See* ER-736.

The eviction moratoria also did not forgive any unpaid rent. The eviction moratoria merely temporarily—not "interminably," Br. of Appellants at 23—restricted landlords' ability to evict tenants. Appellants' takings claim is therefore appropriately considered a regulatory takings claim because the regulations they challenge—temporary eviction moratoria—regulate landlords' relationships with their invited tenants and preserve landlords' rights of reversion.

---

Supp. 3d at 330 ("[G]iven the right to evict [for cause] . . . , 'the tenancies are not perpetual' and 'the owners are not deprived of their reversionary interest.'" (quoting *Higgins*, 83 N.Y.2d at 171–73)); Manheim, at 991 (lifetime leases or leases of indefinite duration are not permanent, physical occupations because "possession will revert to the landlord when the tenant vacates, voluntarily or pursuant to just cause eviction").

16

The applicable case law thus demonstrates that reflexively dubbing any restrictions on a landlord's ability to evict a tenant a per se taking that must be compensated is not appropriate. Rather, the question whether a regulation of the landlord-tenant relationship amounts to a taking is answered by applying the *Penn Central* factors. The Takings Clause is intended to justly compensate property owners for costs "which, in all fairness and justice, should be borne by the public as a whole," *Tahoe-Sierra*, 535 U.S. at 321 (quotation omitted), not to insulate landlords from a tradition of regulation that predates the Constitution, *see Munn v. Illinois*, 94 U.S. 113, 125–26 (1876). This Court should thus reject Appellants' attempt to use the physical takings doctrine "as an end-run around established regulatory-takings jurisprudence." *See Rancho de Calistoga*, 800 F.3d at 1087. Any takings challenge to the eviction moratoria sounds in the regulatory takings doctrine and the District Court properly rejected Appellants' physical takings theory.[7]

---

[7] Because Appellants did not pursue a regulatory takings theory, the Court need not evaluate the *Penn Central* factors. If it were to do so, however, that analysis would show that the eviction moratoria did not effect a compensable regulatory taking. *See, e.g.*, *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 165 (S.D.N.Y. 2020), *appeal dismissed sub nom. 36 Apartment Assocs., LLC v. Cuomo*, 860 F. App'x

**B. The case law on which Appellants rely does not change the takings claim analysis.**

Appellants marshal several cases and theories in arguing that a temporary restriction on landlords' ability to evict an invited tenant amounts to government-sanctioned, indefinite intrusion by an uninvited third party. But none of Appellants' arguments change the fact that regulations of the landlord-tenant relationship—including the eviction moratoria at issue—do not effectuate a per se, physical taking except under the extreme scenario, not implicated here, discussed above. *See supra* pages 15–16.

First, Appellants misconstrue *Yee*. They paint *Yee* as a challenge only to a local rent control ordinance and not to restrictions on mobile home park owners' ability to evict tenants. *See* Br. of Appellants at 34–35, 39. Yet *Yee* certainly did involve a prohibition on eviction. Yee challenged a local mobile home rent ordinance "against the backdrop" of a state statute prohibiting eviction of mobile home park tenants except under certain circumstances. 503 U.S. at 523–24. The statute's limitation on eviction was central to Yee's argument that a physical taking had occurred. *Id.* at

---

215 (2d Cir. 2021) (New York's eviction moratorium effective during COVID-19 pandemic was not a regulatory taking).

526–527. The Supreme Court nonetheless held that "no government" had effected a physical taking because mobile home park owners elected to rent their property in the first instance, and the restrictions on eviction did not force property owners "to refrain in perpetuity from terminating a tenancy." *Id.* at 528.

Although they attempt to distinguish *Yee*, Appellants succeed only in highlighting the similarities between the relevant facts of that case and this one. As in *Yee*, Appellants "were free to evict" tenants in certain circumstances, *see* Br. of Appellants at 35 (citing *Yee*, 503 U.S. at 524); here, where the tenant posed a threat to health or safety of others. *See* ER-736; CitySER-216. The State's eviction moratorium also permitted eviction where the landlord intended to "personally occupy" or "sell the property." *See* ER-736. Also as in *Yee*, Appellants object to "possession at a specific and undesirable price point," Br. of Appellants at 34; they wished to evict only those tenants who could not pay their full rent due to the COVID-19 pandemic while the eviction moratoria were in effect. Most pertinently, the Supreme Court in *Yee* held that the governmental restrictions on rent and on mobile home park owners' ability to evict tenants did not amount to being forced to continue renting their property

to tenants in perpetuity. 503 U.S. at 528. Washington's and Seattle's eviction moratoria, which likewise temporarily prohibited evictions except under specified circumstances, *contra* Br. of Appellants at 23–24, similarly did not amount to forcing landlords to continue renting to their tenants forever. Under *Yee*, then, any physical takings challenge to the eviction moratoria is off the table.

Second, although the Eighth Circuit held that landlords challenging Minnesota's COVID-19 eviction moratorium stated a physical takings claim, that court's reasoning is flawed. As do Appellants, the Eighth Circuit mischaracterized the regulations at issue in *Yee* as *not* "depriv[ing] landlords of their right to evict," *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022), even though the regulations at issue in that case in fact prevented mobile home park owners from evicting tenants unless the owners were changing the use of their land— and even then, eviction required a six- or twelve-month notice. *Yee*, 503 U.S. at 526–28. Courts have found *Heights Apartments*' reasoning unpersuasive. *See Williams*, 2022 WL 17169833, at *11; *Gallo*, 2022 WL 2208934, at *9. In any case, *Heights Apartments* is distinguishable

because the eviction moratorium at issue there had no specified end date. 30 F.4th at 725.

Third, Appellants quote a sentence, without elaboration, of the Supreme Court's decision in *Alabama Association of Realtors v. HHS*, that a moratorium preventing landlords "from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." Br. of Appellants at 31 (quoting 141 S. Ct. 2485, 2489 (2021)). That sentence does not alter the analysis of physical takings claims. The merits of a Takings Clause challenge to the Center for Disease Control's temporary eviction moratorium were not before the Court. Nor did the Court purport to overrule or abrogate its decisions that address the Takings Clause, such as *Yee* or *Cedar Point*. *See GHP Mgmt. Corp.*, 2022 WL 17069822, at *3 (concluding that *Alabama Ass'n of Realtors* cannot be read to abrogate *Yee*).

Fourth, for the reasons discussed in Appellees' briefs, *see* Br. of Def.-Appellee Robert W. Ferguson at 29–36; Br. of City of Seattle at 31–33, Appellants fail to show that the eviction moratoria were equivalent to one or another form of easement under Washington law; indeed, they do not

seem fully convinced of the analogy themselves. *See* Br. of Appellants at 27, 28 (arguing that the eviction moratoria "could . . . be viewed as a negative easement" and "[i]n some respects, . . . could be viewed as an affirmative easement"). In any case, Appellants' easement argument fails because its premise is wrong: Appellees did not "t[ake] control of the right to enter and use" Appellants' properties. *Id.* at 27. Nor did Appellees appropriate physical land for themselves or the general public or otherwise force landlords to grant an easement to the general public; only pre-existing tenants selected by the landlord benefitted from the moratoria. As discussed exhaustively above, neither the State nor Seattle forced Appellants to permit the entry onto their property of any uninvited third party. Nor did Appellees "t[ake] control" of the use of Appellants' property. Appellees did not impose a new use on Appellants' property, nor did they assume control of managing the properties or appropriate rent for themselves; they merely placed a temporary restriction on a certain use of their property, as so many regulations of the landlord-tenant relationship do.

Finally, Appellants cite several cases for the proposition that "the effect of [Appellees'] eviction bans was no different than the government

physically invading and occupying the rental property itself." Br. of Appellants at 15, 15 n.1. But each of these cases is distinguishable for a key reason: in all of them, the government commandeered or condemned private property, uninvited by the owners or leaseholders of the property, and used it for governmental purposes. None of those cases entailed regulations affecting the relationship between the property owners or leaseholders and their invitees. And of course, the Supreme Court was aware of those cases when it decided *Yee*, which post-dates them all.

## C. *Cedar Point* reaffirmed, without expanding, longstanding physical takings doctrine.

The Supreme Court's recent *Cedar Point* decision reaffirms that this case does not involve a physical taking. The Court took the opportunity in *Cedar Point* to clarify two points. First, when "the government has physically taken property for itself or someone else," it has effected a "physical appropriation of property," and "a *per se* taking has occurred," regardless whether the government's action is garbed as a regulation. 141 S. Ct. at 2072. Second, as the Court had already made clear in previous cases, the government's physical appropriation of property need not be continuous to be a per se physical taking. *Id.* at 2075. The Court did not redefine physical takings doctrine in *Cedar Point*; rather, it

summarized the existing takings case law to elucidate the line between physical and regulatory takings. The Court reiterated that takings challenges to governmental restrictions on the use of property are regulatory takings claims and are subject to the *Penn Central* balancing test. *Id.* at 2072.

Most relevant to the issues here, the Court specified in *Cedar Point* that a regulation effects a physical taking where it "appropriates for the enjoyment of *third parties* . . . the owners' right to exclude." *Id.* (emphasis added); *see also id.* at 2071 ("When the government, rather than appropriating private property for itself or a *third party*, instead imposes regulations that restrict an owner's ability to use his own property, [the *Penn Central*] standard applies." (emphasis added)). As discussed above, the Supreme Court has stated on multiple occasions that tenants are invitees of the property owners and *not* uninvited third parties. *See Loretto*, 458 U.S. at 440 (distinguishing cases affirming states' "broad power to regulate . . . the landlord-tenant relationship" from government authorization of "the permanent occupation of the landlord's property by a third party"). *Cedar Point* does not purport to displace, expressly or impliedly, the well-settled case law distinguishing between regulations

24

permitting the intrusion of third parties onto private property, on the one hand, and those that regulate an existing use of property or the relationship between property owners and their invitees, on the other hand. *Cedar Point* is thus consistent with *Yee* and other cases that analyze takings challenges to regulations of the landlord-tenant relationship, which distinguish between uninvited third parties and invited tenants.[8]

The post-*Cedar Point* case law is consistent with this analysis. Courts agree that *Cedar Point* did not expand the physical takings doctrine, but instead "reiterated *Tahoe-Sierra*'s distinction between physical appropriations and use restrictions." *301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1381 (8th Cir. 2022). Beyond that, many courts that have interpreted the *Cedar Point* decision have highlighted that its holding addressed a "unique, narrow question." *Hardy v. United States*, 156 Fed. Cl. 340, 344–45 (2021); *see also Blevins v. United States*,

---

[8] Governments may also protect the rights of uninvited visitors to access private property without compensating the owners in a variety of circumstances, including numerous "background restrictions on property rights" and "health and safety inspection regimes." *Cedar Point*, 141 S. Ct. at 2079. Nor do property owners have a right to compensation for instances of trespass. *Id.* at 2078–79.

158 Fed. Cl. 295, at 305 (Fed. Cl. Feb. 18, 2022) (same, quoting *Hardy*); *Munzel v. Hillsborough Cnty.*, No. 8:21-CV-2185-WFJ-AAS, 2022 WL 671578, at *4 (M.D. Fla. Mar. 7, 2022) (observing that *Cedar Point* is consistent with previous takings precedents and declining to consider governmental action a physical taking where it "does not involve an agricultural access regulation given to labor organizations to enter property to solicit support for unionization").

Even more to the point, courts have almost uniformly rejected property owners' attempts to use the *Cedar Point* opinion to expand the physical takings doctrine by treating regulations of the landlord-tenant relationship like requirements that property owners admit uninvited third parties. In *Farhoud v. Brown*, for example, the landlord plaintiffs argued that a COVID-19-related eviction moratorium effected a per se taking. No. 3:20-cv-2226-JR, 2022 WL 326092, at *9 (D. Or. Feb. 3, 2022). The court held that *Yee*, not *Cedar Point*, governed the landlords' takings claim, because the eviction moratorium granted "no right to third parties to access Plaintiffs' properties. Instead, only those tenants to whom Plaintiffs ha[d] already granted possession [could] remain on Plaintiffs'

property." *Id.* at \*10.[9] Because the eviction moratoria "did not require that [landlords] allow third parties to enter and take access to their property," they effected a temporary restriction on landlords' use of their property, not a physical taking. *Gonzalez*, 504 P.3d at 904. Even outside of the landlord-tenant context, courts have consistently rejected property owners' arguments that *Cedar Point* expanded the physical takings doctrine.[10] *Cedar Point*, in short, has no bearing on Appellants' takings claim.

## CONCLUSION

For the reasons stated above and in Defendants-Appellees' filings, this Court should affirm the decision of the District Court.

---

[9] *See also DiVittorio v. Cnty. of Santa Clara*, No. 21-CV-03501-BLF, 2022 WL 409699 (N.D. Cal. Feb. 10, 2022); *Jevons*, 561 F. Supp. 3d 1082; *Bldg. & Realty Inst. v. New York*, No, 19-CV-11285 (KMK), 2021 WL 4198332 (S.D.N.Y Sept. 14, 2021); *S. Cal. Rental Hous. Ass'n*, 550 F. Supp. 3d 853.

[10] *See, e.g.*, *Pavlock v. Holcomb*, 35 F.4th 581, 590 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 374 (2022); *Golf Vill. N., LLC v. City of Powell, Ohio*, 14 F.4th 611 (6th Cir. 2021); *Blevins*, 159 Fed. Cl. 295; *Hinkle Fam. Fun Ctr., LLC v. Grisham*, 586 F. Supp. 3d 1118 (D.N.M. Feb. 17, 2022); *Hardy*, 156 Fed. Cl. 340; *KI Fla. Properties, Inc. v. Walton Cty.*, No. 3:20CV5358-RH-HTC, 2021 WL 5456668, at \*4 (N.D. Fla. Oct. 15, 2021); *Skatemore, Inc. v. Whitmer*, No. 1:21-CV-66, 2021 WL 3930808 (W.D. Mich. Sept. 2, 2021); *Valancourt Books, LLC v. Perlmutter*, 554 F. Supp. 3d 26 (D.D.C. July 23, 2021), *appeal docketed*, No. 21-5203 (D.C. Cir. argued Oct. 13, 2022).

Respectfully Submitted,

January 24, 2023

/s/ *Rachel L. Fried*

Rachel L. Fried
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
rfried@democracyforward.org

*Counsel for Amici Curiae*

28

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 22-35656 |

I am the attorney or self-represented party.

**This brief contains** | 5,725 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Rachel L. Fried | **Date** | 1/24/2023 |
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                     *Rev. 12/01/22*