No. 22-35656

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆

EL PAPEL, LLC, *et al.*,

*Plaintiffs-Appellants,*

v.

CITY OF SEATTLE, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:20-cv-01323-RAJ-JRC
(Hon. Richard A. Jones)

**BRIEF OF THE NORTHWEST JUSTICE PROJECT AS
*AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES
SEEKING AFFIRMANCE**

| | |
|---|---|
| Scott Crain | Erin M. Riley |
| NORTHWEST JUSTICE PROJECT | Matthew M. Gerend |
| 401 Second Ave. S., Suite 407 | Garrett A. Heilman |
| Seattle, WA 98104 | Adele A. Daniel |
| Tel: (206) 707-0900 | KELLER ROHRBACK L.L.P. |
| | 1201 Third Avenue, Suite 3200 |
| | Seattle, WA 98101 |
| | Tel: (206) 623-1900 |

*Attorneys for Northwest Justice Project*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae*

Northwest Justice Project states that it is a not-for-profit organization and does not

have a parent corporation and that no publicly held corporation owns 10% or more

of any stock or stake in it.

Dated: January 24, 2023          By: s/ Garrett A. Heilman

                                 *Counsel for Amicus Curiae*

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ........................................................................... ii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ..................................... 1

SUMMARY OF ARGUMENT ....................................................................... 2

ARGUMENT .................................................................................................. 4

    I.     Courts Have Long Approved of Regulations of the
         Landlord-Tenant Relationship. ...................................................... 4

    II.    The Moratoria Were Also a Proper Exercise of Police
         Powers in Response to a Public Health Emergency. ....................... 6

    III.   The Supreme Court's Takings Jurisprudence Does Not
         Consider Landlord-Tenant Regulations to Be Physical
         Takings. ...................................................................................... 9

# TABLE OF AUTHORITIES

**Cases**

*Andrus v. Allard*,
    444 U.S. 51 (1979) ........................................................................ 11

*Ballinger v. City of Oakland*,
    24 F.4th 1287 (9th Cir. 2022), *cert. denied*, 142 S. Ct. 2777 (2022) ................ 10

*Block v. Hirsh*,
    256 U.S. 135 (1921) ...................................................................... 7, 9

*CDK Glob. LLC v. Brnovich*,
    16 F.4th 1266 (9th Cir. 2021) ............................................................ 11

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021) ................................................................ 12, 13

*Chicago Bd. of Realtors, Inc. v. City of Chicago*,
    819 F.2d 732 (7th Cir. 1987) ............................................................. 5

*Christensen v. Ellsworth*,
    173 P.3d 228 (Wash. 2007) ............................................................... 5

*F.C.C. v. Fla. Power Corp.*,
    480 U.S. 245 (1987) .................................................................. 3, 10, 13

*Federal Home Loan Mortg. Corp. v. New York State Div. of Hous. &*
    *Cmty. Renewal*,
    83 F.3d 45 (2d Cir. 1996) ............................................................... 10

*Hall v. Feigenbaum*,
    319 P.3d 61 (Wash. Ct. App. 2014) ....................................................... 5

*HAPCO v. City of Philadelphia*,
    482 F.Supp.3d 337 (E.D. Pa. 2020) ....................................................... 5

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) ..................................................................... 11

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) ..........................................................................................7

*Jevons v. Inslee*,
  561 F. Supp. 3d 1082 (E.D. Wash. 2021), *appeal docketed*, No. 22-
  35050 (9th Cir. 2022) .....................................................................................4

*Lindsey v. Normet*,
  405 U.S. 56 (1972) ..........................................................................................5

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ....................................................................... 3, 10, 11, 13

*PruneYard Shopping Center v. Robins*,
  447 U.S. 74 (1980) ................................................................................. 12, 13

*Rental Hous. Ass'n v. City of Seattle*,
  512 P.3d 545 (Wash. Ct. App. 2022) ...........................................................4, 6

*Silver v. Rudeen Mgmt. Co., Inc.*,
  484 P.3d 1251 (Wash. 2021) ...........................................................................4

*South Bay United Pentecostal Church v. Newsom*,
  140 S. Ct. 1613 (2020) ....................................................................................6

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ....................................................................... 3, 10, 11, 13

**Statutes**

Wash. Rev. Code § 59.12 ....................................................................................5

Wash. Rev. Code § 59.18.365–410 .....................................................................5

Wash. Rev. Code § 59.18.650(1) .........................................................................5

Wash. Rev. Code § 59.18.650(2)(d) .................................................................5, 6

**Rules**

Fed. R. App. P. 29(a)(2) .....................................................................................1

Fed. R. App. P. 29(a)(4)(E) ....................................................................1

**Regulations**

*Temporary Halt in Residential Evictions to Prevent the Further
Spread of COVID-19*, 86 Fed. Reg. 34010-02 (June 28, 2021).....................8, 9

**Other Authorities**

Alan Berube & Nicol Bateman, *Who are the workers already
impacted by the COVID-19 recession?,* Brookings Inst. (Apr. 3,
2020) ...........................................................................................7

Housing insecurity and the COVID-19 pandemic, CFPB (Mar. 2021) ...................8

Matthew Haag, *40% of N.Y. Tenants May Not Pay Rent This Month.
What Happens Then?*, N.Y. Times (June 22, 2020) ...........................................8

Rakesh Kochhar, *Unemployment rose higher in three months of
COVID-19 than it did in two years of the Great Recession*, Pew
Rsch. Ctr. (June 11, 2020).................................................................7

Richard Florida, *How the 'Rise of the Rest' Became the 'Rise of the
Rents'*, Bloomberg (Sept. 8, 2022) ....................................................8

Whitney Airgood-Obrycki *et al.*, *Renters' Responses to Financial
Stress During the Pandemic*, Joint Ctr. for Hous. Stud. Harvard
Univ. (Apr. 2021) ..........................................................................7

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Northwest Justice Project ("**NJP**") is Washington's largest publicly funded legal aid program. Each year NJP provides critical civil legal assistance and representation to thousands of low-income people in cases affecting basic human needs, including tenants facing eviction.

Many of NJP's clients faced dire health and financial consequences because of the COVID-19 pandemic. As a result of the pandemic, many Washingtonians lost income, were unable to pay rent, and would have faced eviction. *See* 4-ER-785–89. The Centers for Disease Control and Prevention ("**CDC**") and other public health experts determined that evictions would have led to a surge in the community spread of the deadly disease. CitySER-182; 4-ER-790.

To protect the health and safety of residents, Defendants-Appellees, the State of Washington and the City of Seattle (the "**State**" and "**City**," respectively), imposed temporary restrictions on when and under what circumstances landlords could evict tenants. Without those restrictions, modeling indicates that evictions

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for *amicus curiae* certifies that all parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amicus curiae* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

could have led to 59,008 additional COVID cases, 5,623 additional hospitalizations, and 621 additional deaths. 2-ER-305–310.

On appeal, Plaintiffs-Appellants El Papel, LLC and Berman 2, LLC (the "**Landlords**") challenge the temporary eviction moratoria as violative of the Takings Clause, claiming they constituted physical takings.[2]

Amicus NJP submits this brief in support of the State and City to preserve their traditional role and ability to regulate the economic relations between landlords and tenants, especially when necessary to protect the health and safety of the community.

## SUMMARY OF ARGUMENT

The State and City regulated *when* and *why* the Landlords could evict tenants, which is consistent with a host of other permissible regulations applicable to landlords in the heavily regulated residential leasing market. These temporary restrictions on evictions were further permissible as a proper exercise of police powers, as the moratoria were necessary to stanch the viral spread of a deadly disease during a global pandemic.

State and municipal governments have long exercised such "broad power to regulate housing conditions in general and the landlord-tenant relationship in

---

[2] On appeal, the Landlords dropped their challenges to other regulations the City enacted in response to the pandemic and abandoned their claims premised on the Contract Clause.

particular without paying compensation for all economic injuries that such regulation entails." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982). And they have exercised that power over all aspects of the landlord-tenant relationship, including the circumstances and timing of eviction.

The touchstone for determining whether such regulations constitute a physical taking is the concept of "required acquiescence." *See FCC v. Florida Power Corp.*, 480 U.S. 245, 251–53 (1987) ("This element of required acquiescence is at the heart of the concept of occupation."). Here, the Landlords were not forced to acquiesce to a physical invasion of their property because they *invited* the tenants onto their property. It is the Landlords' "invitation . . . that makes the difference[,]" as it distinguishes the moratoria from "an unwanted physical occupation" and confirms the moratoria are merely a "regulation of [Appellants'] use of their property." *Yee v. City of Escondido*, 503 U.S. 519, 532 (1992) (citation omitted).

NJP urges this Court to hold that the State and City's moratoria are within their "broad power" to regulate landlord-tenant relations without running afoul of the Takings Clause.

3

## ARGUMENT

### I.    Courts Have Long Approved of Regulations of the Landlord-Tenant Relationship.

When property owners like the Landlords in this case rent their property, they are voluntarily agreeing to grant a tenant the exclusive use and possession of their property as part of an economic relationship. In doing so, both the landlord and tenant subject themselves to a bevy of regulations that have long withstood judicial scrutiny. *See, e.g.*, *Rental Hous. Ass'n v. City of Seattle*, 512 P.3d 545, 557 (Wash. Ct. App. 2022) (noting that "tenants' rights, including the right to occupy, are heavily regulated in Washington and protected by state statutes"); *Jevons v. Inslee*, 561 F. Supp. 3d 1082, 1099 (E.D. Wash. 2021) (describing the landlord-tenant relationship as "heavily regulated in Washington," including through statutory provisions establishing a duty to keep the premises fit for human habitation, requiring notice of rent increases and termination, and regulating late fees, tenant screenings, and security deposits), *appeal docketed*, No. 22-35050 (9th Cir. 2022). The regulations "protect landlords' interests, but . . . also maximize[] their obligations." *Silver v. Rudeen Mgmt. Co., Inc.*, 484 P.3d 1251, 1255 (Wash. 2021). The intent is to "balance the bargaining positions between landlord and tenant in residential leasing." *Id.*

The conditions under which a landlord can evict a tenant are part of that balance in Washington and other States.[3] For example, Washington landlords cannot evict a tenant—or refuse to continue a tenancy or end a periodic tenancy—without permissible cause. *See* Wash. Rev. Code § 59.18.650(1) (2021); *see also id.* § 59.18.650(2) (defining the limited circumstances that constitute permissible cause). If they have cause, landlords still must comply with time, manner, and procedure regulations to evict a tenant. *See id.* §§ 59.12, 59.18.365–410. And landlords are required to give tenants a certain amount of time to vacate before they retake possession, depending on the reason the landlord intends to retake possession. *See, e.g.*, *id.* § 59.18.650(2)(d) (requiring 90 days' advance written notice). If landlords fail to comply with these requirements, they are precluded from evicting their tenants. *See, e.g.*, *Christensen v. Ellsworth*, 173 P.3d 228, 231 (Wash. 2007) (noncompliance with statutory method of process precludes court from exercising subject matter jurisdiction); *Hall v. Feigenbaum*, 319 P.3d 61, 65

---

[3] *See, e.g.*, *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 736–37 (7th Cir. 1987) (describing the "landlord-tenant relationship [a]s . . . heavily regulated" and noting that "[s]cores of state laws and common law tenets define relative rights and obligations of landlord and tenants"); *HAPCO v. City of Philadelphia*, 482 F.Supp.3d 337, 352 (E.D. Pa. 2020) (describing the residential leasing market as "heavily-regulated" and listing restrictions on landlords' ability to terminate leases, including restrictions on the reasons landlords can invoke to terminate leases and notices they must provide to terminate leases); *accord Lindsey v. Normet*, 405 U.S. 56, 68–69 (1972) (describing various states' laws governing defenses to eviction).

5

(Wash. Ct. App. 2014) (party providing improper notice may not maintain action or avail itself of the court's jurisdiction).

The State and City's temporary restrictions on evictions are akin to these and other permissible regulations of the landlord-tenant relationship in that each regulates the conditions and timing of evictions. For example, like Washington's for-cause eviction statute, the State eviction moratorium permitted a landlord to evict a tenant if the property owner wished to possess the property themselves or make it available for their immediate family. *Compare* Wash. Rev. Code § 59.18.650(2)(d), *with* 4-ER-723–737. And like Washington's statutes imposing notice requirements and restrictions on the timing of evictions, both moratoria limited when an eviction could occur. *See Rental Hous. Ass'n*, 512 P.3d at 558 (holding the moratoria do not constitute takings because "[t]he ordinances place timing restrictions on eviction, but otherwise do not change a pre-existing landlord-tenant relationship").

## II.     The Moratoria Were Also a Proper Exercise of Police Powers in Response to a Public Health Emergency.

"When [public] officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (second alteration in original) (citation omitted). The State and City's temporary eviction moratoria sought to mitigate the effect of an

unprecedented pandemic in Washington. The eviction moratoria were proper uses of the State and City's power to protect Washingtonians in the face of an enormous public health emergency. *See Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905) (state has broad regulatory discretion "to protect itself against an epidemic of disease which threatens the safety of its members"); *see also Block v. Hirsh*, 256 U.S. 135, 156 (1921) (Holmes, J.) (upholding eviction restrictions against constitutional challenge based on "exigency" of crisis posing a "danger to the public health").

The pandemic led to widespread unemployment in industries immediately impacted by the pandemic.[4] Forty percent of renters reported loss of income, including ten percent who lost all income and an additional thirteen percent who lost more than half of their income.[5]

---

[4] *See* Rakesh Kochhar, *Unemployment rose higher in three months of COVID-19 than it did in two years of the Great Recession*, Pew Rsch. Ctr. (June 11, 2020), https://www.pewresearch.org/fact-tank/2020/06/11/unemployment-rose-higher-in-three-months-of-covid-19-than-it-did-in-two-years-of-the-great-recession/; Alan Berube & Nicole Bateman, *Who are the workers already impacted by the COVID-19 recession?*, Brookings Inst. (Apr. 3, 2020), https://www.brookings.edu/research/who-are-the-workers-already-impacted-by-the-covid-19-recession/.

[5] Whitney Airgood-Obrycki *et al.*, *Renters' Responses to Financial Stress During the Pandemic* at 1, 7–10, 14–19, Joint Ctr. for Hous. Stud. Harvard Univ. (Apr. 2021), https://www.jchs.harvard.edu/sites/default/files/research/files/harvard_jchs_renter_responses_covid_airgood-obrycki_etal_2021.pdf (copy filed at ER-1124–1168).

The loss of income during the pandemic created a rental crisis. By March 2021, "over 8 million rental households" were behind on their rent.[6] According to the CDC, "[o]ver 4 million adults who [were] not current on rent perceive[d] that they [were] at imminent risk of eviction."[7] Despite this crisis, rents rose between May 2021 and May 2022 by more than 15 percent, to a nationwide average of more than $2,000.[8]

The looming evictions constituted a "fundamental public health threat": "the risk of large numbers of residential evictions contributing to the spread of COVID-19 throughout the United States."[9] The connection between evictions and the spread of COVID was observable: "[a]n analysis of observational data from State-based eviction moratoria in 43 states and the District of Columbia showed significant increases in COVID-19 incidence and mortality approximately 2-3

---

[6] *Housing insecurity and the COVID-19 pandemic* at 2, CFPB (Mar. 2021), https://files.consumerfinance.gov/f/documents/cfpb_Housing_insecurity_and_the_COVID-19_pandemic.pdf.

[7] *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, CDC (Mar. 28, 2021); *see also* Matthew Haag, *40% of N.Y. Tenants May Not Pay Rent This Month. What Happens Then?*, N.Y. Times (June 22, 2020), https://www.nytimes.com/2020/03/31/nyregion/coronavirus-landlords-eviction-tenants.html.

[8] Richard Florida, *How the 'Rise of the Rest' Became the 'Rise of the Rents'*, Bloomberg (Sept. 8, 2022, 5:00 AM), https://www.bloomberg.com/news/features/2022-09-08/why-did-housing-costs-explode-during-the-pandemic.

[9] *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 86 Fed. Reg. 34010-02 (June 28, 2021).

months after eviction moratoria were lifted[.]"[10] In Washington State, mathematical modeling estimated evictions could have led to between 18,235 and 59,008 additional COVID cases, between 1,741 and 5,623 additional hospitalizations, and between 191 and 621 additional deaths. 2-ER-305–310.

## III. The Supreme Court's Takings Jurisprudence Does Not Consider Landlord-Tenant Regulations to Be Physical Takings.

Although the eviction moratoria responded to an unprecedented emergency, they did not differ in kind from other landlord-tenant regulations that the U.S. Supreme Court has long approved. Over a century ago, the U.S. Supreme Court upheld a rent control ordinance imposed by the District of Columbia against facial takings and due process challenges. *Block v. Hirsh*, 256 U.S. 135 (1921). The Court found the statute in question to be a valid exercise of the police power because it was adopted only as a temporary emergency measure and provided the landlord a reasonable rent. *See id.* at 157. Here, the temporary eviction moratoria likewise were adopted only as a temporary emergency measure and did not cancel tenants' rent obligations, allowing landlords to seek unpaid rent when the moratoria expired. *See* State-Appellee's Br. at 7–8 and City-Appellee's Br. at 11–12.

---

[10] *Id.*

9

Even as the U.S. Supreme Court's takings jurisprudence has evolved, the Court has continued to affirm that such regulations do not constitute physical takings. In *Loretto*, the Court held that the "physical attachment of plates, boxes, wires, bolts, and screws" on a landlord's property constituted a physical taking. 458 U.S. at 438, 440. A physical taking, the Court explained, "is perhaps the most serious form of invasion of an owner's property interests. To borrow a metaphor, . . . the government does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." *Id.* at 435.

But "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee*, 503 U.S. at 527 (emphasis in original). "This element of required acquiescence is at the heart of the concept of occupation." *FCC*, 480 U.S. at 252. Thus, "where a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking." *Federal Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47–48 (2d Cir. 1996). As this Court has explained, "[w]hen a person voluntarily surrenders liberty or property . . . the State has not *deprived* the person of a constitutionally protected interest." *Ballinger v. City of Oakland*, 24 F.4th 1287, 1293–94 (9th Cir. 2022), *cert. denied*, 142 S. Ct. 2777 (2022) (alteration in

original) (citation omitted). "Once property owners 'voluntarily open their property to occupation by others,' they 'cannot assert a *per se* right to compensation based on their inability to exclude particular individuals.'" *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1282 (9th Cir. 2021) (quoting *Yee*, 503 U.S. at 530).

Where, as here, landowners invited tenants onto their property, the U.S. Supreme Court "has consistently affirmed that States have broad power to regulate [the] housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto*, 458 U.S. at 440. As such, the temporary eviction moratoria cannot have taken every strand of the bundle away from the Landlords. By renting their property and entering the highly regulated housing market, the Landlords already divided their bundle. *See Andrus v. Allard*, 444 U.S. 51, 65–66 (1979) ("[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety."); *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964) (rejecting claim that provisions of the Civil Rights Act of 1964 prohibiting racial discrimination in public accommodations effected a taking). And because the moratoria are traditional regulations governing whether and when a landlord can evict a tenant, *see supra* pp. 4–6, they fall well

within the "broad power" of the State and City to regulate the economic relations between landlord and tenant. *Loretto*, 458 U.S. at 440.

The U.S. Supreme Court recently reiterated this logic in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021). *Cedar Point* held that a California regulation requiring agricultural employers to allow union organizers on their property constituted a *per se* physical taking. *Id.* at 2077. The decision discussed an earlier right-of-access case, *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980). There, the Court considered the effect of a California Supreme Court decision, which had held that the State Constitution protected the right to engage in leafleting at a privately owned shopping center. *Id.* at 78. The shopping center argued that the decision had taken its right to exclude without providing just compensation. *Id.* at 82. The Court evaluated the right-of-access to private property as a regulatory taking, not a physical one. *Id.* at 83.

*Cedar Point* did not overrule *PruneYard*. Instead, the Court explained that the *PruneYard* access was distinguishable because, "[u]nlike the growers' properties, the [shopping center] was open to the public, welcoming some 25,000 patrons a day." *Cedar Point*, 141 S. Ct. at 2076. "Limitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public." *Id.* at 2077 (citing *Horne v. Department of Agric.*, 576 U.S. 350, 364

12

(2015) (distinguishing *PruneYard* as involving "an already publicly accessible" business)).

Just as the *PruneYard* shopping center invited the public onto its property, the Landlord Appellants here have invited tenants onto their properties. *See Yee*, 503 U.S. at 532 ("explain[ing] that 'it is the invitation . . . that makes the difference'") (quoting *FCC*, 480 U.S. at 252–53 ("The line which separates [rent control] cases from *Loretto* is the unambiguous distinction between a commercial lessee and an interloper with a government license.")). Like the rule allowing leafleteers at the shopping center, the temporary eviction moratoria merely regulate access that the landlord has already invited. The Landlords voluntarily granted tenants the exclusive use and possession of the property as part of an economic transaction. The moratoria regulate that transaction; they do not turn the tenant into the "interloper with a government license" discussed in *FCC* or the third-party union organizers at issue in *Cedar Point*. Thus, the City and State did not commit a physical taking when they restricted the circumstances in which tenants may be evicted.

13

RESPECTFULLY SUBMITTED this 24th day of January, 2023.

By: s/ Scott Crain
Scott Crain, WSBA #37224
NORTHWEST JUSTICE PROJECT
401 Second Ave. S, Suite 407
Seattle, WA 98104
Tel: (206) 707-0900

By: s/ Erin M. Riley
s/ Matthew M. Gerend
s/ Garrett A. Heilman
s/ Adele A. Daniel
Erin M. Riley, WSBA #30401
Matthew M. Gerend, WSBA #43276
Garrett A. Heilman, WSBA #48415
Adele A. Daniel, WSBA #53315
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900

*Attorneys for Northwest Justice Project*

14

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** 22-35656

I am the attorney or self-represented party.

**This brief contains 2,872 words**, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief (*select only one*):

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (*select only one*):

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Garrett Heilman  **Date**  January 24, 2023

15

## CERTIFICATE OF SERVICE

I hereby certify that on 24th day of January, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Garrett A. Heilman