No. 22-35656

———————————————

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————

EL PAPEL, LLC and BERMAN 2, LLC,

Plaintiffs – Appellants,

v.

ROBERT W. FERGUSON, in his official capacity as Attorney General of the State of Washington; BRUCE HARRELL, in his official capacity as the Mayor of the City of Seattle; and THE CITY OF SEATTLE, a municipal corporation,

Defendants – Appellees.

———————————————

On Appeal from the United States District Court
for the Western District of Washington
Honorable Richard A. Jones, District Judge
Case No. 2:20-cv-01323-RAJ-JRC

———————————————

### APPELLANTS' REPLY BRIEF

———————————————

JONATHAN M. HOUGHTON
Pacific Legal Foundation
3100 Clarendon Blvd.,
  Suite 1000
Arlington, VA 22201
Telephone: (916) 503-9041
JHoughton@pacificlegal.org

KATHRYN D. VALOIS
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL
33410
Telephone: (561) 691-5000
KValois@pacificlegal.org

ETHAN W. BLEVINS
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
EBlevins@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff – Appellant El Papel, LLC is a limited liability corporation organized under the laws of the State of Washington. It has no parent corporation and issues no shares. Plaintiff – Appellant Berman 2, LLC is a limited liability corporation organized under the laws of the State of Washington. It has no parent corporation and issues no shares.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF AUTHORITIES .................................................. iii

INTRODUCTION ........................................................1

ARGUMENT ...........................................................6

   I.   This Court Should Follow the Supreme Court and the Eighth Circuit ..........7

   II.  Physical Possession Is a Taking, Not an Adjustment to the Landlord-Tenant Relationship ........................................11

     A.   The Respondents' Position Is Contrary to *Loretto* .................13

     B.   Takings Are Determined by Property Rights.........................14

   III. *Yee* Is Not Applicable to This Physical Taking's Case ................17

   IV. Temporary Takings Are Still Takings ...........................22

CONCLUSION ........................................................25

CERTIFICATE OF SERVICE ............................................26

CERTIFICATE OF COMPLIANCE FOR BRIEFS .............................27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  141 S.Ct. 2485 (2021) .................................................................1, 7, 9

*Arkansas Game & Fish Comm'n v. United States*,
  568 U.S. 23 (2012) ......................................................................10, 24

*Armstrong v. United States*,
  364 U.S. 40 (1960) ..............................................................................9

*Ballinger v. City of Oakland*,
  24 F.4th 1287 (9th Cir.), *cert. denied*, 142 S.Ct. 2777 (2022) ....................21, 22

*Bldg. Owners & Managers Ass'n Int'l v. F.C.C.*,
  254 F.3d 89 (D.C. Cir. 2001) ............................................................16

*Burnham v. Superior Court of Cal., County of Marin*,
  495 U.S. 604 (1990) ............................................................................7

*Cedar Point Nursery v. Hassid*,
  141 S.Ct. 2063 (2021) ...........................................3, 6, 10–13, 23, 24

*County of Allegheny v. American Civil Liberties Union, Greater
  Pittsburgh Chapter*, 492 U.S. 573 (1989) ...........................................7

*E. Enterprises v. Apfel*,
  524 U.S. 498 (1998) ............................................................................3

*F.C.C. v. Fla. Power Corp.*,
  480 U.S. 245 (1987) ......................................................................13, 21

*First English Evangelical Lutheran Church of Glendale v. Los
  Angeles County*, 482 U.S. 304 (1987) ...............................................24

*Heights Apartments, LLC v. Walz*,
  30 F.4th 720 (8th Cir.), *denying reh'g and reh'g en banc*,
  39 F.4th 479 (2022) ...............................................................6, 10, 11

*Horne v. Dep't of Agric.*, 576 U.S. 350 (2015) ......................................15

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)............................. 2, 3, 5, 9, 10, 13–17, 19, 21–23

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ..............................................................7

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001)..........................................................................9, 15

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)...........................................................................4, 14

*PruneYard Shopping Ctr. v. Robins*,
    447 U.S. 74 (1980).................................................................................13

*Seminole Tribe of Fla. v. Florida.*,
    517 U.S. 44 (1996)...................................................................................7

*Sheet Metal Workers v. EEOC*,
    478 U.S. 421 (1986)..................................................................................7

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
    535 U.S. 302 (2002)................................................................................16

*United States v. Baird*,
    85 F.3d 450 (9th Cir. 1996) ....................................................................9

*United States v. Gen. Motors Corp.*,
    323 U.S. 373 (1945).........................................................................14, 16

*Yee v. City of Escondido*,
    224 Cal. App. 3d 1349 (1990) .................................................16, 18, 19

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)..................................... 3–6, 9–11, 16, 17, 19–22

## Other Authorities

Scalia, Antonin, *The Rule of Law as a Law of Rules*,
    56 U. Chi. L. Rev. 1175 (1989) ...........................................................8

## INTRODUCTION

The Supreme Court has determined that "preventing [owners] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S.Ct. 2485, 2489 (2021) (per curiam). Here, the facts establish that Appellants El Papel, LLC and Berman 2, LLC were prohibited from evicting tenants that had breached their leases and had lost their right to exclude. Tantamount to a forced occupation, the eviction moratoriums of Respondents Washington State and the City of Seattle stripped away the Appellants' right to possess and exclude and commandeered their private rental properties for public use. Therefore, this Court should reverse the lower court's determination and hold that these eviction bans were a physical taking contrary to the Fifth Amendment.

The divide between Appellants and Respondents is centered upon the landlord-tenant relationship and its relevance, or lack thereof, to whether a fundamental property right has been transferred. The government Respondents contend that because the tenants were initially "invited" via the signing of the lease and not a "stranger," no forced physical occupation can occur. But in making this argument, Respondents have lost sight of what takings cases are about, which is: Did the government take a property right away from the owner?

1

Before the Respondents' eviction bans, El Papel and Berman had the right to possess and to exclude. While that right was subject to the terms of the lease and to Washington's unlawful detainer statute, the Appellants still owned that fundamental property right.

After the Respondents' eviction bans, El Papel and Berman no longer had that right. It was taken by Respondents, who then granted tenants the right to possess El Papel's and Berman's private property and to exclude El Papel and Berman from it, regardless of the property owner's consent, the terms and conditions of the lease, the expiration of the lease, or unlawful detainer.

The fact that the tenant was "invited" months or years before by virtue of a lease doesn't change the fact that a fundamental property right was taken away by the Respondents. And the fact that the Respondent then gave those rights to tenants is proof that the right was taken away in the first place, not a means to claim that the right was never taken at all.

In their way, the Respondents do not disagree with this truism. Couching it in terms of the owner's property right being "paused" or "delayed" or that evictions were "temporarily prevented" or "on hold," simply masks the fact that Appellants' right to possess and exclude was no longer there.

Thus, as the Supreme Court noted in *Loretto*,

whether a permanent physical occupation has occurred presents relatively few problems of proof. ... Once the fact of occupation is

2

> shown, of course, a court should consider the *extent* of the occupation as one relevant factor in determining the compensation due. For that reason, moreover, there is less need to consider the extent of the occupation in determining whether there is a taking in the first instance.

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 437–38 (1982) (footnote omitted).

Focusing upon the property right also helps to reveal the flaw in the Respondents' reliance upon *Yee v. City of Escondido*, 503 U.S. 519 (1992).

The test for whether a taking has occurred is different for different property rights. For the right of possession and exclusion, either you have that right or you don't. Therefore, if you don't have that right anymore, the regulation that took it away is categorically unconstitutional. *See Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063 (2021).

The taking of the right to use (the right at issue in *Yee*) is often predicated upon some partial loss of value and is not as straightforward. While owners have a right to use their property in a profitable manner, at the same time, owners do not have a constitutional guarantee of any particular measure of profit. Thus, a property restriction that still allows for a profitable use, though less profitable than the owner wants it to be, may be constitutionally permissible depending on the circumstances of each case. *See E. Enterprises v. Apfel*, 524 U.S. 498, 523 (1998) ("government regulation often curtails some potential for the use or economic exploitation of private property and not every destruction or injury to property by governmental

3

action has been held to be a taking in the constitutional sense") (cleaned up). Therefore, the right to use is typically assessed under the ad hoc, multifactor test of *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978).

Returning then to *Yee*, this was a case about money and the loss of use—not the rights to possess and exclude. For the property owners in *Yee*,

> their argument is predicated on the unusual economic relationship between park owners and mobile home owners. Park owners may no longer set rents or decide who their tenants will be. As a result, according to petitioners, any reduction in the rent for a mobile home pad causes a corresponding increase in the value of a mobile home, because the mobile home owner now owns, in addition to a mobile home, the right to occupy a pad at a rent below the value that would be set by the free market.

503 U.S. at 526.

Contrary to Respondents, the *Yee* Court did not say that a landlord-tenant relationship precludes a physical takings claim. Rather, *Yee* held that the law applicable to physical takings cannot be used when the property right at issue is the right to use. *Id.* at 527 ("This argument, while perhaps within the scope of our regulatory taking cases, cannot be squared easily with our cases on physical takings.").

Hedging their bets, Respondents also seek to characterize the property right at issue in this case as the loss of economic use. But El Papel and Berman do not make that claim. And ironically, both Respondents also take great pains to point out that El Papel's and Berman's tenants are still required to pay rent and, hence, the

eviction moratoriums have no negative economic impact. How these eviction bans can be a noneconomic regulation of economic use remains unsolved.

The Respondents' position also places them at odds with several Supreme Court holdings, including one within *Yee*. The Respondents' contention that the landlord-tenant relationship precludes a physical takings claim is contradicted by *Loretto*, in which the Court stated that "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." 458 U.S. at 439 n.17. It cannot be that landlords can maintain physical takings claims, as *Loretto* commands, and that landlords cannot maintain physical takings claims, as the Respondents request.

Similarly, *Yee* confirmed that landlords do not abandon their Fifth Amendment rights upon signing a lease agreement: "a different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee*, 503 U.S. at 528. "Had the city required such an occupation, of course, petitioners would have a right to compensation, and the city might then lack the power to condition petitioners' ability to run mobile home parks on their waiver of this right." *Id.* at 531–32.

Lastly, the only Circuit Court of Appeals to confront whether an eviction moratorium was an unconstitutional physical taking was the Eighth Circuit in

*Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022), *denying reh'g and reh'g en banc*, 39 F.4th 479. And in keeping with the above and contrary to the lower court here, the Eighth Circuit eschewed the rent control jurisprudence of *Yee* in favor of the physical takings jurisprudence in *Cedar Point Nursery*. *Id.* at 733. This Court should hold the same. These eviction bans commandeered private property for public use and were a physical taking contrary to the Fifth Amendment.

## ARGUMENT

"The right to exclude is [not] an empty formality, subject to modification at the government's pleasure. On the contrary, it is a fundamental element of the property right, that cannot be balanced away." *Cedar Point Nursery*, 141 S.Ct. at 2077–78. As such, physical takings impart categorical liability upon the transfer of that right. *Id.* at 2074.

In this case, the Respondents' eviction bans were a physical occupation of Appellants' rental properties in the name of public pandemic housing. Upon the Respondents' unilateral decree, occupants were granted the right of possession in someone else's private property and the right to exclude the owners of that property, irrespective of the owner's consent, the lease, and the law of unlawful detainer. The effect of Respondents' eviction bans was no different than the government physically invading and occupying the rental property itself.

6

## I.    This Court Should Follow the Supreme Court and the Eighth Circuit

Both Respondents dismiss the Supreme Court's *Alabama Association of Realtors* case, arguing that whether the CDC had the authority to enact a nationwide eviction moratorium has no relevance here. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S.Ct. 2485 (2021). But "when an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which [courts] are bound." *Seminole Tribe of Fla. v. Florida.*, 517 U.S. 44, 67 (1996) (citing *Burnham v. Superior Court of Cal., County of Marin*, 495 U.S. 604, 613 (1990)) (exclusive basis of a judgment is not dicta) (plurality); *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) ("As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law.") (Kennedy, J., concurring and dissenting); *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 490 (1986) ("Although technically dicta, … an important part of the Court's rationale for the result that it reache[s] ... is entitled to greater weight ....") (O'Connor, J., concurring).

As the Ninth Circuit has explained, this "pragmatic approach to common law" "has been most notably explicated by Justice Scalia in a law-review article describing lower courts as being bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis.'" *Miller v. Gammie*, 335 F.3d 889, 900

(9th Cir. 2003) (citing Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)). Circuit courts "must recognize that [they] are an intermediate appellate court" and that the goal of consistent application of the law "must not be pursued at the expense of creating an inconsistency between our circuit decisions and the reasoning of state or federal authority embodied in a decision of a court of last resort." *Id*.

Therefore, within the Ninth Circuit "we hold that the issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.*

Returning then to *Alabama Association*, although the case is not identical, it is still controlling here. The Court's determination about the impact of the eviction ban on property owners was both necessary and material to the result that it reached. Indeed, had the Court determined the impact on owners to be lesser, it is possible that the outcome may have been different.

In reinstating the injunction against the CDC's eviction moratorium, part of the Court's rationale or "mode of analysis" was that the equities balanced in the property owner's favor. Said the Court:

> [T]he equities do not justify depriving the applicants of the District Court's judgment in their favor. The moratorium has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee

8

> of eventual recovery. Despite the CDC's determination that landlords should bear a significant financial cost of the pandemic, many landlords have modest means.

*Alabama Ass'n of Realtors*, 141 S.Ct. at 2489. This evaluation of the property owners' burden mirrors "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo v. Rhode Island*, 533 U.S. 606, 617–18 (2001) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

The Court also found that "preventing them from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Id*. at 618 (citing *Loretto*, 458 U.S. at 435). Pointedly, the Court in *Alabama Association* did not state that *Yee* applied. That omission is significant because if the taking of the right to exclude was a mere "adjustment of the landlord-tenant relationship," as the Respondents contend in citing to *Yee*, then the equities of the CDC's eviction moratorium may have balanced in the government's favor.

Therefore, because the Court's determination that the eviction ban violated the right to exclude was material to its decision to reinstate the injunction against the CDC, it is also a determination by which lower courts are bound. At the bare minimum, deference must be given. *United States v. Baird*, 85 F.3d 450, 453 (9th

9

Cir. 1996) ("we treat Supreme Court dicta with due deference"). Accordingly, the Respondents' eviction bans, in accord with *Loretto* and *Cedar Point*, were a physical taking that unconstitutionally deprived El Papel and Berman of their fundamental right to possess and exclude.

While not binding precedent, the Ninth Circuit should also follow the holding of the Eighth Circuit in *Heights Apartments, LLC*, 30 F.4th 720. It is the sole Circuit Court decision regarding whether a Covid-eviction moratorium may be an unconstitutional physical taking.

Respondent City of Seattle characterizes this determination as an "outlier," and both Respondents claim that the Eighth Circuit improperly distinguished *Yee* based upon a mistaken assumption that the *Yee* owners sought to exclude future tenants, not existing ones. *Heights Apartments*, 30 F.4th at 733 ("the landlords in *Yee* sought to exclude future or incoming tenants rather than existing tenants"). But to disregard the entirety of a decision based upon a single sentence is error. As Justice Ginsburg had noted, "the first rule of case law as well as statutory interpretation is: Read on." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012).

In the first instance, the Eighth Circuit held that *Cedar Point* was the controlling Supreme Court precedent.

> [*Cedar Point*] explained: Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred. It is immaterial

10

> whether the physical invasion is permanent or temporary, intermittent as opposed to continuous, or whether the government is directly invading the land or allowing a third party to do so. *Cedar Point Nursery* controls here.

*Heights Apartments*, 30 F.4th at 733 (internal citations omitted).

With respect to *Yee*, the Eighth Circuit also said, "*Yee*, which the [government] Defendants rely on, is distinguishable. The rent controls in *Yee* limited the amount of rent that could be charged and neither deprived landlords of their right to evict nor compelled landlords to continue leasing the property past the leases' termination." *Id.*

Thus, the Eighth Circuit's decision properly applied *Cedar Point* and equally properly, disregarded *Yee*. This Court should follow the Eighth Circuit and do likewise.

## II. Physical Possession Is a Taking, Not an Adjustment to the Landlord-Tenant Relationship

Both Respondents contend that the existence of the landlord-tenant relationship precludes a physical takings claim; because El Papel and Berman "invited" their tenants in at lease signing, the tenants are not "strangers," and the Appellants are not subject to a forced occupation. According to Respondents, it is a permissible governmental adjustment of the landlord-tenant relationship.

This "once-invited-you-can-stay-forever" rule finds no support in the text of the Fifth Amendment and would improperly transform all leases into life estates.

11

Regardless of whether it is proper to call the signing of a lease contract an "invitation," it is not unlimited in its terms, nor perpetual in time. In other words, landlords can rescind the "invitation," particularly when the "invitee" refuses to pay rent, refuses to abide by the material terms of the lease, or refuses to leave when the lease's "invitation" expires pursuant to its contractual term. To force El Papel and Berman to house occupants against their will, contrary to the lease, and irrespective of detainer laws, and then characterize those occupants as still "invited" due to the government's "mere adjustment of the landlord-tenant relationship," "is to use words in a manner that deprives them of all their ordinary meaning." *See Cedar Point Nursery*, 141 S.Ct. at 2075.

In order for an "invitation" at lease signing to perpetually bar a physical takings claim, the invitation itself must be both unlimited and indefinite. In other words, that is not a lease, but the conveyance of a life estate or a fee simple title. And if all that is necessary to confer limitless possession is the act of signing a lease, then Washington's Unlawful Detainer statute would be a nullity.

If "it is the invitation that makes the difference," as Respondents state repeatedly, then the tenants of El Papel and Berman were in possession at the government's invitation, as El Papel and Berman both stated that the invitation had long since expired for those tenants that failed to comply with the lease and those whose lease had come to an end. 6-ER-1347, 6-ER-1367. That is not voluntary

renting but forced occupation. *F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 252–53 (1987) ("this element of required acquiescence is at the heart of the concept of occupation" and transforms third parties into "interlopers with a government license").[1]

**A.  The Respondents' Position Is Contrary to *Loretto***

In *Loretto*, the Court explicitly rejected the same argument that the Respondents are making now:

> Teleprompter [the defendant utility company] notes that the law applies only to buildings used as rental property, and draws the conclusion that the law is simply a permissible regulation of the use of real property. We fail to see, however, why a physical occupation of one type of property but not another type is any less a physical occupation.

*Loretto*, 458 U.S. at 438–39. Thus:

> a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation. Teleprompter's broad "use-dependency" argument proves too much. For example, it would allow the government to require a landlord to devote a substantial portion of his building to vending and washing machines, with all profits to be retained by the owners of these services and with no compensation for the deprivation of space. It would even

[1] Both Respondents also point to an identical quote from *Cedar Point Nursery*, which, in turn, was distinguishing the determination in *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980), that "limitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public." *See* Brief in Opposition of Respondent City at 33 and Brief in Opposition of Respondent State at 31 (citing *Cedar Point Nursery*, 141 S.Ct. at 2077). This supports Appellants. The properties of El Papel and Berman were private residences closed to the public, not a business that was open to the public at large and certainly not the shopping center at issue in the free speech case that was *Pruneyard*.

allow the government to requisition a certain number of apartments as permanent government offices. The right of a property owner to exclude a stranger's physical occupation of his land cannot be so easily manipulated.

*Id.* at 439 n.17.

## B. Takings Are Determined by Property Rights

It may seem obvious, but the purpose of the Takings Clause is to protect property *rights*. As the Court stated in *United States v. Gen. Motors Corp.*, the term "property"

> denotes the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it .... When the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing, which we denominate ownership. ... The constitutional provision is addressed to every sort of interest the citizen may possess.

323 U.S. 373, 377–78 (1945); *see also Penn Central*, 438 U.S. at 142–43 (Rehnquist, J., dissenting) ("the Court has frequently emphasized that the term 'property' as used in the Taking Clause includes the entire 'group of rights inhering in the citizen's [ownership]'" (citation omitted)).

By focusing all of their attention on the landlord-tenant relationship, the Respondents ignore the transfer of the property right and, instead, place false emphasis on who the government gave that property right to after they took it. But if a thief steals your car, does it matter whether the thief keeps the car himself, gives

your car to a stranger, or gives it to your neighbor? Regardless of who gets it in the end, your car is still stolen, and the thief is still the one that took it.[2]

In this matter, the tenants of El Papel and Berman were given the right to possess rental property, and the right to exclude the property owner, regardless of the property owner's consent, regardless of their compliance with the lease, and regardless of the law of unlawful detainer. The tenants did not have those rights before. So how did they get them?

The Respondents appropriated them. By virtue of the eviction bans, the right of possession and exclusion was taken from El Papel and Berman and then given by Respondents to the tenants.[3] 6-ER-1347, 6-ER-1367; *see Horne v. Dep't of Agric.*,

---

[2] In the context of a *Penn Central* case regarding an owner's reasonable investment-backed expectations, Justice Scalia stated in a concurrence that:

> there is nothing to be said for giving [a windfall] to the *government*— which not only did not lose something it owned, but is both the *cause* of the miscarriage of fairness and the only one of the three parties involved in the miscarriage (government, naive original owner, and sharp real estate developer) which *acted unlawfully*—indeed *unconstitutionally.* Justice O'CONNOR would eliminate the windfall by giving the malefactor the benefit of its malefaction. It is rather like eliminating the windfall that accrued to a purchaser who bought property at a bargain rate from a thief clothed with the indicia of title, by making him turn over the unjust profit *to the thief.*

*Palazzolo*, 533 U.S. at 636–37 (Scalia, J., concurring).

[3] Respondents also discuss the fact that their respective eviction bans contained certain exceptions. But as explained at length in the Opening Brief, that does not

15

576 U.S. 350, 361–62 (2015) (the determinant for physical takings is whether the owner is deprived of control over the bundle of rights, not whether the government takes actual physical possession); *Bldg. Owners & Managers Ass'n Int'l v. F.C.C.*, 254 F.3d 89, 98 (D.C. Cir. 2001) ("a landlord's lease restrictions are enforceable property rights") (citing *General Motors*, 323 U.S. at 380–82).

But the fact that the Respondents gave those rights to tenants, as opposed to strangers, does not erase the fact that the Respondents forcibly took those property rights away. The tenants are merely the beneficiaries, not a means by which the Respondents can insulate themselves from taking property rights without just compensation. Interestingly, that is exactly what was said by the lower court decision in *Yee* that was ultimately affirmed by the Supreme Court. *Yee v. City of Escondido*, 224 Cal. App. 3d 1349, 1356 (1990), *aff'd*, *Yee v. City of Escondido*, 503 U.S. 519 (1992) ("If an owner's property has been taken by the government, it should be of no constitutional consequence to whom the property has been given.").

Thus, the Respondents' distinction between tenants and strangers is a false one. It is about the taking of a property right, not the identity of who the right is subsequently assigned to once the Respondents strip it away from their former owner. As *Loretto* explained, a physical taking is "without regard to whether the

---

erase the taking of the right to possess and exclude. It simply means that it was a partial physical taking as opposed to a full taking. *See, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002).

State, or instead a party authorized by the State, is the occupant." 458 U.S. at 432 n.9.

Respondents do not strictly contest that the rights once owned by El Papel and Berman were no longer there. But instead of using the word "taken," the Respondents say "paused" or "delayed" or that evictions were "temporarily prevented" or "on hold." Or, that the Appellants' loss of the right to possess and exclude was not the taking of a property right, but that it merely "delayed some landlords' recourse to eviction." *See* Brief in Opposition of Respondent State at 22. Collectively, the Respondents' arguments are like saying that the thief did not steal your car, he just delayed you driving it for a while until the police were able to recover it. Dressing up the language does not change the fact that a taking of a property right had occurred.

## III. *Yee* **Is Not Applicable to This Physical Taking's Case**

Both Respondents place great reliance upon *Yee*. But for the reasons set forth above, the existence of the landlord-tenant relationship does not obviate the Respondents' taking of El Papel and Berman's right to possess and exclude. Moreover, *Yee* is an economic use case, not a physical takings case.

It is instructive to review, in some depth, how the case came to the Supreme Court. The proceedings in the California Supreme Court clearly reflect that the case was about money, not possession:

17

> [P]laintiffs argue, the price of used mobilehomes in Escondido has increased dramatically since passage of the rent control ordinance due entirely to the fact that existing tenants are able to monetize the value to mobilehome owners living in a rent controlled jurisdiction. According to plaintiffs, Escondido's rent control ordinance constitutes a "taking" because it transfers this monetary interest from park owners—who would normally capture the value through increased rents—to tenants.

*Yee*, 224 Cal. App. 3d at 1352. But as the California court held, government price controls are not a regulatory taking:

> Mobilehomes and mobilehome park spaces are what economists refer to as complementary goods. Because they are used together, there is a direct and necessarily inverse relationship between the prices for complementary goods. For example, a decrease in the price of popcorn will cause an increase in the demand for popcorn poppers. Assuming a constant supply, this in turn will result in an increase in the price of popcorn poppers. The "complementary good" effect is basic to a free market economy.
>
> It is thus inevitable that where government acts to reduce (or at least limit increases in) the rental prices charged for mobilehome spaces, the price of mobilehomes will increase. This is particularly true where, as in California, other statutes generally compel a park owner to accept the purchaser of an existing tenant's mobilehome as a new tenant. This assures that the complementary good effect will be substantially limited to those mobilehomes currently occupying rent-controlled spaces.
>
> Recognizing that the function of government may often be to tamper with free markets, correcting their failures and aiding their victims, decisions of the United States and California Supreme Courts have established that local governments may, consistent with the police power, adopt rent control ordinances where imperfections in the unregulated market for rental housing allow landlords to charge excessive rents. The U.S. Supreme Court has repeatedly reaffirmed that rent control ordinances are not per se takings for the purposes of the Fifth Amendment's requirement of due compensation. …

> Where the price charged for a good or service is excessively high due to monopoly or other unfair conditions, it necessarily follows that the price for complementary goods and services will be artificially low. Where a government regulation purports to reduce the excessive and unfair price to a reasonable level, the mere fact that the price for complementary goods and services rises as a result does not transmute an otherwise reasonable price regulation into a compensable "taking."

*Id.* at 1352–53 (cleaned up).

Nonetheless, Yee attempted to claim that this rent control regulation, impacting economics, not possession, was a physical taking. "Instead of addressing the fundamental question, plaintiffs place principal emphasis on the Ninth Circuit's *Hall* opinion. (833 F.2d 1270.) *Hall* relies extensively on the U.S. Supreme Court's decision in *Loretto.*" *Id.* at 1354. But Yee's argument was summarily rejected. "When government acts to restore fair rents by imposing rent control, the fact that the price of used mobilehomes rises has not unreasonably 'taken' anything from the landlord, let alone caused a 'permanent physical occupation' of the landlord's property." *Id.* at 1357.

Thusly, the case arrived at the Supreme Court. The context of the decision below is important because it reflects the underlying determination that the Court actually affirmed and provides additional clarity to the quotes that Respondents rely on in their Opposition.

*Yee* did not hold that physical takings are a legal impossibility within the context of a residential rental property. Rather, affirming the same determination by

the court below, *Yee* held that the physical takings doctrine is inapplicable to an analysis of rent control regulations. *Yee*, 503 U.S. at 527 ("This argument, while perhaps within the scope of our regulatory taking cases, cannot be squared easily with our cases on physical takings."); *id.* at 528 ("While the 'right to exclude' is doubtless, as petitioners assert, 'one of the most essential sticks in the bundle of rights that are commonly characterized as property,' we do not find that right to have been taken from petitioners on the mere face of the Escondido ordinance."). Further, that a transfer of wealth enabled by rent control regulations was not unconstitutional. *Id.* at 529–30.

When viewed in its proper perspective, it is error to contend that *Yee* bars physical takings claim for all rental properties, as the Respondents do here. *Yee*, in fact, said the opposite; first noting that this case was not one in which the landowner was forced to house a tenant against his will, *id.* at 528, and furthermore, "had the city required such an occupation, of course, petitioners would have a right to compensation, and the city might then lack the power to condition petitioners' ability to run mobile home parks on their waiver of this right." *Id.* at 531–32.

Ironically, the Respondents are actually following the same failed strategy as the plaintiffs in *Yee*. Yee tried to apply physical takings law to a rent control case; the Respondents try to apply rent control law to a physical takings case; each looking

towards law that does not apply in order to avoid an unfavorable result. In the same way that the Supreme Court in *Yee* rejected the attempt, it should be so rejected here.

To that end, the other cases relied on by Respondents to support their claim that the eviction bans were only an "adjustment of the landlord-tenant relationship" are cases about rent or money, not possession or exclusion. Case in point, in their discussion of *Yee*, both Respondents cite to *Fla. Power Corp.*, 480 U.S. 245. In that case, certain utility companies voluntarily leased space on their poles to cable companies. 480 U.S. at 247. However, in order to prevent overcharging due to the utility companies' monopoly on utility poles, the Federal Communications Commission established rent controls. *Id.* at 247–48. The Court held that these rent control regulations were not a taking. *Id.* at 250–51. There was no claim of a physical taking, *id.* at 251 ("[N]othing in the Pole Attachments Act … gives cable companies any right to occupy space on utility poles or prohibits utility companies from refusing to enter into attachment agreements with cable operators."), but had there been, the outcome may have been different. *Id.* at 252 n.6 ("We do not decide today what the application of [*Loretto*] would be if the FCC in a future case required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements.").

The Respondents' citation to *Ballinger* is likewise unavailing. In that case, the central issue was not the taking of real property, but the taking of money. Eviction

was not precluded, nor were the owners prevented from taking possession of the real property that they owned. Rather, the dispute pertained to a local statute that requires an owner to pay certain relocation expenses to a tenant before the owner could move back into their home. *Ballinger v. City of Oakland*, 24 F.4th 1287, 1290–91 (9th Cir.), *cert. denied*, 142 S.Ct. 2777 (2022). The Court held that this "transaction cost" was a permissible regulation of this owner-tenant relationship. *Id*. at 1293. The owners, moreover, were not deprived of "a specific and identifiable pool of money," *id.* at 1294, but instead were required to pay what was akin to a tax or a user fee. *Id.* at 1296.

Considering the above, *Yee* does not apply.

## IV. Temporary Takings Are Still Takings

Both Respondents also place emphasis on the fact that the physical taking was temporary, not permanent. For example, the Respondent State recites that "the Supreme Court has made clear that a physical taking only occurs when the government subjects a property owner to a 'permanent physical occupation' of the owner's property. *Loretto*, 458 U.S. at 435." *See* Brief in Opposition of Respondent State at 20. The Respondent City makes similar arguments. *See* Brief in Opposition of Respondent City at 18, 23.

Particularly with regard to the Respondents' citation to *Loretto*, the Supreme Court's holding in *Cedar Point* refutes all that the Respondents claim to be true. Said the Court:

> In the decision below, the Ninth Circuit took the view that the access regulation did not qualify as a *per se* taking because, although it grants a right to physically invade the growers' property, it does not allow for permanent and continuous access "24 hours a day, 365 days a year." The dissent likewise concludes that the regulation cannot amount to a *per se* taking because it allows "access short of 365 days a year." That position is insupportable as a matter of precedent and common sense. There is no reason the law should analyze an abrogation of the right to exclude in one manner if it extends for 365 days, but in an entirely different manner if it lasts for 364.

> To begin with, we have held that a physical appropriation is a taking whether it is permanent or temporary. Our cases establish that compensation is mandated when a leasehold is taken and the government occupies property for its own purposes, even though that use is temporary. The duration of an appropriation—just like the size of an appropriation, bears only on the amount of compensation. For example, after finding a taking by physical invasion, the Court in *Causby* remanded the case to the lower court to determine "whether the easement taken was temporary or permanent," in order to fix the compensation due. 328 U.S. at 267–268, 66 S.Ct. 1062.

> To be sure, *Loretto* emphasized the heightened concerns associated with "[t]he permanence and absolute exclusivity of a physical occupation" in contrast to "temporary limitations on the right to exclude," and stated that "[n]ot every physical *invasion* is a taking." 458 U.S. at 435, n.12, 102 S.Ct. 3164; *see also id.*, at 432–435, 102 S.Ct. 3164. The latter point is well taken, as we will explain. But *Nollan* clarified that appropriation of a right to physically invade property may constitute a taking "even though no particular individual is permitted to station himself permanently upon the premises." 483 U.S. at 832, 107 S.Ct. 3141.

***

23

> The fact that the regulation grants access only to union organizers and only for a limited time does not transform it from a physical taking into a use restriction. Saying that appropriation of a three hour per day, 120 day per year right to invade the growers' premises "does not constitute a taking of a property interest but rather ... a mere restriction on its use, is to use words in a manner that deprives them of all their ordinary meaning." *Nollan*, 483 U.S. at 831, 107 S.Ct. 3141 (citation and internal quotation marks omitted).

*Cedar Point Nursery*, 141 S.Ct. at 2074–75 (2021) (cleaned up).

The Respondents also err in their claim that *Arkansas Game and Fish* and *First English* are inapplicable because of their differing fact patterns. The Fifth Amendment's Takings Clause pertains to private property rights taken by the government. In that respect, the use of eminent domain and the different types of regulatory takings are the same. What the former does by formal action, the latter does by regulation. And because the binding principle is the same, so must be the determination of constitutionality. Therefore, the point of these cases is that a forced transfer of title, whether permanent or temporary, is actionable. *Arkansas Game & Fish Comm'n*, 568 U.S. at 33 ("takings temporary in duration can be compensable"); *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 338–19 (1987) ("These cases reflect the fact that 'temporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation.") (citing cases).

Accordingly, that the Respondents' eviction ban was temporary as opposed to permanent does not change the fact that the Respondents took the right to possess and exclude away from El Papel and Berman.

## CONCLUSION

The Respondents' eviction bans were an uncompensated physical taking of Appellants' real property contrary to the Fifth Amendment. This Court should reverse and remand for further proceedings.

DATED: February 7, 2023.      Respectfully submitted,

Pacific Legal Foundation

 *s/ Jonathan M. Houghton*
JONATHAN M. HOUGHTON
KATHRYN D. VALOIS
ETHAN W. BLEVINS
*Attorneys for Plaintiffs – Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 *s/ Jonathan M. Houghton*
JONATHAN M. HOUGHTON

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Cir. Case Number: 22-35656

I am the attorney or self-represented party.

**This brief contains  6,392  words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATE: February 7, 2023.          _  s/ Jonathan M. Houghton  _
                                 JONATHAN M. HOUGHTON
                                 *Attorney for Plaintiffs – Appellants*

27